Certified Copy of
the original Document
Date: 3-23-A-D. 2003
by, Terry-Lee:
of Braunen

03 MAR 26 AM 11:27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

The Accused Sovereign
Captured Vi Et Armis
Larry-Eugene: Raugust
Not. Individually
Involuntary-Trustee
Vs.
UNITED STATES OF AMERICA
a Corporation - Plaintiff
Vs.
LARRY E. RAUGUST
A state created Legal Fiction
Trust - Defendant

) No. CR-02-197-RHW
) Affidavit(s)
) and special
) briefs and
) Exhibits
) 1, 2, 3,
) 4, 5, 6,
) 7, 8, 9, 10, 11

Affidavits and Speacial briefs
and Exhibits

1. Affidavit and Proclamation of Elector;
   and

2. Affidavit of Revocation of Implied
   Power of Attorney; and

3. Speacial Plea in Bar; and

4. Demand To Dismiss for Lack of Jurisdiction

5. Certiorari to court of appeals No. 93-1260

6. Federal Jurisdiction

26

7.  Committee on the Judiciary serial No. 67. (Testilying)

8.  It's all in the Name

9.  I'm not a Person, or an Individual or a Human

10. RCW 42-17-251          11. Exclusionary Rule

Definitions

All words and phrases in this brief are defined the same as all of my other briefs in Bovier's 1914 Edition Law Dictionary in Precedant.

The undersigned Sovereign man Affirms the claims and statements made here in are the truth and are True, correct, complete and certain and not misleading to the best of my current knowledge and Beliefs, so help me my Almighty Creator Yahwah.

The undersigned Affirms the above statements under the pains and Penalty's of perjury under the christian Laws and the Common Laws of our Land.

All Powers, Rights, Rules, Remedy's Retained
          All Rights Reserved

_Larry Eugene: Raugust_
not-Individually, Larry-Eugene: Raugust

Date: the 23 day the 03 month,
      Anno Domini 2003

//›
///
///
//›
//›

Affidavit(s) and Special Briefs     page 2 of 2     Larry-Eugene: Raugust

When recorded, return to:

_____

_____

_____

_____

## Affidavit and Proclamation of Sovereign Elector

With Notice and Praecipe to ___UNITED STATES DISTRICT COURT___

The definition for the words, terms, and phrases used hereon, in their lawful or legal tense, are found in Bouvier's Law Dictionary Anno Domini 1914 edition, (three volume set) in precedent. Words used hereon in their non-lawful or legal tense are found in Noah Webster's Anno Domini 1828 single volume dictionary in precedent.

## Affidavit and Proclamation

The undersigned ___Larry - Eugene ꞓ Raugust___ hereby declares that, being of sound and disposing mind and memory and not acting under duress, menace, fraud or undue influence of anybody whatsoever, do make, publish, proclaim, and hereby provide solemn and formal Notice of the following:

A. I am a Flesh and Blood [male/female] of ___Caucasion___ [race] descent, over the age of 18 years. The Flesh and Blood of my Body constitute the substantive **prima facia** Evidence in support of My claim to and possession of the **de jure** character of "Posterity," and the "Law of the Land" resides with Me. I am not a

B. I hold Preamble "Sovereign Citizenship" in The State of Washington through my domicile and de jure Common Law Natural Birthright through Blood and Descent, thereby establishing My Preamble Citizenship and Fundamental Unalienable Rights through Consanguinity in common with the Founding Fathers of the united States (of America Anno Domini 1789) the Republic, who came to This Land before Me. The Natural Inheritance of Birthright, Blood, and Descent is antecedent to all State and Federal Constitutions and not a consequence of them. I am a Sovereign Citizen of the united States (of America Anno Domini 1789) the Republic.

C. My domicile/location for over 30 days is:

___Larry - Eugene ꞓ Raugust___
by, ___2002 BAUER Rd___
City of ___ODESSA, Washington___

The State of Washington, Anno Domini 1878

D. **I am a Sovereign Elector** (under the Almighty Sovereign Creator), with the Right to participate and cast a Ballot(s) at local or State Elections. I have the Right and Authoritative Power to declare Myself a Candidate for a local or State Elective Office and to have My proper grammatically correct Name/Appellation printed in the form and manner I dictate on the "Elector Status Instrument" and/or on the Ballot for Election of Office (other than a Federal Elective Office) should I declare to seek such Elective Office.

**The foregoing Information is True, and Correct,** and therefore the Truth, the whole Truth and nothing but the Truth, so help me My Almighty Sovereign Creator [God].

**Wherefore,** the Undersigned _Larry ~ Eugene : Raugust_ has set my hand and mark this _23rd_ day, of the _3_ month, in the year of my Master Redeemer Yahshua the Messiah, A.D. _2003_.

**All My Rights, Freedoms, and Liberties Retained.**

---

Signed                                                          Absolute Sovereign Washington Elector

Witness                                          Witness

---

## Notice and Praecipe

1.  In the event you are unable or unwilling to comply with this Notice and Praecipe, duty requires that you either rebut point-by-point with particularity the claims herein or give explanation with particularity as to the reasons for your inability or unwillingness to perform. In the absence of such rebuttal and/or explanation, the Undersigned will demand a copy of your Oath of Fidelity and/or Oath of Office together with the policy number, and name and address of your bonding company. Furthermore, your failure either timely to rebut and/or explain your failure to perform under this Praecipe will constitute your acquiescence and assent by tacit procuration to conclusive evidence of your concurrence with the contents of the above stated Affidavit and Proclamation.

2.  You are hereby instructed to Well and Truly Conform the books, files [registry], and similar records of your office to the Particulars set forth herein and to show the Undersigned's correct Name/appellation as an Absolute Sovereign Washington Elector.

    Be aware, that you lack authority and are hereby prohibited from altering the Undersigned Christian or Family Name/Appellation and from imposing either an alias or address upon such as, but not limited to, Name(s), location(s), or item(s) labeled contrary to what I have stated herein. Any such alterations will be refused for cause and fraud.

    Any spellings of My Christian and Family Name/Appellation that use all capital letters or that truncate or transpose all or a portion thereof are misnomers and constitute evidence of an artifice to slander or libel My Character and to create a colorable *persona* under color of law for purposes of deceit and fraud.

**The foregoing Proclamation,** having been presented to you by the Undersigned, you are hereby instructed to perform hereunder and provide written confirmation of such performance to the Undersigned at the location stated in Paragraph "D" above within twenty (20) days.

**All My Rights, Freedoms, and Liberties Retained.**

---

Signed                                                          Absolute Sovereign Washington Elector

Affidavit of Elector Status              Page 2 of 2

District Court of the UNITED STATES
In and For the DISTRICT OF IDAHO

The Accused Sovereign man
Larry-Eugene: Raugust
Not Individually
Involuntary-Trustee

vs.

UNITED STATES OF AMERICA
A municipal corporation
AN Enterprise

Assumed -Plaintiff

vs.

LARRY E. RAUGUST
A state created legal fiction

Trust/Defendant

) Case No.: No. CR-02-197-RHW
)
) AFFIDAVIT
) by the Sovereign
) Revocation of Implied
) Power of Attorney
)      And
) Supporting Affidavit
)
)
)
)
)
)
)
)
)
)
)
)
)
)

AFFIDAVIT

Revocation of Implied Power of Attorney

Know all Men and Women by these Presents, that I, Larry-Eugene: Raugust

family, being first duly Affirm an Oath, deposes and says my yeas be yeas and

my nays be nays and;

page 1 of 5

1. My true and correct name/appellation is Larry-Eugene: Rangust, and my
primary Domicile is:                                          , not-domestic,
Idaho, Republic 1870 unless otherwise stated.  I have current Knowledge of
the matters contained within this Affidavit, and I am of consenting age and
fully competent to testify with respect to these matters.

2. I, Larry-Eugene: Rangust, as a Lawful North American Continent, American
National, Born on the Soil of the Sovereign Washington Country of the
Several Sovereign States, do hereby Wholly Rescind, Revoke, Cancel, Annul
and Terminate all Implied Powers of Attorney, in fact or otherwise, signed
by me, my Agent(s), Parents, parens patriae, implied in Law or by Trust,
Voluntary or Involuntary, with or without my informed Consent and or
Knowledge, as these Revoked Implied Power(s) of Attorney pertain to me in
the Past, nunc pro tunc, present-current, and the future.

3. Any other Evidence or Presumption to the contrary is hereby Rebutted.  Any
past signatures or authorizations on any Internal Revenue Service 1040'2,
W-4's, 1099's, 941's, etcetera, and/or Social Security Administration forms
(SS-5), and/or state(s) Drivers Licenses, and/or Vehicle registrations,
and/or Birth or Trust Certificates, and/or Voter Registrations, and/or any
other Franchises with any agency(s) of the Corporate Government(s) etc.,
were in Error and Involuntarily made under Threat, Duress, and Coercion
(TDC).  I hereby Revoke, Cancel, and render Null and Void, nunc pro tunc,
both Currently and Retroactively to the time of signing, any and all such
Contracts and/or Franchises.

4. That No man, woman, elected Official, public servant, bureaucrat,
Corporation, Government or state has any authority whatsoever to act on my

page 2 of 5

1    behalf, nor to represent, or re-pre-sent me in a Court of Law, nor any

2    Legislative or Judicial Tribunal, nor Any administration that binds me to

3    any Unconscionable Adhesion Contract(s) or Franchise(s) that I have Not

4    entered into Knowingly and willingly after full Disclosure of all facts.

5  5. I have made, constituted and Re-affirm my full Power of Attorney and

6    Sovereign Rights, Effective (ed) Immediately, over all my Private and

7    business Affairs.  I give and grant myself full Power and Authority to do

8    and to perform all and every act and things whatsoever necessary to be done

9    to ensure that the Unalienable and Sovereign Rights, secured by me under

10   the Laws and Covenants by my Absolute Sovereign Creator Yahweh, and the

11   Declaration of Independence A.D. 1776, the Organic Laws of and the

12   Constitution for The united States of the North American Continent, The

13   Common Law, and the State Constitution for the Sovereign Country of

14   *Idaho* A.D.1890, will be Honored, Respected and Protected.  I have

15   also given my sacred Oath to protect and defend The Constitution for the

16   united States of the Northern America against all enemies foreign or

17   domestic and against any form of tyranny.

18  6. I have already declared "sui juris" status in connection with my *private*

19   Property(s) and my name/appellation.  If any agency of any of the Corporate

20   government(s) disputes the above Affirmed Claimed "status" in connection

21   with the "name/appellation" Affirmed by my Oath and Sealed in this

22   Affidavit, I Demand any such party bring forward and produce all documents

23   and or Contracts or Franchises being "held-in-due-course," Pursuant to

24   U.C.C. 3-305.52 and U.C.C. 3-505, that create Any Legal disability to my

25   claimed "sui juris" Status and "alieni juris" relating to my

*page 3 of 5*

1    "Name/Appellation".  I am Not under any circumstances to be construed as to

2    a revocation of Any of my Sovereign Unalienable Rights thus Secured.

3                              Perjury Jurat

4    I, Larry-Eugene: Rangus, do hereby Affirm under the Laws and Covenants of my

5    Absolute Sovereign Creator Yahweh and under the Pains and Penalties of Perjury

6    under the Laws of the united States of America A.D. 1787 Pursuant to the Title

7    28 uSC § 1746(1) and executed "without the UNITED STATES," that the foregoing

8    is True, Correct, Complete and Certain to the best of my Belief and current

9    informed Knowledge.  I now affix my signature and official Seal to all of the

10   above Affirmation(s) with Explicit Reservation and Retention of all my

11   Unalienable Rights, Without Prejudice to any of those Rights pursuant to

12   U.C.C. 1-103.6 and U.C.C. 1-207, 1-208.

13        Further the Sovereign Elector Sayeth Not.

14        Respectfully,                        Date: _____ _____ _____

15

16   _____

17   Seal of, Larry-Eugene: Rangus, The Sovereign In Propia Persona

18

19

20   The State of  Idaho  )

21   The County of        )                    Affirmed Notary

22   On _____ _____ before me, Larry-Eugene: Rangus appeared and proved to

23   me by satisfactory evidence to be The Sovereign-American-National whose name

24   is subscribed to the within instrument and executed, the same in his Sovereign

25   Capacity with his signature on said instrument before me.

                          page 4 of 5

Witness my hand and Official Seal.

_____    Affiant Picture I.D. _____

My commission expires _____    Type of I.D. _____

page 5 of 5

Exhibit - 3

CHELAN COUNTY DISTRICT COURT

STATE OF WASHINGTON,

        Plaintiffs,

   vs.

STRAND, RODNEY DALE,

        Defendant/Trust

And "The People of the State of
Washington"
By intervention

    ) **Cause No.**  C0349546, C0349547, &
    ) **3988CPR**
    )
    ) **Special Plea in Bar**
    )
    ) Plaintiff is a Nul tiel
    ) corporation,
    ) and
    ) Coram Non Juidicae
    )

Comes now the People of the State of Washington and make this
special plea in bar in order to affirmatively aver that the
plaintiff to this action is a nul tiel corporation, and that this
court is without judicial power. This special plea in bar is to
attack the prerequisite jurisdictional requirements necessary for
jurisdiction. This plea in bar does not address the elements, or
the sufficiency of the plaintiff's pleading, but is intended to
raise jurisdictional matters that specially bar this alleged

Page: 1 of 11

Memo in support and Offer of Proof of no judge in the premises

court from further action. This plea is recognizable at common law, and by this courts own rules as follows:

While recognizing that CRLJ 2 allows only one form of action to be known as "civil action", the court rules provide by rule 8, and 9 the ability of a party to raise affirmative defenses attacking the capacity of the plaintiff, and the court. CRLJ 8(c)

"In pleading to a preceding, pleading, a party shall set forth affirmatively….and **any other matter** constituting an avoidance or affirmative defense." (Emphasis mine).

CRLJ 9(a) sets frth the required criteria to attack the capacity of a party to sue.

"**When a party desires to raise an issue as to the legal existence of any party** or the capacity of any party to sue or be sued or the authority of a party to be sued in a representative capacity, he shall do so by specific negative averment."(Emphasis mine).

Likewise the "criminal" rules at CrRLJ 1.1 says

" These rules govern the procedure in the courts of limited jurisdiction of the state of Washington in all criminal proceedings and supersede all procedural statutes and rules that may be in conflict. **They shall be interpreted and supplemented in light of the common law** and the decisional law of this state. These rules shall not be construed to affect or derogate from the constitutional right of any defendant."(Emphasis mine)


While we do not anticipate a refusal to follow the court rules on the part of Alicia Nakata, We are neverthless familiar with the reputation of this court and feel this lengthy explanation warranted.

Plaintiff is a Nul tiel corporation

Memo in support and Offer of Proof of no judge in the premises

It is our position that the plaintiff in this matter is not a legal entity under the Constitution. By specific negative averment, $\mathcal{I}$ deny the People have delegated the State or the United States authority to create an entity that resembles the State Government, but does not utilize the style of process of the State Government. $\mathcal{I}$ deny such entity is a necessary and proper instrumentality of the United States.

**Coram Non Juidicia**

It is our position that this court is at best a court engaged in the private business of judging. It is well settled in Federal jurisprudence that the salary of a Federal judge may not be diminished during their continuance in office. Article three of the Federal Constitution. Also the Federal taxing power does not extend to State judicial officers. We aver that the salary of the judges of this court do have federal taxes withheld from their pay. We allege that this fact is conclusive that the office these judges occupy is non-judicial, and is a non governmental function. We deny this court holds any judicial power to execute a sentence, or enforce its rulings.

Memorandum in support.

Issue one Plaintiff is a Nul tiel corporation

**Memo in support and Offer of Proof of no judge in the premises**

In 1878 the people by lawful convention created a State Constitution. On Dec. 5th 1878 the election was held, and the Constitution was passed.  Pursuant to the schedule, sec. 5, the territorial officers continued to hold office until the superseded by the authority of the State. At sec. 17 of the schedule, the first general election was to be held on the Tuesday next succeeding the sixth Monday after the admission of the state. The first election was to elect among other offices, the members of the legislature. There was a considerable time period until the State was in fact admitted to the Union, but it did occur in 1889, and was allegedly done by senate bill No. 185. To the best of my knowledge the State of Washington was admitted on Jan 28, 1889, and therefore pursuant to the schedule, on the Tuesday next succeeding the sixth Monday, the territorial legislature was to be replaced by the State. The State Supreme Court admitted the occurrence of Statehood in 1936 in Ryan v. State as follows;

> "By the enabling act of Congress, passed Feb 22, 1889, the territory of Washington became the State of Washington. Subject to the limitations and restraints of the Federal Constitution, the state as such, has all the sovereign powers of independent nations over all persons and things within its territorial limits." 188 Wash, 115,130 (1936)

It should be noted that on Feb 22, 1889 the only Convention held in which a Constitution had been drafted, was in 1878.

There has yet to be an actual election done by the State under the lawful process. I have searched diligently for such an

**Memo in support and Offer of Proof of no judge in the premises**

election and find no such election has taken place.

> "Full and conclusive proof is not required where a party has
> the burden of proving a negative, but it is necessary that
> the proof be at least sufficient to render the existence of
> the negative probable, or to create a fair and reasonable
> presumption of the negative until the contrary is shown."
> Higgins v. Salewsky 17 Wn App, 207, (1977)

It appears that without an election having taken place by the
People of the State of Washington, we are left with a government
Defacto. The present government in fact is the remaining
territorial government, possibly filling the state functions. The
term "State" was construed to mean "Territory" by an unauthorized
act (session laws 1889, p. 94) see also

"Thus in some statutes, the term "state" will be construed
to include a territory." AM Jur "States etc." §2
While the Law does allow an officer defacto, the law does not
recognize an office defacto. (State v. Moore 73 Wn App.
805, (1994), State v. Canady 116 Wn 2d. 853, (1991), Higgins v.
Salewsky 17 Wn App, 207, (1977). It is possible to fill in fact
an office that does not rightly belong to you, yet it is not
possible to in fact fill a non-office. If the members of the now
deceased territory in an unlawful manner did in fact occupy the
seats of the State, then in order for the acts of the defacto
State Officers to be valid, they would need to conform to the
lawful requirements of the State Constitution.

It should be addressed at this point that in 1889 a
convention was convened in violation of the first constitution,

at Art XVI Section 2. The former Constitution allows a process to
call another convention. This process was not followed by the
second convention and for this reason it is a nullity. It is also
pointed out that the 1889 convention did not produce a
constitution that admitted Washington into the Union. The
original Constitution is the one upon which Washington gained
admittance.

Based upon the premise that the present government is at
best defacto, and that the officers defacto fill the offices of
the Constitution, their acts are valid only if they would have
been valid had they held their office dejure. In other words, a
defacto officer, and a dejure officer have this in common, all
their acts must be lawful. In contrast a defacto office can do no
act at all, since there is no such office.

In order to prosecute in fact on the People's behalf, the
style of process must conform to the process required by law. As
a territory the style of process was "Territory of Washington".
Upon statehood, the actions commenced by the territory were
required to be prosecuted in the name of the State. See Sec. 1,4
of the Schedule. The process of the State is to be " **The People
of the State of Washington**", Article VIII Sec. 17. There appears
to be a fraudulent attempt to replace "State" with "Territory",
and continue the territorial process possibly under the theory

Page: 6 of 11

**Memo in support and Offer of Proof of no judge in the premises**

that the second state constitution's schedule at sec. 1. Once
again if there is a claim by plaintiff to an office in fact, the
actions of such officer defacto must comply with the law. If
Plaintiff claims a territorial office, it is a claim to an office
defacto, and has no basis in law. If he claims to be a defacto
officer, then he must prosecute all actions by the Constitutional
mandated style of process, or show cause why the second state
Constitution supersedes the prior one.

Whereas the process does not comply with the Constitutional *required*
the action is either not on behalf of the government, (not by a
office defacto) but simply a person, or it is done by the defacto
government, but does not follow the law, (making it of no legal
effect).

This county seems to have trouble understanding what the
State Supreme Court ruled an action involving this county,
although utilizing the second state constitution, as follows:

> "As to the first, it was urged that since the notice to
> respondents did not run in the name of the state of
> Washington, and that by art. IV, S. 27 of the state
> constitution, all process is required to be in the name of
> the state of Washington, the notice was ineffectual to give
> jurisdiction. An elaborate argument on this point is pressed
> upon us on this point ~~is pressed upon us~~ to show that the
> notice herein is process within the meaning of the
> constitution. But we think it unnecessary to enter into a
> review of this question, since we have heretofore held that
> a summons in a civil action is not process; and we think the
> notice given herein stands on no higher plane. State ex rel.
> Chelan Elec. Co. v. Sup. Court. 142 Wash. 270, 282, (1927)

The court admitted that since the notice was not done in the name
of the State, it had no higher standing than a civil summons.
Citing Wagnitz v. Ritter

> "The summons is in no sense a process of the court; it is a
> notice merely, which an attorney is authorized to issue and
> cause to be served without the direction or knowledge of the
> court." Wagnitz v. Ritter 31 Wash. 343,349, (1903).

No doubt this court will cite State v. Fisk, 151 Wash. 323,
(1929). The court should note that in State v. Fisk, :

> "The case proceeded regularly to trial upon the merits in
> the superior court, sitting with a jury, **there being no
> challenge, demurrer or plea interposed by the defendant to
> the information other than his plea of not guilty.**" Emphasis
> mine



On appeal the only issue was the signing of a deputy in place of
the principle. The issue of process was not raised, and the court
stated "the prosecution was instituted in the name of the state
as required by Art. 4 sec. 27 of our state constitution". I
challenge the premise that the second state Constitution is
controlling, as well as the fact that the process at bar conforms
to the explicit requirements of either constitution.
    Based upon the fact that the notice provided defendant was
not done in the name of the State, as constitutionally required
(by either constitution) I challenge the plaintiff to prove it
has legal existence.

**Issue two Coram Non Juidice**

    The court has no judicial authority to act. It is avered that

the salaries of the judges of this court are taxed by the Federal

government. It has long been established in multiple rulings that

the salary of a State officer cannot be taxed by the Federal

Government. The taxation of the salary of the judges of this

court give rise to the rational presumption that they are not

State officers.

> "It would seem to follow, as a reasonable, if not a
> necessary, consequence, that the means and instrumentalities
> employed for carrying on the operations of their governments,
> for preserving their existence, and fulfilling the high and
> responsible duties assigned to them in the Constitution,
> should be left free and unimpaired,-should not be liable to
> be crippled, much less [199 U.S. 437, 460]   defeated, by the
> taxing power of another government, which power acknowledges
> no limits but the will of the legislative body imposing the
> tax. Collector v. Day  11 Wall 113.

And also

> "Thus as to persons or corporations which serve as agencies
> of government, national or state, and also have private
> property or engage on their own account in business for
> gain, it is well settled that the principle does not extend
> to their private property or private business, but only to
> their operations or acts as such agencies;2 and in harmony
> with this view, it has also been held that when a state
> departs her usual governmental functions and "engages in
> business which is of aprivate nature" no imunity arises in
> respect to her own or her agents operations in that
> business." Indian Mortorcycle v. United States. 283 U.S.
> 570,(1931)

And also

> "... by the very terms of the rule, the immunity of the states
> from federal taxation is limited to those agencies which are
> of a governmental character. Whenever a state engages in a
> business of a private nature, it exercises nongovernmental
> functions, and the business, though conducted by the state,
> is not immune from the exercise of the power of taxation
> which the Constitution vests in the Congress. This court, in
> South Carolina v. United States, 199 U.S. 437 , 26 S.Ct.
> 110, 4 Ann.Cas. 737, a case in no substantial respect
> distinguishable from the present one, definitely so held.
> Compare Board of Trustees of University of Illinois v.
> United States, 289 U.S. 48, 59 , 53 S.Ct. 509." STATE OF
> OHIO v. HELVERING, 292 U.S. 360 (1934)

They went on to say

> "Whenever a State engages in a business which is of a
> private nature that business is not withdrawn from the
> taxing power of the Nation." The decision sustained the
> identical tax provisions involved in the present case, and
> therefore we follow it as controlling." STATE OF OHIO v.
> HELVERING, Supra

Also

> "In other words, the two governments-national and state-are
> each to exercise their powers so as not to interfere with
> the free and full exercise by the other of its powers. This
> proposition, so far as the nation is concerned, was affirmed
> at an early day in the great case of M'Culloch v. Maryland,
> 4 Wheat. 316, 4 L. ed. 579, in which it was held that the
> state had no power to pass a law imposing a tax upon the
> operations of a national bank. The case is familiar and
> needs not to be quoted from. No answer has ever been made to
> the argument of Mr. Chief Justice Marshall, and the
> propositions there laid down have become fundamental in our
> constitutional jurisprudence." STATE OF SOUTH CAROLINA v.
> U.S., 199 U.S. 437 (1905)

Also

> "Not only, therefore, can there be no loss of separate and
> independent autonomy to the states, through their union
> under the Constitution, but it may be not unreasonably said
> that the preservation of the states, and the maintenance of
> their governments, are as much within the design and care of
> the Constitution as the preservation of the Union and the
> maintenance of the national government. The Constitution, in
> all its provisions, looks to an indestructible Union,
> composed of indestructible states." Texas v. White 7 Wall.
> 700, 725, 19 L. ed. 227, 237

It is inconceivable that this court could or would be willing
to test these cases, ~~with and~~ or the immunity or lack thereof, and
proceed to act "judicially" without rebuttal to the premises
established by this pleading.

_____                    Date_____

**Memo in support and Offer of Proof of no judge in the premises**

The People of the State of Washington,

By its lawful designee.

**Memo in support and Offer of Proof of no judge in the premises**

Exhibit 4

Everett C. Gilbertson, Sui Juris
c/o General Delivery
Battle Lake [zip code exempt]
MINNESOTA STATE

In Propria Persona

Under Protest and
by Special Visitation


UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

FOURTH DIVISION

UNITED STATES OF AMERICA [sic], )   Case No. CR-4-96-65
                              )
         Plaintiff [sic],     )   NOTICE AND DEMAND TO DISMISS
                              )   FOR LACK OF ANY CRIMINAL
    v.                        )   JURISDICTION WHATSOEVER:
                              )   28 U.S.C. 1359;
EVERETT C. GILBERTSON [sic],  )   FRCP Rules 9(b), 12(b)(1),
                              )   12(b)(2), 12(b)(3)
         Defendant [sic].     )
_____)

COMES NOW  Everett C. Gilbertson, Sui Juris, Citizen of Minnesota
state, expressly  not a  citizen of  the United  States ("federal
citizen")  and Defendant in the above entitled matter (hereinafter
"Defendant"), to  demand an  immediate dismissal  of the  instant
criminal  case,  with  prejudice,  for  lack  of  any  criminal
jurisdiction to  proceed in  the first  instance, either over the
subject matter  or over  the Person or property of the Defendant,
and to  provide formal  Notice to all interested parties of same.
Defendant hereby  incorporates by reference all authorities cited
in  Exhibit "A":  Federal Criminal  Jurisdiction,  and  in  His
MEMORANDUM  OF  LAW  IN  SUPPORT  OF  CHALLENGE  TO  CRIMINAL
JURISDICTION OF THIS COURT [i.e. There is none.], Rules 301, 302:

page 1 of 20

Federal Rules of Evidence, as if all were set forth fully herein.

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
Page 1 of 18

KNOW ALL BY THESE PRESENTS:
(preamble to numbered paragraphs)

I, Everett C. Gilbertson, Sui Juris, Defendant in the above entitled matter, hereby demand that this territorial (legislative) tribunal dismiss the instant criminal case with prejudice because it lacks exclusive jurisdiction over the exact geographical location where the alleged criminal activity mentioned in the so-called indictment is alleged to have taken place. Defendant was not arrested in any fort, magazine, arsenal, dockyard, "needful building", or other federal enclave within Minnesota state, nor was My Person or My private property situated within any of the aforementioned federal areas (a/k/a the federal zone).

A very recent U.S. Supreme Court decision, dated April 26, 1995, addressed the issue of exclusive legislative jurisdiction of the Congress, and the powers of the federal government. Justice Thomas, in a concurring majority opinion in U.S. v. Lopez, 115 S.Ct. 1624 (1995), 131 L.Ed.2d 626, very clearly says:

Indeed, on this crucial point, the majority and Justice Breyer [dissenting] agree in principle: the Federal Government has nothing approaching a police power. Id. at page 64.

[emphasis added

Justice Thomas went on to discuss "a regulation of police" at page 86, wherein he stated as follows:

U.S. v. DeWitt, 76 U.S. 41, 9 Wall. 41, 19 L.Ed 593 (1870) marked the first time the court struck down a federal law as exceeding the power conveyed by the commerce clause. In a

*page 3 of 20*

2 page opinion, the court invalidated a nationwide law prohibiting all sales of naptha, and illuminating oils. In so doing, the court remarked that the commerce clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate states." Id. at page 44.

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
Page 2 of 18.

The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. Id. pp. 44-45.

Earlier in the text, Justice Thomas, Id. at page 85, said, "Even before Gibbons, Chief Justice Marshall, writing for the Court in Cohens v. Virginia, 19 U.S. 264, 6 Wheat 264, 5 L.Ed 257 (1821), noted that Congress had no general right to punish murder committed within any of the states," and that Congress could not punish felonies generally. However, Congress could enact laws for places where it enjoyed plenary powers, for instance, over the District of Columbia, and whatever effect ordinary murders, robberies, or gun possession might have on interstate commerce was irrelevant to the question of Congressional power.

The first Federal Criminal Act did not establish a nationwide prohibition against murder and the like. See Act of April 30, 1790, Chapter 9 [1 Stat. 112]; rather, only when committed in United States (federal government) territories and possessions, or on the high seas. With the single exceptions of treason and counterfeiting, and notwithstanding any of the effects which murder, robbery, or gun possession might have on interstate commerce, Congress understood that it could not establish nationwide prohibitions. Period.

Justice Thomas summed up his opinion dramatically with the

page 3 of 30

statement quoted in part herein:

> If we wish to be true to a Constitution that does not cede a
> police power to the Federal Government ....

(1) "All federal crimes are statutory." Doble, "Venue and Criminal Cases in the United States District Court," Virginia Law Review, 287, 289 (1926), quoting: " ...[O]n the other hand, since all Federal Crimes are statutory and all criminal prosecutions in the Federal courts are based on Acts of Congress," Rule 26, Federal Rules of Criminal Procedure, Taking of Testimony, Advisory Committee Notes, 1944 Adoption, paragraph 2 (emphasis added).

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 3 of 18~~

(2) Rule 54, Federal Rules of Criminal Procedure, paragraph (c), Application of Terms, to wit: "Act of Congress" includes any act of Congress locally applicable to and in force in the District of Columbia, in Puerto Rico, in a territory or in an insular possession. [emphasis added]

(3) There is no presumption in favor of jurisdiction, and the basis for jurisdiction must be affirmatively shown. Hanford v. Davis, 16 S.Ct. 1051, 163 U.S. 273, 41 L.Ed. 157 (1896).

(4) See exact wording of ̲a̲r̲t̲i̲c̲l̲e̲ ̲I̲,̲ ̲S̲e̲c̲t̲i̲o̲n̲ ̲8̲,̲ ̲c̲l̲a̲u̲s̲e̲ ̲1̲7̲, in the ̲C̲o̲n̲s̲t̲i̲t̲u̲t̲i̲o̲n̲ ̲f̲o̲r̲ ̲t̲h̲e̲ ̲U̲n̲i̲t̲e̲d̲ ̲S̲t̲a̲t̲e̲s̲ ̲o̲f̲ ̲A̲m̲e̲r̲i̲c̲a̲, which grant of authority does not extend over every square inch of the 48 contiguous Union states or over the 50 Union states.

(5) In principle, the exclusive legislative jurisdiction of the United States (federal government) is not addressed to subject matter, but to specific geographical locations. See U.S.

v. Bevans, 16 U.S. (3 Wheat) 336 (1818).

(6)  It is  axiomatic that the prosecution must always prove territorial jurisdiction  over a  crime, in order to  sustain  a conviction therefor.  U.S. v. Benson, 495 F.2d 475 at 481 (1974). A jurisdictional defect can never be waived by the Defendant, nor acquiesced by the Defendant, in the absence of a positive showing upon the  record that  jurisdiction was clearly and unambiguously established.  It takes an Act of Congress!

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
Page 4 of 18.

(7)  Without proof  of the requisite ownership or possession by the  United States,  the crime has not been made out.  U.S. v. Watson, 80  Fed. Supp. 649 (1948, E.D. Va.).  Only in America can We be  forced  into the  status  of  "subjects"  of  a  foreign corporation, by  fiat legislation  and the stroke of a CEO's pen, at the  point of  a gun,  and thereby  be immediately divested of standing in  judicio, and  declared to  be debtors and enemies of our Own government.  See 12 U.S.C. 95(a) and (b).

(8)  In  criminal  prosecutions,  where  the  United  States (federal government)  is a  proper moving party, it must not only establish ownership  of the  property upon  which the  crime  was allegedly committed,  but it must also produce documentation that Minnesota state  has ceded to it jurisdiction over that property. In the case of Fort Leavenworth Railway Co. v. Iowa, 114 U.S. 525 at 531 (1885), the U.S. Supreme Court held as follows:

> Where  lands  are  acquired  without  such  consent,  the
> possession  of  the  United  States,  unless  political
> jurisdiction be  ceded to  them in some other way, is simply
> that of an ordinary proprietor.

page 5 of 20

(9)  No jurisdiction exists for the United States (federal government) to enforce federal criminal laws, until consent to accept jurisdiction over acquired lands has been published and filed in behalf of the United States, as provided in 40 U.S.C. 255. The fact that a state may have authorized the United States to exercise jurisdiction is immaterial.  See Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122, 87 L.Ed. 1421 (1943).

(10) All courts of justice are duty-bound to take judicial notice of the territorial extent of jurisdiction, although those acts are not formally put into evidence, nor in accord with pleadings.   Jones v. U.S., 137 U.S. 202, 11 S.Ct. 80 (1890).

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 5 of 18.~~

(11) Where a federal court is without jurisdiction over the offense, a judgment of conviction by the court and/or by the jury is void ab initio, on its face.  Bauman v. U.S., 156 F.2d 534 (5th Cir. 1946).  [emphasis added]

(12) Federal criminal jurisdiction is never presumed;  it must always be proven;  and it can never be waived.  See U.S. v. Rogers, 23 Fed. 658 (USDC, W.D. Ark., 1885).

(13) The federal courts are limited both by the Constitution and by Acts of Congress.  Owen Equip. & Erection Co. v. Kroger, 98 S.Ct. 2396, 437 U.S. 365, 57 L.Ed.2d 274 (1978).

(14) The jurisdiction of federal courts is defined in the Constitution at Article III for judicial courts; in Article I for legislative courts; and in Article IV for territorial courts. Some courts created by Acts of Congress have been referred to as "Constitutional Courts," whereas others are

*page 6 of 20*

regarded as "Legislative Tribunals." O'Donoghue v. U.S., 289 U.S. 516 (1933), 77 L.Ed 1356, 53 S.Ct. 74; Mookini v. U.S., 303 U.S. 201 at 205 (1938), 82 L.Ed 748, 58 S.Ct. 543.

(15) Legislative court judges do not enjoy Article III guarantees; "inherently judicial" tasks must be performed by judges deriving power under Article III. See U.S. v. Sanders, 641 F.2d 659 (1981), cert. den. 101 S.Ct. 3055, 452 U.S. 918, 69 L.Ed 422.

(16) Creation and composition of the United States District Court ("USDC") were accomplished by Acts of Congress on June 25, 1948 [62 Stat. 895], and November 13, 1963 [77 Stat. 331], currently codified at 28 U.S.C. 132; and the jurisdiction thereof, previously demonstrated herein, i.e. Chapter 85 of Title 28, lists civil, admiralty, maritime, patent, bankruptcy, etc., and does not once list, mention, or describe any criminal jurisdiction. It is not there, so don't bother looking for it!

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
                          ~~Page 6 of 18~~

(17) Acts of Congress creating the United States District Courts ("USDC") do not vest said territorial tribunals with any criminal jurisdiction whatsoever; these courts have only such jurisdiction as is conferred upon them by Act of Congress under the Constitution. See Hubbard v. Ammerman, 465 F.2d 1169 (5th Cir., 1972), cert. den. 93 S.Ct. 967, 410 U.S. 910, 35 L.Ed.2d 272.

(18) The United States District Court ("USDC") is not a court of general jurisdiction, and has no other power bestowed upon it, except as prescribed by Congress. See Graves v. Snead,

page 7 of 20

541 F.2d 159 (6th Cir., 1976), cert. den. 97 S.Ct. 1106, 429 U.S. 1093, 51 L.Ed.2d 539.   *Inclusio unius est exclusio alterius.*

(19) It is apparent that the ▨▨▨▨▨▨▨▨▨▨▨▨▨ for the Judicial District of Minnesota was created and established under ▨▨▨▨▨▨▨▨▨, and its jurisdiction is defined and limited by Chapter 85 of Title 28, United States Code.  The Historical and Statutory Notes under 28 U.S.C. 132 contain the following important qualification in the section entitled "Continuation of Organization of Court", to wit:

> Section 2(b) of Act June 25, 1948, provided in part that the **provisions of this title** as set out in section 1 of said Act June 25, 1948, with respect to the organization of the court, **shall be construed as a continuation of existing law** . . . .

> [emphasis added]

(20) The courts of appropriate jurisdiction for violations of Title 18 U.S.C. are designated at ▨▨▨▨▨▨▨▨, specifically naming them as "▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨" [sic].

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 7 of 18~~

(21) There is a distinct and definite difference between a "United States District Court" ("▨▨▨▨") and a "District Court of the United States" ("▨▨▨▨").  The words "District Court of the United States" commonly describe constitutional courts created under ▨▨▨▨▨▨ of the Constitution, not the legislative courts which have long been the courts of the Territories.   See International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 342 U.S. 237 at 241 (1952), 72 S.Ct. 235, 96 L.Ed. 275, 13 Alaska 536.

(22) The term "District Court of the United States" commonly

*Page 8 of 20*

describes ⠀⠀⠀⠀⠀ courts, or "courts of the United States", and not legislative courts of the territories. See American Insurance Co. v. 356 Bales of Cotton, 1 Pet. 511 (1828), 7 L.Ed 242; International Longshoremen's and Warehousemen's Union v. Wirtz, 170 F.2d 183 (9th Cir., 1948), cert. den. 336 U.S. 919, 93 L.Ed. 1082, 69 S.Ct. 641, reh. den. 336 U.S. 971, 69 S.Ct. 936.

(23) Though the judicial system set up in a territory of the United States is a part of federal jurisdiction, the phrase "court of the United States", when used in a federal statute, is generally construed as not referring to "territorial courts". See Balzac v. Porto Rico, 258 U.S. 298 at 312 (1921), 42 S.Ct. 343, 66 L.Ed. 627. In Balzac, the High Court stated:

> The United States District Court is not a true United States court established under ⠀⠀⠀⠀ of the Constitution to administer the judicial power of the United States therein conveyed. It is created by virtue of the sovereign congressional faculty, granted under ⠀⠀⠀⠀⠀⠀⠀⠀, of that instrument, of **making all needful rules and regulations respecting the territory belonging to the United States**. The resemblance of its jurisdiction to that of true United States courts in offering an opportunity to nonresidents of resorting to a tribunal not subject to local influence, does not change its character as a mere territorial court.
>
> [emphasis added]

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 8 of 18~~

(24) The distinction within the dual nature of the federal court system is also noted in Title ⠀⠀⠀⠀⠀⠀⠀, which states that the United States District Court for the Canal Zone shall have jurisdiction "... concurrently with the **district courts of the United States**, of offenses against the laws of the United States committed upon the high seas." [emphasis added]

(25) This distinction is the reason why federal jurisdiction

page 9 of 20

over prosecutions is more than a technical concept; it is Constitutional requirement.  See U.S. v. Johnson, 337 F.2d 180, aff'd 383 U.S. 169 (1966), 86 S.Ct. 749, 15 L.Ed.2d 681, cert. den. 87 S.Ct. 44, 134, and 385 U.S. 846, 17 L.Ed.2d 77, 117.

(26) The distinction between "district courts of the United States" and "United States district courts" is readily apparent in the Section of Title 18 dealing with civil remedies for activities prohibited by 18 U.S.C. 1962 (i.e. racketeering). Subsection (a) of 18 U.S.C. 1964 makes explicit reference to the Article III "district courts of the United States", as follows:

> (a) The **district courts of the United States** shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders ....

> [emphasis added]

Subsection (c) of 18 U.S.C. 1964 makes explicit reference to the Article IV "United States district court", as follows:

> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate **United States district court** ....

> [emphasis added]

The language of these two subsections is almost identical in scope, with the important difference resulting from an apparent need to legislate separate and distinct court authorities for the Article III and for the Article IV forums, respectively. *Inclusio unius est exclusio alterius.* See also 28 U.S.C. 1441 et seq., in which Congress appears to have confused the USDC with the DCUS throughout the removal statutes codified therein.

(27) Besides the Lopez decision, at least two other courts, i.e. United States District Courts, have come to the same or similar conclusions. See U.S.A. v. Wilson, Stambaughr, Skott, Ketchum, Braun, and Ballin, ████, Wisconsin, Case Number 94-CR-140 (March 16, 1995); and U.S. v. Kearns, ████, Texas, Case Number SA-95-CR-201 (October 6, 1995).

(28) Interestingly enough, in a bankruptcy case in the U.S. Bankruptcy Court, Middle District of Pennsylvania (Chapter 13), Case No. 5-94-00839, titled In re: Francis Patrick Farrell v. ████████, the alleged debtor sued out a compulsory counterclaim against the ████████ after the alleged creditor submitted its proof of claim. The counterclaim showed an extent of corruption unparalleled in American history, to which agencies of the federal government will often resort, specifically by placing a fraudulent "T-Code" on Individual Master File ("IMF") records.

(29) In this way, the ████████ use Admiralty and Maritime forfeiture laws to deprive a state Citizen of property and assets, and to mis-classify Him as a "high level narcotics trafficker." This occurred on November 17, 1995! Why? See U.S. v. Good, 114 S.Ct. 492 at 502, footnote 2 (1993). A similar mis-classification -- "Illegal Tax Protester" -- is likewise an oxymoron for violating the First Amendment (protest has never been illegal in America) and for forcing a construction that reveals an "illegal tax," for all the world to see!

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 10 of 10~~

## SUMMARY

The United States District Courts ("████") have no criminal

*page 11 of 20*

jurisdiction whatsoever to prosecute a state Citizen within one of the 50 states of the Union which comprises the United States of America ("USA"), until and unless Congress says so.

Until and unless the United States (federal government) can prove ownership over said geographical land mass, particularly that parcel of land which is the private real property of the Defendant, the USDC have no criminal jurisdiction whatsoever within any of the 50 Union states.

Not a single Act of Congress vests the USDC, as distinct from the DCUS, with anything but "civil" authority. There is absolutely no criminal jurisdiction vested in said territorial tribunals, authorized by Article IV in the U.S. Constitution.

Recent research has also proven that the federal judiciary has sabotaged the U.S. Constitution and corrupted laws governing the conduct of the federal courts. This has been done in part by creating the false impression that the United States District Court ("USDC") has territorial and subject matter jurisdiction within the several states of the Union, particularly over criminal prosecutions, when it does not.

The truth is that the USDC is designed to adjudicate matters that arise within the federal zone, and the District Court of the United States ("DCUS") is designed to adjudicate matters that arise within the state zone. See U.S. v. Lopez supra.

On the face of the alleged indictment served upon Defendant, the USDC is named. This is a fraud upon Defendant, and upon all American People, who enjoy the fundamental guarantee of due process of law. Sedition by syntax is not due process of law.

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:

page 12 of 20

Page 11 of 18

## REMEDY DEMANDED

Therefore, Defendant hereby demands that this Article IV legislative tribunal establish exclusive, original jurisdiction by producing certified documents consisting of the following:

(a) Documentation showing "United States" (federal government) ownership of each and every geographical location mentioned in the instant indictment, wherein the alleged criminal activity took place;

(b) Documentation from the Minnesota Legislature which provides evidence of a cession by Minnesota state, surrendering jurisdiction to the "United States" (federal government) over the geographical location as stated in (a) above;

(c) Documentation pursuant to Title 40 U.S.C. 255, wherein the "United States" (federal government) accepted jurisdiction to the geographical location as stated in (a) above, or, documentation showing concurrent jurisdiction with Minnesota state over the geographical location as stated in (a) above;

Alternatively, absent the requisite documentation, Defendant hereby demands that this USDC dismiss the instant case with prejudice and in the interests of justice, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure. "Shall" as used therein is mandatory. Confer in Black's Law Dictionary.


Dated: _____

Respectfully submitted,

/s/ Everett C. Gilbertson

Everett C. Gilbertson, Sui Juris
Citizen of Minnesota state          page 13 of 20

(expressly not a citizen of the United States)

All Rights Reserved without Prejudice

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 12 of 18~~

Exhibit "A":
Federal Criminal Jurisdiction

It is a well established principle of law that "all federal legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears"; see Caha v. United States, 152 U.S. 211, 215, 14 S.Ct. 513 (1894); American Banana Company v. United Fruit Company, 213 U.S. 347, 357, 29 S.Ct. 511 (1909); United States v. Bowman, 260 U.S. 94, 97, 98, 43 S.Ct. 39 (1922); Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932); Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575 (1949); United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949); and United States v. First National City Bank, 321 F.2d 14, 23 (2nd Cir., 1963). And this principle of law is expressed in a number of cases from the federal appellate courts; see McKeel v. Islamic Republic of Iran, 722 F.2d 582, 589 (9th Cir., 1983) (holding the Foreign Sovereign Immunities Act as territorial); Meredith v. United States, 330 F.2d 9, 11 (9th Cir., 1964) (holding the Federal Torts Claims Act as territorial); United States v. Cotroni, 527 F.2d 708, 711 (2nd Cir., 1975) (holding federal wiretap laws as territorial); Stowe v. Devoy, 588 F.2d 336, 341 (2nd Cir., 1978); Cleary v. United States Lines, Inc., 728 F.2d 607, 609 (3rd Cir., 1984) (holding federal age discrimination laws as territorial); Thomas v. Brown & Root, Inc., 745 F.2d 279, 281 (4th Cir., 1984) (holding same as Cleary, supra); United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir., 1977) (holding marine mammals protection act as territorial); Pfeiffer v. William Wrigley, Jr., Co., 755 F.2d 554, 557 (7th Cir., 1985) (holding age discrimination laws as territorial); Airline Stewards & Stewardesses Assn. v. Northwest Airlines, Inc., 267 F.2d 170, 175 (8th Cir., 1959) (holding Railway Labor Act as territorial); Zahourek v. Arthur Young and Co., 750 F.2d 827, 829 (10th Cir., 1984) (holding age discrimination laws as territorial); Commodities Futures Trading Comm. v. Nahas, 738 F.2d 487, 493 (D.C.Cir., 1984) (holding commission's subpoena power under federal law as territorial); Reyes v. Secretary of H.E.W., 476 F.2d 910, 915 (D.C.Cir., 1973) (holding administration of Social Security Act as territorial); and Schoenbaum v. Firstbrook, 268 F.Supp. 385, 392 (S.D.N.Y., 1967) (holding securities act as territorial). But, because of statutory language, certain federal drug laws operate extra-territorially; see United States v. King, 552 F.2d 833, 851 (9th Cir., 1976). The United States has territorial jurisdiction only in Washington, D.C., the federal enclaves within the States, and in the territories and insular possessions of the "United States". However, it has no territorial jurisdiction over non-federally owned areas inside

page 14 of 20

the territorial jurisdiction of the States within the American Union. And this proposition of law is supported by literally hundreds of cases.

As a general rule, the power of the United States criminally to prosecute is, for the most part, confined to offenses committed within "its jurisdiction". This is born out simply by examination of ................ which defines the term "United States" in clear jurisdictional terms. Section 7 contains the fullest statutory definition of the "jurisdiction of the United States" [sic]. The United States District Courts have jurisdiction of offenses occurring within the "United States", pursuant to ................ .

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction;
~~Page 13 of 19~~

Examples of this proposition are numerous. In Pothier v. Rodman, 291 F. 311 (1st Cir., 1923), the question involved whether a murder committed at Camp Lewis Military Reservation in the State of Washington was a federal crime. Here, the murder was committed more than a year before the U.S. acquired a deed for the property in question. Pothier was arrested and incarcerated in Rhode Island and filed a Habeas Corpus petition seeking his release on the grounds that the federal courts had no jurisdiction over an offense not committed in U.S. jurisdiction. The First Circuit agreed that there was no federal jurisdiction and ordered his release. But, on appeal to the U.S. Supreme Court, in Rodman v. Pothier, 264 U.S. 399, 44 S.Ct. 360 (1924), that Court reversed; although agreeing with the jurisdictional principles enunciated by the First Circuit, it held that only the federal court in Washington State could hear that issue. In United States v. Unzeuta, 35 F.2d 750 (8th Cir., 1929), the Eighth Circuit held that the U.S. had no jurisdiction over a murder committed in a railroad car at Fort Robinson, the state cession statute being construed as not including railroad rights-of-way. This decision was reversed in United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284 (1930), the court holding that the U.S. did have jurisdiction over the railroad rights-of-way in Fort Robinson. In Bowen v. Johnson, 97 F.2d 860 (9th Cir., 1938), the question presented was whether jurisdiction over an offense prosecuted in federal court could be raised in a petition for Habeas Corpus. The denial of Bowen's petition was reversed in Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442 (1939), the Court concluding that such a jurisdictional challenge could be raised in a Habeas Corpus petition. But, the Court then addressed the issue, and found that the U.S. both owned the property in question and had a state legislative grant ceding jurisdiction to the United States, thus there was jurisdiction in the United States to prosecute Bowen. But, if jurisdiction is not vested in the United States pursuant to statute, there is no jurisdiction; see Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122 (1943).

And the lower federal courts also require the presence of federal jurisdiction in criminal prosecutions. In Kelly v.

*page 15 of 20*

United States, 27 F. 616 (D.Me., 1885), federal jurisdiction of a
manslaughter committed at Fort Popham was upheld when it was
shown that the U.S. owned the property where the offense occurred
and the state had ceded jurisdiction.  In United States v. Andem,
158 F. 996 (D.N.J., 1908), federal jurisdiction for a forgery
offense was upheld on a showing that the United States owned the
property where the offense was committed and the state had ceded
jurisdiction of the property to the U.S.  In United States v.
Penn, 48 F. 669 (E.D.Va., 1880), since the U.S. did not have
jurisdiction over Arlington National Cemetery, a federal larceny
prosecution was dismissed.  In United States v. Lovely, 319 F.2d
673 (4th Cir., 1963), federal jurisdiction was found to exist by
U.S. ownership of the property and a state cession of
jurisdiction.  In United States v. Watson, 80 F.Supp. 649
(E.D.Va., 1948), federal criminal charges were dismissed, the
court stating as follows:

> Without proof of the requisite ownership or possession of
> the United States, the crime has not been made out.  80
> F.Supp., at 651.


Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 15 of 18~~


In Brown v. United States, 257 F. 46 (5th Cir., 1919),
federal jurisdiction was upheld on the basis that the U.S. owned
the post office site where a murder was committed and the state
had ceded jurisdiction;  see also England v. United States, 174
F.2d 466 (5th Cir., 1949);  Krull v. United States, 240 F.2d 122
(5th Cir., 1957);  Hudspeth v. United States, 223 F.2d 848 (5th
Cir., 1955);  and Gainey v. United States, 324 F.2d 731 (5th
Cir., 1963).  In United States v. Townsend, 474 F.2d 209 (5th
Cir., 1973), a conviction for receiving stolen property was
reversed when the court reviewed the record and learned that
there was absolutely no evidence disclosing that the defendant
had committed this offense within the jurisdiction of the United
States.  And in United States v. Benson, 495 F.2d 475 (5th Cir.,
1974), in finding federal jurisdiction for a robbery committed at
Fort Rucker, the court stated:

> It is axiomatic that the prosecution must always prove
> territorial jurisdiction over a crime in order to sustain a
> conviction therefor.  495 F.2d, at 481.


In two Sixth Circuit cases, United States v. Tucker, 122 F.
518 (W.D.Ky., 1903), a case involving an assault committed at a
federal dam, and United States v. Blunt, 558 F.2d 1245 (6th Cir.,
1977), a case involving an assault within a federal penitentiary,
jurisdiction was sustained by finding that the U.S. owned the
property in question and the state involved had ceded
jurisdiction.  In In re Kelly, 71 F. 545 (E.D.Wis., 1895), a
federal assault charge was dismissed when the court held that the
state cession statute in question was not adequate to convey
jurisdiction of the property in question to the United States.

In United States v. Johnson, 426 F.2d 1112 (7th Cir., 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and cession. And cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see United States v. Heard, 270 F.Supp. 198 (W.D.Mo., 1967); United States v. Redstone, 488 F.2d 300 (8th Cir., 1973); United States v. Goings, 504 F.2d 809 (8th Cir., 1974) (demonstrating loss of jurisdiction); Hayes v. United States, 367 F.2d 216 (10th Cir., 1966); United States v. Carter, 430 F.2d 1278 (10th Cir., 1970); Hall v. United States, 404 F.2d 1367 (10th Cir., 1969); and United States v. Cassidy, 571 F.2d 534 (10th Cir., 1978).

Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more than any of the rest. In United States v. Bateman, 34 F. 86 (N.D.Cal., 1888), it was determined that the United States did not have jurisdiction to prosecute for a murder committed at the Presidio because California had never ceded jurisdiction; see also United States v. Tully, 140 F. 899 (D.Mon., 1905). But later, California ceded jurisdiction for the Presidio to the United States, and it was held in United States v. Watkins, 22 F.2d 437 (N.D.Cal., 1927), that this enabled the U.S. to maintain a murder prosecution; see also United States v. Holt, 168 F. 141 (W.D. Wash., 1909), United States v. Lewis, 253 F. 469 (S.D.Cal, 1918), and United States v. Wurtzbarger, 276 F. 753 (D.Or., 1921). Because the U.S. owned, and had a state cession of jurisdiction for, Fort Douglas in Utah, it was held that the U.S. had jurisdiction for a rape prosecution in Rogers v. Squier, 157 F.2d 948 (9th Cir., 1946). But, without a cession, the U.S. has no jurisdiction; see Arizona v. Manypenny, 445 F.Supp. 1123 (D.Ariz., 1977).


Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 16 of 19~~


The above cases from the U.S. Supreme Court and federal appellate courts set forth the rule that in criminal prosecutions, the government, as the party seeking to establish the existence of federal jurisdiction, must prove U.S. ownership of the property in question and a state cession of jurisdiction. This same rule manifests itself in state cases. State courts are courts of general jurisdiction and in a state criminal prosecution, the state must only prove that the offense was committed within the state and a county thereof. If a defendant contends that only the federal government has jurisdiction over the offense, he, as proponent for the existence of federal jurisdiction, must likewise prove U.S. ownership of the property where the crime was committed and state cession of jurisdiction.

Examples of the operation of this principle are numerous. In Arizona, the State has jurisdiction over federal lands in the public domain, the state not having ceded jurisdiction of that property to the U.S.; see State v. Dykes, 114 Ariz. 592, 562 P.2d 1090 (1977). In California, if it is not proved by a

*page 17 of 20*

defendant in a state prosecution that the state has ceded jurisdiction, it is presumed the state does have jurisdiction over a criminal offense; see People v. Brown, 69 Cal. App.2d 602, 159 P.2d 686 (1945). If the cession exists, the state has no jurisdiction; see People v. Mouse, 203 Cal. 782, 265 P. 944 (1928). In Montana, the state has jurisdiction over property if it is not proved there is a state cession of jurisdiction to the U.S.; see State ex rel Parker v. District Court, 147 Mon. 151, 410 P.2d 459 (1966); the existence of a state cession of jurisdiction to the U.S. ousts the state of jurisdiction; see State v. Tully, 31 Mont. 365, 78 P. 760 (1904). The same applies in Nevada; see State v. Mack, 23 Nev. 359, 47 P. 763 (1897), and Pendleton v. State, 734 P.2d 693 (Nev., 1987); it applies in Oregon (see State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918) and State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987)); and in Washington (see State v. Williams, 23 Wash.App. 694, 598 P.2d 731 (1979)).

In People v. Hammond, 1 Ill.2d 65, 115 N.E.2d 331 (1953), a burglary of an IRS office was held to be within state jurisdiction, the court holding that the defendant was required to prove existence of federal jurisdiction by U.S. ownership of the property and state cession of jurisdiction. In two cases from Michigan, larcenies committed at U.S. Post Offices which were rented were held to be within state jurisdiction; see People v. Burke, 161 Mich. 397, 126 N.W. 446 (1910) and People v. Van Dyke, 276 Mich. 32, 267 N.W. 778 (1936); see also In re Kelly, 311 Mich. 596, 19 N.W.2d 218 (1945). In Kansas City v. Garner, 430 S.W.2d 630 (Mo.App., 1968), state jurisdiction over a theft offense occurring in a federal building was upheld, and the court stated that a defendant had to show federal jurisdiction by proving U.S. ownership of the building and a cession of jurisdiction from the state to the United States. A similar holding was made for a theft at a U.S. missile site in State v. Rindall, 146 Mon. 64, 404 P.2d 327 (1965). In Pendleton v. State, 734 P.2d 693 (Nev., 1987), the state court was held to have jurisdiction over a DUI ("driving under the influence") committed on federal lands, the defendant having failed to show U.S. ownership and state cession of jurisdiction.

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
~~Page 16 of 18~~

In People v. Gerald, 40 Misc.2d 819, 243 N.Y.S.2d 1001 (1963), the state was held to have jurisdiction of an assault at a U.S. Post Office since the defendant did not meet his burden of showing presence of federal jurisdiction; and because a defendant failed to prove title and jurisdiction in the United States for an offense committed at a customs station, state jurisdiction was upheld in People v. Fisher, 97 A.D.2d 651, 469 N.Y.S.2d 187 (A.D. 3 Dept., 1983). The proper method of showing federal jurisdiction in state court is demonstrated by the decision in People v. Williams, 136 Misc.2d 294, 518 N.Y.S.2d 751 (1987). This rule was likewise enunciated in State v. Burger, 33 Ohio App.3d 231, 515 N.E.2d 640 (1986), in a case involving a DUI

offense committed on a road near a federal arsenal.

In Kuerschner v. State, 493 P.2d 1402 (Okl.Cr.App., 1972), the state was held to have jurisdiction of a drug sales offense occurring at an Air Force Base, the defendant not having attempted to prove federal jurisdiction by showing title and jurisdiction of the property in question in the United States; see also Towry v. State, 540 P.2d 597 (Okl.Cr.App., 1975). Similar holdings for murders committed at U.S. Post Offices were made in State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918), and in United States v. Pate, 393 F.2d 44 (7th Cir., 1968). Another Oregon case, State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987), demonstrates this rule. And finally, in Curry v. State, 111 Tex. Cr. 264, 12 S.W.2d 796 (1928), it was held that, in the absence of proof that the state had ceded jurisdiction of a place to the United States, the state courts had jurisdiction over an offense.

Therefore, in federal criminal prosecutions, the government must prove the existence of federal jurisdiction by showing U.S. ownership of the place where the crime was committed and state cession of jurisdiction. If the government contends for the power criminally to prosecute for an offense occurring outside "its jurisdiction", it must prove an extra-territorial application of the statute in question as well as a constitutional foundation supporting the same. Absent this showing, no federal prosecution can be commenced for offenses committed outside "its jurisdiction", i.e. the federal zone.

# # #

Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:

PROOF OF SERVICE

I, Everett C. Gilbertson, Sui Juris, hereby certify, under

penalty of perjury, under the laws of the United States of

America, without the "United States," that I am at least 18 years

of age, a Citizen of one of the United States of America, and

that I personally served the following document(s):

NOTICE AND DEMAND TO DISMISS FOR
LACK OF ANY CRIMINAL JURISDICTION WHATSOEVER:
28 U.S.C. 1359; FRCP Rules 9(b), 12(b)(1),
12(b)(2), 12(h)(3)

by placing one true and correct copy of said document(s) in first

class United States Mail, with postage prepaid and properly

addressed to the following:


Henry Shea
United States Attorneys
110 South Fourth Street
Minneapolis [zip code exempt]
MINNESOTA STATE

Attorney General
Department of Justice
10th & Constitution, N.W.
Washington [zip code exempt]
DISTRICT OF COLUMBIA

Solicitor General
Department of Justice
10th & Constitution, N.W.
Washington [zip code exempt]
DISTRICT OF COLUMBIA


Dated: _____


/s/ Everett C. Gilbertson

_____
Everett C. Gilbertson, Sui Juris
Citizen of Minnesota state
(expressly not a citizen of the United States)

All Rights Reserved without Prejudice


[See USPS Publication #221 for addressing instructions.]


   Notice and Demand to Dismiss for Lack of Criminal Jurisdiction:
                    ~~Page 18 of 18~~


                    #  #  #

_____

**Return to Table of Contents for**

**U.S.A. v. Gilbertson, 8th Circuit**

_____

*page 20 of 20*

[This version of the case includes the footnotes, unlike one pulled down from the project hermes machine at Cornell U., which for some reason doesn't seem to have the footnotes in opinions available through it.]

[Cite as U.S. v. Lopez, 115 S.Ct. 1624 (1995)]

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Lumber Co., 200 U. S. 321, 337.

SUPREME COURT OF THE UNITED STATES

Syllabus

UNITED STATES v. LOPEZ

certiorari to the united states court of appeals for the fifth circuit

No. 93-1260.
Argued November 8, 1994-Decided April 26, 1995

After respondent, then a 12th-grade student, carried a concealed handgun into his high school, he was charged with violating the Gun-Free School Zones Act of 1990, which forbids ``any individual   knowingly to possess a firearm at a place that [he] knows . . . is a school zone,'' 18 U. S. C. section 922(q)(1)(A). The District Court denied his motion to dismiss the indictment, concluding that section 922(q) is a constitutional exercise of Congress' power to regulate activities in and affecting commerce. In reversing, the Court of Appeals held that, in light of what it characterized as insufficient congressional findings and legislative history, section 922(q) is invalid as beyond Congress' power under the Commerce Clause.

Held: The Act exceeds Congress' Commerce Clause authority. First, although this Court has upheld a wide variety of congressional Acts regulating intrastate economic activity that substantially affected interstate commerce, the possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, have such a substantial effect on interstate commerce. Section 922(q) is a criminal statute that by its terms has nothing to do with ``commerce'' or any sort of economic enterprise, however broadly those terms are defined. Nor is it an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under the Court's cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce. Second, 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the

*page 1 of 35*

*/*

upon an anonymous tip, school  authorities confronted respondent, who admitted that he  was carrying the weapon.  He was arrested and charged  under Texas law with firearm possession on school premises.  See Tex. Penal Code Ann. section 46.03(a)(1) (Supp. 1994).  The next day, the state charges were dismissed  after federal agents charged respondent by complaint  with violating the Gun-Free School Zones Act of 1990.   18 U. S. C. section 922(q)(1)(A) (1988 ed., Supp. V).  [footnote 1]

A federal grand jury indicted respondent on one count  of knowing possession of a firearm at a school zone, in  violation of section 922(q).  Respondent moved to dismiss his  federal indictment on the ground that section 922(q) "is  unconstitutional as it is beyond the power of Congress  to legislate control over our public schools."  The District  Court denied the motion, concluding that section 922(q) "is  a  constitutional exercise of Congress' well-defined power to  regulate activities in and affecting commerce, and the  'business' of elementary, middle and high schools . . .  affects interstate commerce."  App. to Pet. for Cert. 55a.   Respondent waived his right to a jury trial.  The District  Court conducted a bench trial, found him guilty  of violating section 922(q), and sentenced him to six months' imprisonment and two years' supervised release.

On appeal, respondent challenged his conviction based  on his claim that section 922(q) exceeded Congress' power to  legislate under the Commerce Clause.  The Court of  Appeals for the Fifth Circuit agreed and reversed  respondent's conviction.  It held that, in light of what it  characterized as insufficient congressional findings and  legislative history, "section 922(q), in the full reach of its  terms, is invalid as beyond the power of Congress under  the Commerce Clause."  2 F. 3d 1342, 1367-1368 (1993).   Because of the importance of the issue, we granted certiorari, 511 U. S. ___ (1994), and we now affirm.

We start with first principles.  The Constitution  creates a Federal Government of enumerated powers.   See  U. S. Const., Art. I, section 8.  As James Madison wrote,  "[t]he powers delegated by the proposed Constitution to  the federal government are few and defined.  Those  which are to remain in the State governments are numerous and indefinite."  The Federalist No. 45, pp.  292-293 (C. Rossiter ed. 1961).  This constitutionally  mandated division of authority "was adopted by the  Framers to ensure protection of our fundamental liberties."  Gregory v. Ashcroft, 501 U. S. 452, 458 (1991)  (internal quotation marks omitted).  "Just as the separation and independence of the coordinate branches  of the Federal Government serves to prevent the  accumulation of excessive power in any one branch, a  healthy balance of power between the States and the  Federal Government will reduce the risk of tyranny and  abuse from either front."  Ibid.

The Constitution delegates to Congress the power "[t]o  regulate Commerce with foreign Nations, and among the  several States, and with the Indian Tribes."  U. S.  Const., Art. I, section 8, cl. 3.  The Court, through Chief  Justice Marshall, first defined the nature of Congress'  commerce power in Gibbons v. Ogden, 9 Wheat. 1,  189-190 (1824):

manufacture, and is not part of it"); Carter v. Carter Coal Co., 298 U. S. 238, 304 (1936) ("Mining brings the subject matter of commerce into existence. Commerce disposes of it"). Simultaneously, however, the Court held that, where the interstate and intrastate aspects of commerce were so mingled together that full regulation of interstate commerce required incidental regulation of intrastate commerce, the Commerce Clause authorized such regulation. See, e.g., Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342 (1914) (Shreveport Rate Cases).

In A. L. A. Schecter Poultry Corp. v. United States, 295 U. S. 495, 550 (1935), the Court struck down regulations that fixed the hours and wages of individuals employed by an intrastate business because the activity being regulated related to interstate commerce only indirectly. In doing so, the Court characterized the distinction between direct and indirect effects of intrastate transactions upon interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system." Id., at 548. Activities that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly were beyond Congress' reach. Id., at 546. The justification for this formal distinction was rooted in the fear that otherwise "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government." Id., at 548.

Two years later, in the watershed case of NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1 (1937), the Court upheld the National Labor Relations Act against a Commerce Clause challenge, and in the process, departed from the distinction between "direct" and "indirect" effects on interstate commerce. Id., at 36-38 ("The question [of the scope of Congress' power] is necessarily one of degree"). The Court held that intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" are within Congress' power to regulate. Id., at 37.

In United States v. Darby, 312 U. S. 100 (1941), the Court upheld the Fair Labor Standards Act, stating:

> "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce." Id., at 118.

See also United States v. Wrightwood Dairy Co., 315 U. S. 110, 119 (1942) (the commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power").

In Wickard v. Filburn, the Court upheld the application of amendments to the Agricultural Adjustment Act of 1938 to the

Metropolitan Transit Authority, 469 U. S. 528 (1985).  In response
to the dissent's warnings that the Court was  powerless to enforce
the limitations on Congress'  commerce powers because "[a]ll
activities affecting  commerce, even in the minutest degree,
[Wickard], may  be regulated and controlled by Congress," 392 U.
S., at  204 (Douglas, J., dissenting), the Wirtz Court replied
that the dissent had misread precedent as "[n]either  here nor in
Wickard has the Court declared that  Congress may use a relatively
trivial impact on commerce as an excuse for broad general
regulation of state  or private activities," id., at 197, n. 27.
Rather, "[t]he Court has said only that where a general regulatory
statute bears a substantial relation to commerce, the de  minimis
character of individual instances arising under  that statute is of
no consequence." Ibid. (first emphasis added).

     Consistent with this structure, we have identified three broad
categories of activity that Congress may regulate under its
commerce power. Perez v. United  States, supra, at 150; see also
Hodel v. Virginia Surface  Mining & Reclamation Assn., supra, at
276-277.  First,  Congress may regulate the use of the channels of
interstate commerce.  See, e.g., Darby, 312 U. S., at 114;  Heart
of Atlanta Motel, supra, at 256 ("`[T]he authority  of Congress to
keep the channels of interstate commerce  free from immoral and
injurious uses has been frequently sustained, and is no longer open
to question.'"   (quoting Caminetti v. United States, 242 U. S.
470, 491  (1917)).  Second, Congress is empowered to regulate and
protect the instrumentalities of interstate commerce, or  persons
or things in interstate commerce, even though  the threat may come
only from intrastate activities.   See, e.g., Shreveport Rate
Cases, 234 U. S. 342 (1914);  Southern R. Co. v. United States, 222
U. S. 20 (1911)  (upholding amendments to Safety Appliance Act as
applied to vehicles used in intrastate commerce); Perez,  supra, at
150 ("[F]or example, the destruction of an  aircraft (18 U. S. C.
section 32), or . . . thefts from interstate  shipments (18 U. S.
C. section 659)").  Finally, Congress'  commerce authority includes
the power to regulate those  activities having a substantial
relation to interstate  commerce, Jones & Laughlin Steel, 301 U.
S., at 37, i.e.,  those activities that substantially affect
interstate commerce.  Wirtz, supra, at 196, n. 27.

     Within this final category, admittedly, our case law  has not
been clear whether an activity must "affect" or "substantially
affect" interstate commerce in order to be  within Congress' power
to regulate it under the Commerce Clause.  Compare Preseault v.
ICC, 494 U. S. 1,  17 (1990), with Wirtz, supra, at 196, n. 27 (the
Court  has never declared that "Congress may use a relatively
trivial impact on commerce as an excuse for broad general
regulation of state or private activities").  We conclude,
consistent with the great weight of our case law, that the proper
test requires an analysis of whether the regulated activity
"substantially affects" interstate commerce.

     We now turn to consider the power of Congress, in the
light of this framework, to enact section 922(q).  The first two
categories of authority may be quickly disposed of: section 922(q)
is not a regulation of the use of the channels of interstate
commerce, nor is it an attempt to prohibit the interstate

activity, in which the regulatory scheme could be undercut unless the intra-state activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

Second, section 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. For example, in United States v. Bass, 404 U. S. 336 (1971), the Court interpreted former 18 U. S. C. section 1202(a), which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce . . . any firearm." 404 U. S., at 337. The Court interpreted the possession component of section 1202(a) to require an additional nexus to interstate commerce both because the statute was ambiguous and because "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." Id., at 349. The Bass Court set aside the conviction because although the Government had demonstrated that Bass had possessed a firearm, it had failed "to show the requisite nexus with interstate commerce." Id., at 347. The Court thus interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the "mere possession" of firearms. See id., at 339, n. 4; see also United States v. Five Gambling Devices, 346 U. S. 441, 448 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative"). Unlike the statute in Bass, section 922(q) has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.

Although as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce, see, e.g., Preseault v. ICC, 494 U. S. 1, 17 (1990), the Government concedes that "[n]either the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Brief for United States 5-6. We agree with the Government that Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce. See McClung, 379 U. S., at 304; see also Perez, 402 U. S., at 156 ("Congress need [not] make particularized findings in order to legislate"). But to the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye, they are lacking here. [footnote 4]

The Government argues that Congress has accumulated institutional expertise regarding the regulation of firearms through previous enactments. Cf. Fullilove v. Klutznick, 448 U. S. 448, 503 (1980) (Powell, J., concurring). We agree, however, with

process and the potential economic consequences flowing from that threat. Post, at 5-9. Specifically, the dissent reasons that (1) gun-related violence is a serious problem; (2) that problem, in turn, has an adverse effect on classroom learning; and (3) that adverse effect on classroom learning, in turn, represents a substantial threat to trade and commerce. Post, at 9. This analysis would be equally applicable, if not more so, to subjects such as family law and direct regulation of education.

For instance, if Congress can, pursuant to its Commerce Clause power, regulate activities that adversely affect the learning environment, then, a fortiori, it also can regulate the educational process directly. Congress could determine that a school's curriculum has a "significant" effect on the extent of classroom learning. As a result, Congress could mandate a federal curriculum for local elementary and secondary schools because what is taught in local schools has a significant "effect on classroom learning," cf. post, at 9, and that, in turn, has a substantial effect on interstate commerce.

Justice Breyer rejects our reading of precedent and argues that "Congress . . . could rationally conclude that schools fall on the commercial side of the line." Post, at 16. Again, Justice Breyer's rationale lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial. Under the dissent's rationale, Congress could just as easily look at child rearing as "fall[ing] on the commercial side of the line" because it provides a "valuable service-namely, to equip [children] with the skills they need to survive in life and, more specifically, in the workplace." Ibid. We do not doubt that Congress has authority under the Commerce Clause to regulate numerous commercial activities that substantially affect interstate commerce and also affect the educational process. That authority, though broad, does not include the authority to regulate each and every aspect of local schools.

Admittedly, a determination whether an intrastate activity is commercial or noncommercial may in some cases result in legal uncertainty. But, so long as Congress' authority is limited to those powers enumerated in the Constitution, and so long as those enumerated powers are interpreted as having judicially enforceable outer limits, congressional legislation under the Commerce Clause always will engender "legal uncertainty." Post, at 17. As Chief Justice Marshall stated in McCulloch v. Maryland, 4 Wheat. 316 (1819):

> "The [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it . . . is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." Id., at 405.

See also Gibbons v. Ogden, 9 Wheat., at 195 ("The enumeration presupposes something not enumerated"). The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation.

//

school."  section 921 (a)(25).

2. See also Hodel, 452 U.S., at 311 ("[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so") (Rehnquist, J., concurring in judgment); Heart of Atlanta Motel, 379 U.S., at 273 ("[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled only by this Court") (Black, J., concurring).

3. Under our federal system, the "'States possess primary authority for defining and enforcing the criminal law.'" Brecht v. Abrahamson, 507 U.S. ___, ___, 113 S.Ct. 1710, 1720, 123 L.Ed.2d. 353 (1993) (quoting Engle v. Isaac, 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d. 783 (1982); see also Screws v. United States, 325 U.S. 91, 109, 65 S.Ct. 1031, 1039, 89 L.Ed.2d. 1495 (1945) (plurality opinion) ("Our national government is one of designated powers alone.  Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States").  When Congress criminalizes conduct already denounced as criminal by the States, it effects a "'change in the sensitive relation between federal and state criminal jurisdiction.'"  United States v. Emmons, 410 U.S. 396, 411-412, 93 S.Ct. 1007, 1015-1016, 35 L.Ed.2d. 379 (1973) (quoting United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d. 488 (1971)).  The Government acknowledges that section 922(q) "displace[s] state policy choices in . . . that its prohibitions apply even in States that have chosen not to outlaw the conduct in question."  Brief for United States 29, n. 18; see also Statement of President George Bush on Signing the Crime Control Act of 1990, 26 Weekly Comp. of Pres. Doc. 1944, 1945 (Nov. 29, 1990) ("Most egregiously, [section 922(q)] inappropriately overrides legitimate state firearms laws with a new and unnecessary Federal law.  The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed upon the States by Congress").

4. We note that on September 14, 1994, President Clinton signed into law the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103-322, 108 Stat. 1796.  Section 320904 of that Act, id., at 2125, amends section 922(q) to include congressional findings regarding the effects of firearm possession in and around schools upon interstate and foreign commerce.  The Government does not rely upon these subsequent findings as a substitute for the absence of findings in the first instance.  Tr. of Oral Arg. 25 ("[W]e're not relying on them in the strict sense of the word, but we think at a very minimum they indicate that reasons can be identified for why Congress wanted to regulate this particular activity").

   Justice Kennedy, with whom Justice O'Connor joins, concurring.

   The history of the judicial struggle to interpret the Commerce Clause during the transition from the economic system the Founders knew to the single, national market still emergent in our own era

and commerce. Manufacture is transformation-the fashioning of raw materials into a change of form for use. The functions of commerce are different." Kidd v. Pearson, 128 U. S. 1, 20 (1888). Though that approach likely would not have survived even if confined to the question of a State's authority to enact legislation, it was not at all propitious when applied to the quite different question of what subjects were within the reach of the national power when Congress chose to exercise it.

This became evident when the Court began to confront federal economic regulation enacted in response to the rapid industrial development in the late 19th century. Thus, it relied upon the manufacture-commerce dichotomy in United States v. E. C. Knight Co., 156 U. S. 1 (1895), where a manufacturers' combination controlling some 98% of the Nation's domestic sugar refining capacity was held to be outside the reach of the Sherman Act. Conspiracies to control manufacture, agriculture, mining, production, wages, or prices, the Court explained, had too "indirect" an effect on interstate commerce. Id., at 16. And in Adair v. United States, 208 U. S. 161 (1908), the Court rejected the view that the commerce power might extend to activities that, although local in the sense of having originated within a single state, nevertheless had a practical effect on interstate commercial activity. The Court concluded that there was not a "legal or logical connection . . . between an employe's membership in a labor organization and the carrying on of interstate commerce," id., at 178, and struck down a federal statute forbidding the discharge of an employee because of his membership in a labor organization. See also The Employers' Liability Cases, 207 U. S. 463, 497 (1908) (invalidating statute creating negligence action against common carriers for personal injuries of employees sustained in the course of employment, because the statute "regulates the persons because they engage in interstate commerce and does not alone regulate the business of interstate commerce").

Even before the Court committed itself to sustaining federal legislation on broad principles of economic practicality, it found it necessary to depart from these decisions. The Court disavowed E. C. Knight's reliance on the manufacturing-commerce distinction in Standard Oil Co. of New Jersey v. United States, 221 U. S. 1, 68-69 (1911), declaring that approach "unsound." The Court likewise rejected the rationale of Adair when it decided, in Texas & New Orleans R. Co. v. Railway Clerks, 281 U. S. 548, 570-571 (1930), that Congress had the power to regulate matters pertaining to the organization of railroad workers.

In another line of cases, the Court addressed Congress' efforts to impede local activities it considered undesirable by prohibiting the interstate movement of some essential element. In the Lottery Case, 188 U. S. 321 (1903), the Court rejected the argument that Congress lacked power to prohibit the interstate movement of lottery tickets because it had power only to regulate, not to prohibit. See also Hipolite Egg Co. v. United States, 220 U. S. 45 (1911); Hoke v. United States, 227 U. S. 308 (1913). In Hammer v. Dagenhart, 247 U. S. 251 (1918), however, the Court insisted that the power to regulate commerce "is directly the contrary of the assumed right to forbid commerce from moving," id., at 269-270, and

National Industrial Recovery Act had "no direct relation to interstate commerce").

The case that seems to mark the Court's definitive commitment to the practical conception of the commerce power is NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1 (1937), where the Court sustained labor laws that applied to manufacturing facilities, making no real attempt to distinguish Carter, supra, and Schechter, supra. 301 U. S., at 40-41. The deference given to Congress has since been confirmed. United States v. Darby, 312 U. S. 100, 116-117 (1941), overruled Hammer v. Dagenhart, supra. And in Wickard v. Filburn, 317 U. S. 111 (1942), the Court disapproved E. C. Knight and the entire line of direct-indirect and manufacture-production cases, explaining that "broader interpretations of the Commerce Clause [were] destined to supersede the earlier ones," id., at 122, and "whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution," id., at 123, n. 24. Later examples of the exercise of federal power where commercial transactions were the subject of regulation include Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241 (1964), Katzenbach v. McClung, 379 U. S. 294 (1964), and Perez v. United States, 402 U. S. 146 (1971). These and like authorities are within the fair ambit of the Court's practical conception of commercial regulation and are not called in question by our decision today.

The history of our Commerce Clause decisions contains at least two lessons of relevance to this case. The first, as stated at the outset, is the imprecision of content- based boundaries used without more to define the limits of the Commerce Clause. The second, related to the first but of even greater consequence, is that the Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point. Stare decisis operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature. That fundamental restraint on our power forecloses us from reverting to an understanding of commerce that would serve only an 18th-century economy, dependent then upon production and trading practices that had changed but little over the preceding centuries; it also mandates against returning to the time when congressional authority to regulate undoubted commercial activities was limited by a judicial determination that those matters had an insufficient connection to an interstate system. Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.

In referring to the whole subject of the federal and state balance, we said this just three Terms ago:

"This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two

States and the Federal Government will reduce the risk of tyranny and abuse from either front. . . .  In the tension between federal and state power lies the promise of liberty"); New York v. United States, supra, at ___ (slip op., at 34) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals.  State sovereignty is not just an end in itself: `Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power'") (quoting Coleman v. Thompson, 501 U. S. 722, 759 (1991) (Blackmun, J., dissenting)).

The theory that two governments accord more liberty than one requires for its realization two distinct and discernable lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States.  If, as Madison expected, the federal and state governments are to control each other, see The Federalist No. 51, and hold each other in check by competing for the affections of the people, see The Federalist No. 46, those citizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function.  "Federalism serves to assign political responsibility, not to obscure it."  FTC v. Ticor Title Ins. Co., 504 U. S. 621, 636 (1992).  Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory.  See New York v. United States, supra, at ___ ; FERC v. Mississippi, 456 U. S. 742, 787 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part).  The resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power.

To be sure, one conclusion that could be drawn from The Federalist Papers is that the balance between national and state power is entrusted in its entirety to the political process. Madison's observation that "the people ought not surely to be precluded from giving most of their confidence where they may discover it to be most due," The Federalist No. 46, p. 295 (C. Rossiter ed. 1961), can be interpreted to say that the essence of responsibility for a shift in power from the State to the Federal Government rests upon a political judgment, though he added assurance that "the State governments could have little to apprehend, because it is only within a certain sphere that the federal power can, in the nature of things, be advantageously administered," ibid.  Whatever the judicial role, it is axiomatic that Congress does have substantial discretion and control over the federal balance.

For these reasons, it would be mistaken and mischievous for the political branches to forget that the sworn obligation to preserve and protect the Constitution in maintaining the federal balance is their own in the first and primary instance.  In the Webster-Hayne Debates, see The Great Speeches and Orations of Daniel Webster 227-272 (E. Whipple ed. 1879), and the debates over the Civil Rights Acts, see Hearings on S. 1732 before the Senate Committee on Commerce, 88th Cong., 1st Sess., pts. 1-3 (1963), some Congresses

*19*

Our position in enforcing the dormant Commerce Clause is
instructive.  The Court's doctrinal approach in that area has
likewise "taken some turns."  Oklahoma Tax Comm'n v. Jefferson
Lines, Inc., 514 U. S. ___, ___ (1995) (slip op., at 4).  Yet in
contrast to the prevailing skepticism that surrounds our ability to
give meaning to the explicit text of the Commerce Clause, there is
widespread acceptance of our authority to enforce the dormant
Commerce Clause, which we have but inferred from the constitutional
structure as a limitation on the power of the States.  One element
of our dormant Commerce Clause jurisprudence has been the principle
that the States may not impose regulations that place an undue
burden on interstate commerce, even where those regulations do not
discriminate between in-state and out-of-state businesses.  See
Brown-Forman Distillers Corp. v. New York State Liquor Authority,
476 U. S. 573, 579 (1986) (citing Pike v. Bruce Church, Inc., 397
U. S. 137, 142 (1970)).  Distinguishing between regulations that do
place an undue burden on interstate commerce and regulations that
do not depends upon delicate judgments.  True, if we invalidate a
state law, Congress can in effect overturn our judgment, whereas in
a case announcing that Congress has transgressed its authority, the
decision is more consequential, for its stands unless Congress can
revise its law to demonstrate its commercial character.  This
difference no doubt informs the circumspection with which we
invalidate an Act of Congress, but it does not mitigate our duty to
recognize meaningful limits on the commerce power of Congress.

The statute before us upsets the federal balance to a degree
that renders it an unconstitutional assertion of the commerce
power, and our intervention is required.  As the Chief Justice
explains, unlike the earlier cases to come before the Court here
neither the actors nor their conduct have a commercial character,
and neither the purposes nor the design of the statute have an
evident commercial nexus.  See ante, at 10-12.  The statute makes
the simple possession of a gun within 1,000 feet of the grounds of
the school a criminal offense.  In a sense any conduct in this
interdependent world of ours has an ultimate commercial origin or
consequence, but we have not yet said the commerce power may reach
so far.  If Congress attempts that extension, then at the least we
must inquire whether the exercise of national power seeks to
intrude upon an area of traditional state concern.

An interference of these dimensions occurs here, for it is well
established that education is a traditional concern of the States.
Milliken v. Bradley, 418 U. S. 717, 741-742 (1974); Epperson v.
Arkansas, 393 U. S. 97, 104 (1968).  The proximity to schools,
including of course schools owned and operated by the States or
their subdivisions, is the very premise for making the conduct
criminal.  In these circumstances, we have a particular duty to
insure that the federal-state balance is not destroyed.  Cf. Rice,
supra, at 230 ("[W]e start with the assumption that the historic
police powers of the States" are not displaced by a federal statute
"unless that was the clear and manifest purpose of Congress");
Florida Lime & Avocado Growers, Inc. v. Paul, 373 U. S. 132, 146
(1963).

While it is doubtful that any State, or indeed any reasonable

The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and to do so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term. The tendency of this statute to displace state regulation in areas of traditional state concern is evident from its territorial operation. There are over 100,000 elementary and secondary schools in the United States. See U. S. Dept. of Education, National Center for Education Statistics, Digest of Education Statistics 73, 104 (NCES 94-115, 1994) (Tables 63, 94). **Each of these now has an invisible federal zone extending 1,000 feet beyond the (often irregular) boundaries of the school property.** In some communities no doubt it would be difficult to navigate without infringing on those zones. Yet throughout these areas, school officials would find their own programs for the prohibition of guns in danger of displacement by the federal authority unless the State chooses to enact a parallel rule.

This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain policy, cf. New York v. United States, 505 U. S. ___ (1992), or to organize its governmental functions in a certain way, cf. FERC v. Mississippi, 456 U. S., at 781 (O'Connor, J., concurring in judgment in part and dissenting in part). While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.

For these reasons, I join in the opinion and judgment of the Court.

Justice Thomas, concurring.

The Court today properly concludes that the Commerce Clause does not grant Congress the authority to prohibit gun possession within 1,000 feet of a school, as it attempted to do in the Gun-Free School Zones Act of 1990, Pub. L. 101-647, 104 Stat. 4844. Although I join the majority, I write separately to observe that our case law has drifted far from the original understanding of the Commerce Clause. In a future case, we ought to temper our Commerce Clause jurisprudence in a manner that both makes sense of our recent case law and is more faithful to the original understanding of that Clause.

We have said that Congress may regulate not only "Commerce . . . among the several states," U. S. Const., Art. 1, 8, cl. 3, but also anything that has a "substantial effect" on such commerce. This test, if taken to its logical extreme, would give Congress a "police power" over all aspects of American life. Unfortunately, we have never come to grips with this implication of our substantial effects formula. Although we have supposedly applied the substantial effects test for the past 60 years, we always have

literally means "with merchandise."  See 3 Oxford English
Dictionary 552 (2d ed. 1989) (com-"with"; merci-"merchandise").  In
fact, when Federalists and Anti-Federalists discussed the Commerce
Clause during the ratification period, they often used trade (in
its selling/bartering sense) and commerce interchangeably.  See The
Federalist No. 4, p. 22 (J. Jay) (asserting that countries will
cultivate our friendship when our "trade" is prudently regulated by
Federal Government); [footnote 1] id., No. 7, at 39-40 (A.
Hamilton) (discussing "competitions of commerce" between States
resulting from state "regulations of trade"); id., No. 40, at 262
(J. Madison) (asserting that it was an "acknowledged object of the
Convention . . . that the regulation of trade should be submitted
to the general government"); Lee, Letters of a Federal Farmer No.
5, in Pamphlets on the Constitution of the United States 319 (P.
Ford ed. 1888); Smith, An Address to the People of the State of
New-York, in id., at 107.

     As one would expect, the term "commerce" was used in
contradistinction to productive activities such as manufacturing
and agriculture.  Alexander Hamilton, for example, repeatedly
treated commerce, agriculture, and manufacturing as three separate
endeavors.  See, e.g., The Federalist No. 36, at 224 (referring to
"agriculture, commerce, manufactures"); id., No. 21, at 133
(distinguishing commerce, arts, and industry); id., No. 12, at 74
(asserting that commerce and agriculture have shared interests).
The same distinctions were made in the state ratification
conventions.  See e.g., 2 Debates in the Several State Conventions
on the Adoption of the Federal Constitution 57 (J. Elliot ed. 1836)
(hereinafter Debates) (T. Dawes at Massachusetts convention); id.,
at 336 (M. Smith at New York convention).

     Moreover, interjecting a modern sense of commerce into the
Constitution generates significant textual and structural problems.
For example, one cannot replace "commerce" with a different type of
enterprise, such as manufacturing.  When a manufacturer produces a
car, assembly cannot take place "with a foreign nation" or "with
the Indian Tribes."  Parts may come from different States or other
nations and hence may have been in the flow of commerce at one
time, but manufacturing takes place at a discrete site.
Agriculture and manufacturing involve the production of goods;
commerce encompasses traffic in such articles.

     The Port Preference Clause also suggests that the term
"commerce" denoted sale and/or transport rather than business
generally.  According to that Clause, "[n]o Preference shall be
given by any Regulation of Commerce or Revenue to the Ports of one
State over those of another."  U. S. Const., Art. I, section 9, cl.
6.  Although it is possible to conceive of regulations of
manufacturing or farming that prefer one port over another, the
more natural reading is that the Clause prohibits Congress from
using its commerce power to channel commerce through certain
favored ports.

     The Constitution not only uses the word "commerce" in a narrower
sense than our case law might suggest, it also does not support the
proposition that Congress has authority over all activities that
"substantially affect" interstate commerce.  The Commerce Clause

very least, convince us that the "substantial effects" test must
be reexamined.

## II

The exchanges during the ratification campaign reveal the
relatively limited reach of the Commerce Clause and of federal
power generally. The Founding Fathers confirmed that most areas of
life (even many matters that would have substantial effects on
commerce) would remain outside the reach of the Federal Government.
Such affairs would continue to be under the exclusive control of
the States.

Early Americans understood that commerce, manufacturing, and
agriculture, while distinct activities, were intimately related and
dependent on each other—that each "substantially affected" the
others. After all, items produced by farmers and manufacturers
were the primary articles of commerce at the time. If commerce was
more robust as a result of federal superintendence, farmers and
manufacturers could benefit. Thus, Oliver Ellsworth of Connecticut
attempted to convince farmers of the benefits of regulating
commerce. "Your property and riches depend on a ready demand and
generous price for the produce you can annually spare," he wrote,
and these conditions exist "where trade flourishes and when the
merchant can freely export the produce of the country" to nations
that will pay the highest price. A Landholder No. 1, Connecticut
Courant, Nov. 5, 1787, in 3 Documentary History of the Ratification
of the Constitution 399 (M. Jensen ed. 1978) (hereinafter Docu-
mentary History). See also The Federalist No. 35, at ___ (A.
Hamilton) ("[D]iscerning citizens are well aware that the branches
of and manufacturing arts furnish the materials of mercantile
enterprise and industry. Many of them indeed are immediately
connected with the operations of commerce. They know that the
merchant is their natural patron and friend"); id., at ___ ("Will
not the merchant . . . be disposed to cultivate . . . the interests
of the mechanic and manufacturing arts to which his commerce is so
nearly allied?"); A Jerseyman: To the Citizens of New Jersey,
Trenton Mercury, Nov. 6, 1787, in 3 Documentary History 147 (noting
that agriculture will serve as a "source of commerce"); Marcus, The
New Jersey Journal, Nov. 14, 1787, id., at 152 (both the merchant
and the farmer benefit from the prosperity of commerce). William
Davie, a delegate to the North Carolina Convention, illustrated the
close link best: "Commerce, sir, is the nurse of [agriculture and
manufacturing]. The merchant furnishes the planter with such
articles as he cannot manufacture himself, and finds him a market
for his produce. Agriculture cannot flourish if commerce
languishes; they are mutually dependent on each other." 4 Elliot
20.

Yet, despite being well aware that agriculture, manufacturing,
and other matters substantially affected commerce, the founding
generation did not cede authority over all these activities to
Congress. Hamilton, for instance, acknowledged that the Federal
Government could not regulate agriculture and like concerns:

"The administration of private justice between the citizens of
the same State, the supervision of agriculture and of other

Wheat. 1 (1824) established that Congress may control all local
activities that "significantly affect interstate commerce," post,
at 1.  And, "with the exception of one wrong turn subsequently
corrected," this has been the "traditiona[l]" method of
interpreting the Commerce Clause.  Post, at 18 (citing Gibbons and
United States v. Darby, 312 U. S. 100, 116-117 (1941)).

    In my view, the dissent is wrong about the holding and reasoning
of Gibbons.  Because this error leads the dissent to characterize
the first 150 years of this Court's case law as a "wrong turn," I
feel compelled to put the last 50 years in proper perspective.

                                A

    In Gibbons, the Court examined whether a federal law that
licensed ships to engage in the "coasting trade" preempted a New
York law granting a 30-year monopoly to Robert Livingston and
Robert Fulton to navigate the State's waterways by steamship.  In
concluding that it did, the Court noted that Congress could
regulate "navigation" because "[a]ll America . . . has uniformly
understood, the word 'commerce,' to comprehend navigation.  It was
so understood, and must have been so under- stood, when the
constitution was framed."  9 Wheat., at 190.  The Court also
observed that federal power over commerce "among the several
States" meant that Congress could regulate commerce conducted
partly within a State.  Because a portion of interstate commerce
and foreign commerce would almost always take place within one or
more States, federal power over interstate and foreign commerce
necessarily would extend into the States.  Id., at 194-196.

    At the same time, the Court took great pains to make clear that
Congress could not regulate commerce "which is completely internal,
which is carried on between man and man in a State, or between
different parts of the same State, and which does not extend to or
affect other States."  Id., at 194.  Moreover, while suggesting
that the Constitution might not permit States to regulate
interstate or foreign commerce, the Court observed that
"[i]nspection laws, quarantine laws, health laws of every
description, as well as laws for regulating the internal commerce
of a State" were but a small part "of that immense mass of
legislation . . . not surrendered to a general government."  Id.,
at 203.  From an early moment, the Court rejected the notion that
Congress can regulate everything that affects interstate commerce.
That the internal commerce of the States and the numerous state
inspection, quarantine, and health laws had substantial effects on
interstate commerce cannot be doubted.  Nevertheless, they were not
"surrendered to the general government."

    Of course, the principal dissent is not the first to misconstrue
Gibbons.  For instance, the Court has stated that Gibbons
"described the federal commerce power with a breadth never yet
exceeded."  Wickard v. Filburn, 317 U. S. 111, 120 (1942).  See
also Perez v. United States, 402 U. S. 146, 151 (1971) (claiming
that with Darby and Wickard, "the broader view of the Commerce
Clause announced by Chief Justice Marshall had been restored").  I
believe that this misreading stems from two statements in Gibbons.

that the substantial effects test is but an innovation of the 20th century.

Even before Gibbons, Chief Justice Marshall, writing for the Court in Cohens v. Virginia, 6 Wheat. 264 (1821), noted that Congress had "no general right to punish murder committed within any of the States," id., at 426, and that it was "clear that congress cannot punish felonies generally," id., at 428. The Court's only qualification was that Congress could enact such laws for places where it enjoyed plenary powers-for instance, over the District of Columbia. Id., at 426. Thus, whatever effect ordinary murders, or robbery, or gun possession might have on interstate commerce (or on any other subject of federal concern) was irrelevant to the question of congressional power. [footnote 6]

United States v. Dewitt, 9 Wall. 41 (1870), marked the first time the Court struck down a federal law as exceeding the power conveyed by the Commerce Clause. In a two-page opinion, the Court invalidated a nationwide law prohibiting all sales of naphtha and illuminating oils. In so doing, the Court remarked that the Commerce Clause "has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States." Id., at 44. The law in question was "plainly a regulation of police," which could have constitutional application only where Congress had exclusive authority, such as the territories. Id., at 44-45. See also License Tax Cases, 5 Wall. 462, 470-471 (1867) (Congress cannot interfere with the internal commerce and business of a State); Trade-Mark Cases, 100 U. S. 82 (1879) (Congress cannot regulate internal commerce and thus may not establish national trademark registration).

In United States v. E. C. Knight Co., 156 U. S. 1 (1895), this Court held that mere attempts to monopolize the manufacture of sugar could not be regulated pursuant to the Commerce Clause. Raising echoes of the discussions of the Framers regarding the intimate relationship between commerce and manufacturing, the Court declared that "[c]ommerce succeeds to manufacture, and is not a part of it." Id., at 12. The Court also approvingly quoted from Kidd v. Pearson, 128 U. S. 1, 20 (1888):

> "'No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce . . . . If it be held that the term [commerce] includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested . . . with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining-in short, every branch of human industry.'" E. C. Knight, 156 U. S., at 14.

If federal power extended to these types of production "comparatively little of business operations and affairs would be left for state control." Id., at 16. See also Newberry v. United

The aggregation principle is clever, but has no stopping point. Suppose all would agree that gun possession within 1,000 feet of a school does not substantially affect commerce, but that possession of weapons generally (knives, brass knuckles, nunchakus, etc.) does. Under our substantial effects doctrine, even though Congress cannot single out gun possession, it can prohibit weapon possession generally. But one always can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce. Under our jurisprudence, if Congress passed an omnibus "substantially affects interstate commerce" statute, purporting to regulate every aspect of human existence, the Act apparently would be constitutional. Even though particular sections may govern only trivial activities, the statute in the aggregate regulates matters that substantially affect commerce.

V

This extended discussion of the original understanding and our first century and a half of case law does not necessarily require a wholesale abandonment of our more recent opinions. [footnote 8] It simply reveals that our substantial effects test is far removed from both the Constitution and from our early case law and that the Court's opinion should not be viewed as "radical" or another "wrong turn" that must be corrected in the future. [footnote 9] The analysis also suggests that we ought to temper our Commerce Clause jurisprudence.

Unless the dissenting Justices are willing to repudiate our long-held understanding of the limited nature of federal power, I would think that they too must be willing to reconsider the substantial effects test in a future case. If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be "defined" as being "'commensurate with the national needs'" or self-consciously intended to let the Federal Government " defend itself against economic forces that Congress decrees inimical or destructive of the national economy.'" See post, at 12-13 )Breyer, J., dissenting) (quoting North American Co. v. SEC, 327 U. S. 686, 705 (1946)). Such a formulation of federal power is no test at all: it is a blank check.

At an appropriate juncture, I think we must modify our Commerce Clause jurisprudence. Today, it is easy enough to say that the Clause certainly does not empower Congress to ban gun possession within 1,000 feet of a school.

FOOTNOTES

1. All references to the Federalist are to the Jacob E. Cooke 1961 edition.

2. Even to speak of the "Commerce Clause" perhaps obscures the actual scope of that Clause. As an original matter, Congress did not have authority to regulate all commerce: Congress could only "regulate Commerce with foreign Nations, and among the several

regulated manufacturing or agriculture.  Nor was there any statute which purported to regulate activities with "substantial effects" on interstate commerce.

7. To be sure, congressional power pursuant to the Commerce Clause was alternatively described less narrowly or more narrowly during this 150-year period.  Compare United States v. Coombs, 12 Pet. 72, 78, 9 L.Ed. 1004 (1838) (commerce power "extends to such acts done on land, which interfere with, obstruct, or prevent the due exercise of power to regulate [interstate and international] commerce" such as stealing goods from a beached ship) with United States v. E.C. Knight Co., 156 U.S. 1, 13, 15 S.Ct. 249, 254, 39 L.Ed. 325 (1895) ("Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities . . . may be regulated, but this is because they form part of the interstate trade or commerce").  During this period, however, this Court never held that Congress could regulate everything that substantially affects commerce.

8. Although I might be willing to return to the original understanding, I recognize that many believe it is too late in the day to undertake a fundamental reexamination of the past 60 years. Consideration of stare decisis and reliance interests may convince us that we cannot wipe the slate clean.

9. Nor can the majority's opinion fairly be compared to Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).  See post, at ___, Souter, J., dissenting).  Unlike Lochner and our more recent "substantive due process" cases, today's decision enforces only the Constitution and not "judicial policy judgments."  See post, at ___.  Notwithstanding Justice Souter's discussion, "'commercial' character" is not only a natural but an inevitable "ground of Commerce Clause distinction."  See post, at ___ (emphasis added).  Our invalidation of the Gun Free School Zones Act therefore falls comfortable within our proper role in reviewing federal legislation to determine if it exceeds congressional authority as defined by the Constitution itself.  As John Marshall put it: "If [Congress] were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the Constitution which they are to guard . . . They would declare it void."  3 Debates 553 (before the Virginia ratifying convention); see also The Federalist No. 44, at 303 (James Madison) (asserting that if Congress exercises powers "not warranted by [the Constitution's] true meaning " the judiciary will defend the Constitution); id., No. 78, at 526 (A. Hamilton) (asserting that the "courts of justice are to be considered the as the bulwarks of a limited constitution against legislative encroachments").  Where, as here, there is a case or controversy, there can be no "misstep", post, at ___, in enforcing the Constitution.

    Justice Stevens, dissenting.

    The welfare of our future "Commerce with foreign Nations, and among the several States," U. S. Const., Art. I, section 8, cl. 3, is vitally dependent on the character of the education of our children.  I therefore agree entirely with Justice Breyer's

page 35 of 35

(Last update: September 1, 1999)

## FEDERAL JURISDICTION

In the United States, there are two separate and distinct jurisdictions, one being that of the States within their own territorial boundaries and the other being federal jurisdiction. Broadly speaking, state jurisdiction encompasses the legislative power to regulate, control and govern real and personal property, individuals and enterprises within the territorial limits of any given State. In contrast, federal jurisdiction is extremely limited, with the same being exercised only in areas external to state legislative power and territory. Notwithstanding the clarity of this simple principle, the line of demarcation between these two jurisdictions and the extent and reach of each has become somewhat blurred due to popular misconceptions and the efforts expended by the federal government to conceal one of its major weaknesses. Only by resorting to history and case law can this obfuscation be clarified and the two distinct jurisdictions be readily seen.

The original thirteen colonies of America were each separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and each was governed separately and independently by the English Parliament.

The political connections of the separate colonies to the English Crown and Parliament descended to an rebellious state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, the First Continental Congress was convened by representatives of the several colonies in October, 1774, and its purpose was to submit a petition of grievances to the British Parliament and Crown. By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights;" but further, they asserted that these acts manifested designs, schemes and plans "which demonstrate a system formed to enslave America."

Matters grew worse and between October, 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July, 1776, the exercise of British authority in all of the colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal Declaration of Independence.

The legal effect of the Declaration of Independence was to make each new State a separate and independent sovereign over which there was no other government of superior power or jurisdiction. This was clearly shown in M'Ilvaine v. Coxe's Lessee, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

"This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign states, and that they did not derive them from concessions made by the British king. The treaty of peace contains a recognition of their independence, not a grant of it. From hence it results, that the laws of the several state governments were the laws of sovereign states, and as such were obligatory upon the people of such state, from the time they were enacted."

The consequences of independence was again explained in Harcourt v. Gaillard, 25 U.S. (12 Wheat.) 523, 526, 527 (1827), where the Supreme Court stated:

"There was no territory within the United States that was claimed in any other right than that of some one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the states. "Each declared itself sovereign and independent, according to the limits of its territory.

"[T]he soil and sovereignty within their acknowledged limits were as much theirs at the declaration of independence as at this hour." Thus, unequivocally, in July, 1776, the new States possessed all sovereignty, power, and jurisdiction over all the soil and persons in their respective territorial limits.

This condition of supreme sovereignty of each State over all property and persons within the borders thereof continued notwithstanding the adoption of the Articles of Confederation. Article II of that document declared:

"Article II. Each state retains its sovereignty, freedom, and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled." As the history of the confederation government demonstrated, each State was indeed sovereign and independent to such a degree that it made the central government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States and the remedy became the calling of a constitutional convention.

The representatives which assembled in Philadelphia in May, 1787, to attend the Constitutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention was more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by them at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, § 8, cl. 17 of the U.S. Constitution, which defined federal jurisdiction as follows:

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The reason for the inclusion of this clause in the Constitution is obvious. Under the Articles of Confederation, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the Articles of Confederation was merely a body which represented and acted as agents of the separate States for external affairs, and it had no jurisdiction within the States. This defect in the Articles made the Confederation Congress totally dependent upon any given State for protection, and this dependency did in fact cause embarrassment for that Congress. During the Revolutionary War while the Congress met in Philadelphia, a body of mutineers from the Continental Army surrounded the Congress and chastised and insulted its members. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy this situation, so Congress was forced to flee first to Princeton, New Jersey, and finally to Annapolis, Maryland.[1] Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places which Congress might purchase for forts, magazines, arsenals and other needful buildings wherein the State ceded jurisdiction of such lands to the federal government. Other than in these areas, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, and jurisdiction over those areas which had not been so ceded remained within the States.

While there had been no real provisions in the Articles which permitted the Confederation Congress to acquire property and possess exclusive jurisdiction over that property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States. These lands were deemed essential to enable the United States to perform the powers delegated by the Constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of them to Congress. Perhaps the best explanations for this clause in the Constitution were set forth in Essay No. 43 of The Federalist:

"The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently

circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

"The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident. The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment."

Since the ratification of the present U.S. Constitution, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply this clause of the Constitution. The essence of all these decisions manifests a legal principle that the States of this nation have exclusive jurisdiction of property and persons located within their borders, excluding such lands and persons residing thereon which have been ceded to the United States.

Perhaps one of the earliest decisions on this point was United States v. Bevans, 16 U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts. The defense complained that only the state had jurisdiction to prosecute this crime and argued that the federal circuit courts had no jurisdiction of this crime supposedly committed within the federal government's admiralty jurisdiction. In argument before the Supreme Court, counsel for the United States admitted as much:

"The exclusive jurisdiction which the United States have in forts and dock-yards ceded to them, is derived from the express assent of the states by whom the cessions are made. It could be derived in no other manner; because without it, the authority of the state would be supreme and exclusive therein," Id., at 350-51.

In holding that the State of Massachusetts had jurisdiction over this crime, the Court held:

"What, then, is the extent of jurisdiction which a state possesses? "We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power," Id., at 386-87. "The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction... Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

"It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction," Id., at 388.

The Court in Bevans thus established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

The decision in Bevans was closely followed by decisions made in two state courts and one federal court within the next two years. In Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme Court of Pennsylvania was presented with the issue of whether lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be sold pursuant to state law. In deciding that the law of Pennsylvania exclusively controlled this sale of federal land, the Court held:

"The legislation and authority of congress is confined to cessions by particular states for the seat of government, and purchases made by consent of the legislature of the state, for the purpose of erecting forts.

The legislative power and exclusive jurisdiction remained in the several states of all territory within their limits, not ceded to, or purchased by, congress, with the assent of the state legislature, to prevent the collision of legislation and authority between the United States and the several states." A year later, the Supreme Court of New York was presented with the issue of whether the State of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819), that court held that the fort was subject to the jurisdiction of the State since the lands therefore had not been ceded to the United States:

"To oust this state of its jurisdiction to support and maintain its laws, and to punish crimes, it must be shown that an offense committed within the acknowledged limits of the state, is clearly and exclusively cognizable by the laws and courts of the United States. In the case already cited, Chief Justice Marshall observed, that to bring the offense within the jurisdiction of the courts of the union, it must have been committed out of the jurisdiction of any state; it is not (he says,) the offence committed, but the place in which it is committed, which must be out of the jurisdiction of the state."

The decisional authority upon which this court relied was United States v.

Bevans, supra.

At about the same time that the New York Supreme Court rendered its opinion in Godfrey, a similar fact situation was before a federal court, the only difference being that the murder was committed on land which had been ceded to the United States. In United States v. Cornell, 25 Fed.Cas. 646, 648, No. 14,867 (C.C.D.R.I. 1819), the court held that the case fell within federal jurisdiction:

"But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

"When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted."

Almost 18 years later, the U.S. Supreme Court was again presented with a case involving the distinction between state and federal jurisdiction. In New Orleans v. United States, 35 U.S. (10 Pet.) 662, 737 (1836), the United States claimed title to property in New Orleans likewise claimed by the city. After holding that title to the subject lands was owned by the city, the Court addressed the question of federal jurisdiction:

"Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the federal government shall establish forts or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction."

In New York v. Miln, 36 U.S. (11 Pet.) 102 (1837), the question before the Court involved an attempt by the City of New York to assess penalties against the master of a ship for his failure to make a report regarding the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the Court held:

"If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction," Id., at 133.

"They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive," Id., at 139.

page 4 of 11

Some eight years later in Pollard Hagan, 44 U.S. (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a real property title dispute with one of the parties claiming a right to the contested property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay. In discussing the subject of federal jurisdiction, the Court held:

"We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," Id., at 221.

"[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," Id., at 223.

"Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," Id., at 228-29. The single most important case regarding the subject of federal jurisdiction appears to be Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. Here, the railroad company property which passed through the Fort Leavenworth federal enclave was being subjected to taxation by Kansas, and the company claimed an exemption from state taxation because its property was within federal jurisdiction and outside that of the state. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

"The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals." Thus the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to that jurisdiction; this jurisdiction is superior. Federal jurisdiction results from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. There is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and insular possessions of the United States. The above principles of jurisdiction established in the last century continue their vitality today with only one minor exception. In the last century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing in the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which had been totally surrendered by the States. With the advent in this century of large federal works projects and national parks, the problems regarding management of these areas by the federal government were magnified. During the last century, it was thought that if a State ceded jurisdiction to the federal government, the cession granted full and complete jurisdiction. But with the ever increasing number of separate tracts of land falling within the jurisdiction of the federal government in this century, it was obviously determined by both federal and state public officials that the States should retain greater control over these ceded lands, and the courts have acknowledged the constitutionality of varying degrees of state jurisdiction and control over lands so ceded.

One of the first cases to acknowledge the proposition that a State could retain some jurisdiction over property ceded to the federal government was Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455 (1930). Here, a state attempt to assess an ad valorem tax on Army blankets located within a federal army camp was found invalid and beyond the state's jurisdiction. But in regards to the proposition that a State could make a qualified cession of jurisdiction to the federal government, the Court stated:

"[T]he state undoubtedly may cede her jurisdiction to the United States and may make the cession either absolute or qualified as to her may appear desirable, provided the qualification is consistent with the purposes for which the reservation is maintained and is accepted by the United States. And, where such a

*page 5 of 11*

cession is made and accepted, ███ll be determinative of the jurisdiction of ███ the United States and the state within the reservation," Id., at 651-52.

Two cases decided in 1937 by the U.S. Supreme Court further clarify the constitutionality of a reservation of partial state jurisdiction over lands ceded to the jurisdiction of the United States. In James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208 (1937), the State of West Virginia sought to impose a tax upon the gross receipts of the company arising from a contract which it had made with the United States to build some dams. One of the issues involved in this case was the validity of the state tax imposed on the receipts derived by the company from work performed on lands to which the State had ceded "concurrent" jurisdiction to the United States. The Court held that a State could reserve and qualify any cession of jurisdiction for lands owned by the United States; since the State had done so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of jurisdiction to the U.S. A similar result occurred in Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233 (1937). Here, the United States was undertaking the construction of several dams on the Columbia River in Washington, and had purchased the lands necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee Dam, but filed suit challenging the Washington income tax when that State sought to impose that tax on the contract proceeds. Mason's argument that the federal government had exclusive jurisdiction over both the lands and its contract was not upheld by either the Supreme Court of Washington or the U.S. Supreme Court. The latter Court held that none of the lands owned by the U.S. were within its jurisdiction and thus Washington clearly had jurisdiction to impose the challenged tax; see also Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663 (1946).

Some few years later in 1943, the Supreme Court was again presented with similar taxation and jurisdiction issues; the facts in these two cases were identical with the exception that one clearly involved lands ceded to the jurisdiction of the United States. This single difference caused directly opposite results in both cases. In Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628 (1943), the question involved the applicability of state law to a contract entered into and performed on a federal enclave to which jurisdiction had been ceded to the United States. During World War II, California passed a law setting a minimum price for the sale of milk, and this law imposed penalties for sales made below the regulated price. Here, Pacific Coast Dairy consummated a contract on Moffett Field, a federal enclave within the exclusive jurisdiction of the United States, to sell milk to such federal facility at below the regulated price. When this occurred, California sought to impose a penalty for what it perceived as a violation of state law. But, the U.S. Supreme Court refused to permit the enforcement of the California law, holding that the contract was made and performed in a territory outside the jurisdiction of California and within the jurisdiction of the United States, a place where this law didn't apply. Thus in this case, the existence of federal jurisdiction was the foundation for the decision. However, in Penn Dairies v. Milk Control Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct. 617 (1943), an opposite result was reached on almost identical facts. Here, Pennsylvania likewise had a law which regulated the price of milk and penalized milk sales below the regulated price. During World War II, the United States leased some land from Pennsylvania for the construction of a military camp; since the land was leased, Pennsylvania did not cede jurisdiction to the United States. When Penn Dairies sold milk to the military facility for a price below the regulated price, the Commission sought to impose the penalty. In this case, since there was no federal jurisdiction, the Supreme Court found that the state law applied and permitted the imposition of the penalty. These two cases clearly show the different results which can occur with the presence or absence of federal jurisdiction.

A final point regarding federal jurisdiction concerns the question of when such jurisdiction ends or ceases. This issue was considered in S.R.A. v. Minnesota, 327 U.S. 558, 563-64, 66 S.Ct. 749 (1946), which involved the power of a State to tax the real property interest of a purchaser of land sold by the United States. Here, a federal post office building was sold to S.R.A. pursuant to a real estates sale contract which provided that title would pass only after the purchase price had been paid. In refuting the argument of S.R.A. that the ad valorem tax on its equitable interest in the property was really an unlawful tax on U.S. property, the Court held:

"In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article I, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states. As the purpose of Clause 17 was to give control over the sites of

governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power."

Thus when any property within the exclusive jurisdiction of the United States is no longer utilized by that government for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts to the State. The above principles regarding the distinction between State and federal jurisdiction continue today; see Paul v. United States, 371 U.S. 245, 83 S.Ct. 426 (1963), and United States v. State Tax Commission of Mississippi, 412 U.S. 363, 93 S.Ct. 2183 (1973). What was definitely decided in the beginning days of this Republic regarding the extent, scope, and reach of each of these two distinct jurisdictions remains unchanged and forms the foundation and basis for the smooth workings of state governmental systems in conjunction with the federal government. Without such jurisdictional principles which form a clear boundary between the jurisdiction of the States and the United States, our federal governmental system would have surely met its demise long before now.

In summary, the jurisdiction of the States is essentially the same as they possessed when they were leagued together under the Articles of Confederation. The confederated States possessed absolute, complete and full jurisdiction over property and persons located within their borders. It is hypocritical to assume or argue that these States, which had banished the centralized power and jurisdiction of the English Parliament and Crown over them by the Declaration of Independence, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress. They did not and they closely and jealously guarded their own rights, powers and jurisdiction. When the Articles were replaced by the Constitution, the intent and purpose of the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States of lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

By the adoption of the Constitution, the States jointly surrendered some 17 specific and well defined powers to the federal Congress, which related almost entirely to external affairs of the States. Any single delegated power, or even several powers combined, do not operate in a fashion so as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent.

The only provision in the Constitution which permits territorial jurisdiction to be vested in the United States is found in Art. I, § 8, cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, and it possessed jurisdiction only in the lands encompassed in the Northwest Territories. Shortly after formation of the Union, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. Over time, the States have ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions which may now be owned by the United States.

The above conclusion is buttressed by the opinion of the federal government itself. In June 1957, the United States government published a work entitled Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part II, and this report is the definitive study on this issue. Therein, the Committee stated:

"The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction -- by State consent under Article I, section 8, clause 17... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place," Id., at 41. "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the State, the Federal Government possesses no legislative jurisdiction over any area within a State, such jurisdiction being for exercise by the State, subject to non-interference by the State with Federal functions," Id., at 45.

*page 7 of 11*

"The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State," Id., at 46.

Case 3:02-cr-00187-RNW    Document 26    Filed 05/12/23    Page 66 of 98

"On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts or omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crime occurs on areas as to which legislative jurisdiction has been vested in the Federal Government," Id., at 107.

Thus from a wealth of case law, in addition to this lengthy and definitive government treatise, the "jurisdiction of the United States" is identified as a very precise and carefully defined portion of America. The United States is one of the 50 jurisdictions existing on this continent, excluding Canada and its provinces.

## FEDERAL CRIMINAL JURISDICTION

It is a well established principle of law that all federal "legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears;" see Caha v. United States, 152 U.S. 211, 215, 14 S.Ct. 513 (1894); American Banana Company v. United Fruit Company, 213 U.S. 347, 357, 29 S.Ct. 511 (1909); United States v. Bowman, 260 U.S. 94, 97, 98, 43 S.Ct. 39 (1922); Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932); Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575 (1949); United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949); and United States v. First National City Bank, 321 F.2d 14, 23 (2nd Cir. 1963). This particular principle of law is expressed in a number of cases from the federal appellate courts; see McKeel v. Islamic Republic of Iran, 722 F.2d 582, 589 (9th Cir. 1983) (holding the Foreign Sovereign Immunities Act as territorial); Meredith v. United States, 330 F.2d 9, 11 (9th Cir. 1964) (holding the Federal Torts Claims Act as territorial); United States v. Cotroni, 527 F.2d 708, 711 (2nd Cir. 1975) (holding federal wiretap laws as territorial);

Stowe v. Devoy, 588 F.2d 336, 341 (2nd Cir. 1978); Cleary v. United States Lines, Inc., 728 F.2d 607, 609 (3rd Cir. 1984) (holding federal age discrimination laws as territorial); Thomas v. Brown & Root, Inc., 745 F.2d 279, 281 (4th Cir. 1984) (holding same as Cleary, supra); United States v. Mitchell, 553 F.2d 996, 1002 (5th Cir. 1977) (holding marine mammals protection act as territorial); Pfeiffer v. William Wrigley, Jr., Co., 755 F.2d 554, 557 (7th Cir. 1985) (holding age discrimination laws as territorial);

Airline Stewards & Stewardesses Assn. v. Northwest Airlines, Inc., 267 F.2d 170, 175 (8th Cir. 1959) (holding Railway Labor Act as territorial); Zahourek v. Arthur Young and Co., 750 F.2d 827, 829 (10th Cir. 1984) (holding age discrimination laws as territorial); Commodities Futures Trading Comm. v. Nahas, 738 F.2d 487, 493 (D.C.Cir. 1984) (holding commission's subpoena power under federal law as territorial); Reyes v. Secretary of H.E.W., 476 F.2d 910, 915 (D.C.Cir. 1973) (holding administration of Social Security Act as territorial); and Schoenbaum v. Firstbrook, 268 F.Supp. 385, 392 (S.D.N.Y. 1967) (holding securities act as territorial). This principle was perhaps best expressed in Caha v. United States, 152 U.S., at 215, where the Court declared:

"The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government."

But, because of treaties as well as express statutory language, the federal drug laws operate extra-territorially; see United States v. King, 552 F.2d 833, 851 (9th Cir. 1976). The United States has territorial jurisdiction only in Washington, D.C., the federal enclaves within the States, and in the territories and insular possessions of the United States. However, it has no territorial jurisdiction over non-federally owned areas inside the territorial jurisdiction of the States within the American Union, and this proposition of law is supported by literally hundreds of cases.

As a general rule, the power of the United States to criminally prosecute is, for the most part, confined to offenses committed within "its jurisdiction" in the absence of treaties. This is born out simply by examination of 18 U.S.C. §5 which defines the term "United States" in clear jurisdictional terms. [2] Further, §7 of that federal criminal code contains the fullest statutory definition of the "jurisdiction of the United States." The U.S. district courts have jurisdiction of offenses occurring within the "United States" pursuant to 18 U.S.C. §3231.

*page 8 of 11*

Examples of this proposition are numerous. In Pothier v. Rodman, 291 F. 311 (1st Cir. 1923), the question involved whether a murder committed at Camp Lewis Military Reservation in the State of Washington was a federal crime. Here, the murder was committed more than a year before the U.S. acquired a deed for the property which was the scene of the crime. Pothier was arrested and incarcerated in Rhode Island and filed a habeas corpus petition seeking his release on the grounds that the federal courts had no jurisdiction over this offense not committed in U.S. jurisdiction. The First Circuit agreed that there was no federal jurisdiction and ordered his release. But, on appeal to the U.S. Supreme Court, in Rodman v. Pothier, 264 U.S. 399, 44 S.Ct. 360 (1924), that Court reversed; although agreeing with the jurisdictional principles enunciated by the First Circuit, it held that only the federal court in Washington State could decide that issue. In United States v. Unzeuta, 35 F.2d 750 (8th Cir. 1929), the Eighth Circuit held that the U.S. had no jurisdiction over a murder committed in a railroad car at Fort Robinson, the state cession statute being construed as not including railroad rights-of-way. This decision was reversed in United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284 (1930), the Court holding that the U.S. did have jurisdiction over the railroad rights-of-way in Fort Robinson. In Bowen v. Johnson, 97 F.2d 860 (9th Cir. 1938), the question presented was whether the lack of jurisdiction over an offense prosecuted in federal court could be raised in a habeas corpus petition. The denial of Bowen's petition was reversed in Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442 (1939), the Court concluding that such a jurisdictional challenge could be raised via such a petition. But, the Court then addressed the issue, found that the U.S. both owned the property in question and had a state legislative grant ceding jurisdiction to the United States, thus there was jurisdiction in the United States to prosecute Bowen. But, if jurisdiction is not vested in the United States pursuant to statute, there is no jurisdiction; see Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122 (1943).

The lower federal courts also require the presence of federal jurisdiction in criminal prosecutions. In Kelly v. United States, 27 F. 616 (D.Me. 1885), federal jurisdiction of a manslaughter committed at Fort Popham was upheld when it was shown that the U.S. owned the property where the offense occurred and the state had ceded jurisdiction. In United States v. Andem, 158 F. 996 (D.N.J. 1908), federal jurisdiction for a forgery offense was upheld on a showing that the United States owned the property where the offense was committed and the state had ceded jurisdiction of the property to the U.S. In United States v. Penn, 48 F. 669 (E.D.Va. 1880), since the U.S. did not have jurisdiction over Arlington National Cemetery, a federal larceny prosecution was dismissed. In United States v. Lovely, 319 F.2d 673 (4th Cir. 1963), federal jurisdiction was found to exist by U.S. ownership of the property and a state cession of jurisdiction. In United States v. Watson, 80 F.Supp. 649, 651 (E.D.Va. 1948), federal criminal charges were dismissed, the court stating:

"Without proof of the requisite ownership or possession of the United States, the crime has not been made out."

In Brown v. United States, 257 F. 46 (5th Cir. 1919), federal jurisdiction was upheld on the basis that the U.S. owned the post office site where a murder was committed and the state had ceded jurisdiction; see also England v. United States, 174 F.2d 466 (5th Cir. 1949); Hudspeth v. United States, 223 F.2d 848 (5th Cir. 1955); Krull v. United States, 240 F.2d 122 (5th Cir. 1957); and Gainey v. United States, 324 F.2d 731 (5th Cir. 1963). In United States v. Townsend, 474 F.2d 209 (5th Cir. 1973), a conviction for receiving stolen property was reversed when the court reviewed the record and learned that there was absolutely no evidence disclosing that the defendant had committed this offense within the jurisdiction of the United States. In United States v. Benson, 495 F.2d 475, 481 (5th Cir. 1974), in finding federal jurisdiction for a robbery committed at Fort Rucker, the court held:

"It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor." In two Sixth Circuit cases, United States v. Tucker, 122 F. 518 (W.D.Ky. 1903), a case involving an assault committed at a federal dam, and United States v. Blunt, 558 F.2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, jurisdiction was sustained by finding that the U.S. owned the property in question and the state involved had ceded jurisdiction. In re Kelly, 71 F. 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the United States. In United States v. Johnson, 426 F.2d 1112 (7th Cir. 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and a state cession. And cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see United States v. Heard, 270 F.Supp. 198 (W.D.Mo. 1967); United States v. Redstone, 488 F.2d 300 (8th Cir. 1973); United States v. Goings, 504 F.2d 809 (8th Cir. 1974) (demonstrating

page 9 of 11

loss of jurisdiction); Hayes v. United States, 367 F.2d 216 (10th Cir. 1966); ___ v. United States, 404 F.2d 1367 (10th Cir. 1969); United States v. Carter, 430 F.2d 1278 (10th Cir. 1970); and United States v. Cassidy, 571 F.2d 534 (10th Cir. 1978). Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more than any of the rest. In United States v. Bateman, 34 F. 86 (N.D.Cal. 1888), it was determined that the United States did not have jurisdiction to prosecute for a murder committed at the Presidio because California had never ceded jurisdiction; see also United States v. Tully, 140 F. 899 (D.Mon. 1905). But later, California ceded jurisdiction for the Presidio to the United States, and it was held in United States v. Watkins, 22 F.2d 437 (N.D.Cal. 1927), that this enabled the U.S. to maintain a murder prosecution. See also United States v. Holt, 168 F. 141 (W.D.Wash. 1909), United States v. Lewis, 253 F. 469 (S.D.Cal. 1918), and United States v. Wurtzbarger, 276 F. 753 (D.Or. 1921). Because the U.S. owned and had a state cession of jurisdiction for Fort Douglas in Utah, it was held that the U.S. had jurisdiction for a rape prosecution in Rogers v. Squier, 157 F.2d 948 (9th Cir. 1946). But, without a cession, the U.S. has no jurisdiction; see Arizona v. Manypenny, 445 F.Supp. 1123 (D.Ariz. 1977).

The above cases from the U.S. Supreme Court and federal appellate courts set forth the rule that in criminal prosecutions, the government, as the party seeking to establish the existence of federal jurisdiction, must prove U.S. ownership of the property in question and a state cession of jurisdiction. This same rule manifests itself in state cases. State courts are courts of general jurisdiction and in a state criminal prosecution, the state must only prove that the offense was committed within the state and a county thereof. If a defendant contends that only the federal government has jurisdiction over the offense, he, as proponent for the existence of federal jurisdiction, must likewise prove U.S. ownership of the property where the crime was committed and state cession of jurisdiction.

Examples of the operation of this principle are numerous. In Arizona, the State has jurisdiction over federal lands in the public domain, the state not having ceded jurisdiction of that property to the U.S.; see State v. Dykes, 114 Ariz. 592, 562 P.2d 1090 (1977). In California, if it is not proved by a defendant in a state prosecution that the state has ceded jurisdiction, it is presumed the state does have jurisdiction over a criminal offense; see People v. Brown, 69 Cal. App.2d 602, 159 P.2d 686 (1945). If the cession exists, the state has no jurisdiction; see People v. Mouse, 203 Cal. 782, 265 P. 944 (1928). In Montana, the state has jurisdiction over property if it is not proved there is a state cession of jurisdiction to the U.S.; see State ex rel Parker v. District Court, 147 Mon. 151, 410 P.2d 459 (1966); the existence of a state cession of jurisdiction to the U.S. ousts the state of jurisdiction; see State v. Tully, 31 Mont. 365, 78 P. 760 (1904). The same applies in Nevada; see State v. Mack, 23 Nev. 359, 47 P. 763 (1897), and Pendleton v. State, 734 P.2d 693 (Nev. 1987); it applies in Oregon (see State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918), and State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987)); and in Washington (see State v. Williams, 23 Wash.App. 694, 598 P.2d 731 (1979)).

In People v. Hammond, 1 Ill.2d 65, 115 N.E.2d 331 (1953), a burglary of an IRS office was held to be within state jurisdiction, the court holding that the defendant was required to prove existence of federal jurisdiction by U.S. ownership of the property and state cession of jurisdiction. In two cases from Michigan, larcenies committed at U.S. post offices which were rented were held to be within state jurisdiction; see People v. Burke, 161 Mich. 397, 126 N.W. 446 (1910), and People v. Van Dyke, 276 Mich. 32, 267 N.W. 778 (1936). See also In re Kelly, 311 Mich. 596, 19 N.W.2d 218 (1945). In Kansas City v. Garner, 430 S.W.2d 630 (Mo.App. 1968), state jurisdiction over a theft offense occurring in a federal building was upheld, and the court stated that a defendant had to show federal jurisdiction by proving U.S. ownership of the building and a cession of jurisdiction from the state to the United States. A similar holding was made for a theft at a U.S. missile site in State v. Rindall, 146 Mon. 64, 404 P.2d 327 (1965). In Pendleton v. State, 734 P.2d 693 (Nev. 1987), the state court was held to have jurisdiction over a D.U.I. committed on federal lands, the defendant having failed to show U.S. ownership and state cession of jurisdiction.

In People v. Gerald, 40 Misc.2d 819, 243 N.Y.S.2d 1001 (1963), the state was held to have jurisdiction of an assault at a U.S. post office since the defendant did not meet his burden of showing presence of federal jurisdiction; and because a defendant failed to prove title and jurisdiction in the United States for an offense committed at a customs station, state jurisdiction was upheld in People v. Fisher, 97 A.D.2d 651, 469 N.Y.S.2d 187 (A.D. 3 Dept. 1983). The proper method of showing federal jurisdiction in state court is demonstrated by the decision in People v. Williams, 136 Misc.2d 294, 518 N.Y.S.2d 751 (1987). This rule was likewise enunciated in State v. Burger, 33 Ohio App.3d 231, 515 N.E.2d 640 (1986), a case involving a D.U.I. offense committed on a road near a federal arsenal. In Kuerschner v. State, 493 P.2d 1402

(Okl.Cr.App. 1972), the state was held to have jurisdiction of a drug sales offense occurring at an Air Force Base, the defendant not having attempted to prove federal jurisdiction by showing title and jurisdiction of the property in question in the United States; see also Towry v. State, 540 P.2d 597 (Okl.Cr.App. 1975). Similar holdings for murders committed at U.S. post offices were made in State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918), and in United States v. Pate, 393 F.2d 44 (7th Cir. 1968). Another Oregon case, State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987), demonstrates this rule. Finally, in Curry v. State, 111 Tex. Cr. 264, 12 S.W.2d 796 (1928), it was held that, in the absence of proof that the state had ceded jurisdiction of a place to the United States, the state courts had jurisdiction over an offense.

Therefore, in federal criminal prosecutions involving jurisdictional type crimes, the government must prove the existence of federal jurisdiction by showing U.S. ownership of the place where the crime was committed and state cession of jurisdiction. If the government contends for the power to criminally prosecute for an offense committed outside "its jurisdiction," it must prove an extra-territorial application of the statute in question as well as a constitutional foundation supporting the same. Absent this showing, no federal prosecution can be commenced for offenses committed outside "its jurisdiction."

## END NOTES:

[1] See Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 529, 5 S.Ct. 995 (1885).

[2] The statutory definition of "United States" as expressed in this § 5 is identical to the constitutional definition of this term; see Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504 (1923), which deals with the definition of "United States" as used in the 18th Amendment.

The first FULL and complete definition of the word "state" in a federal statute appears in an act to tax booze and tobacco, 15 Stat. 125, ch. 186 (July 20, 1868). Section 104 of this act, 15 Stat. at 166, contained definitions to certain words appearing in the act and here may be found the following:

"... and the word 'State' to mean and include a Territory and District of Columbia..."

* * * * * * * * * * * * * * * * * * * * * * * * * *

[Note for the reader: The above memo discusses only about 140 cases. If you wish to find more cases addressing the issue of federal territorial jurisdiction, please see the other 3 separate files noted on the main web site. The important U.S. Supreme Court cases are all cataloged in their own file; the same type of cases from each federal circuit and each state are found in the other two files. If you wish to learn more about how federal laws are applicable outside "its jurisdiction," please study the brief regarding treaties.]

# THE CONSEQUENCES OF PERJURY AND RELATED CRIMES

# HEARING

BEFORE THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

ON

THE CONSEQUENCES OF PERJURY AND RELATED CRIMES

DECEMBER 1, 1998

## Serial No. 67



page 1 of 5

Printed for the use of the Committee on the Judiciary

And the word "Duty" in the Duty, Honor, Country motto, said to us that we're not just prepared to give our lives, we're prepared to lead a tough life as well. We're prepared to spend countless nights and days in field training, or to jump out the door of a perfectly good airplane on a moonless night. And today's soldiers can add months away from their families while in Haiti, Bosnia, Croatia, Macedonia, Kuwait, the Sinai, Korea, Germany, Central America and elsewhere.

There have been very good efforts over the years to amplify on the meaning of Duty, Honor, Country. In my view none has been any better than the recent articulation of the seven Army values:

Duty
Honor
Integrity
Loyalty
Selfless Service
Courage
Respect for Others

Note the integrity has now been separately listed from Honor to add even more emphasis to its importance.

Why is it important that the military services be values-based institutions? There are both external and internal reasons. Externally, to paraphrase a great American, America's military is created by America, just for America and is from America. It hasn't been any other way for 225 years, but it particularly—it's an all-recruited Army, the draft ended. This is not really an all-volunteer army—it's an all-recruited Army. Each year a half-million young American men and women have to personally elect to join the military, and another 1.6 million have to elect to remain. That is truly "from America." So the military must have a positive sense of, frankly, we'll have to return to the draft. Despite occasional mistakes and gaffes, the military has been the most admired institution in America for almost two decades, according to the Gallup poll survey of Americans' confidence in their institutions. It's my personal view as an old recruiter that it can't be any other way. Erode the value system and Americans will not be proud to join nor to stay.

Fortunately today's highest military leaders are attuned to this reality—and none of them need to be reminded of the importance of an ethical climate. They talk it, and they walk the talk.

Now consider the internal military reasons for having a solid set of core values of life. Not every one of them has had the advantage of being front to parents like my mom and dad. Not all of them have been exposed to the Ten Commandments or the 12 points of the Scout Law. So the Army has an aggressive program of character development starting with basic training.

New soldiers learn to think that an Army of a million men and women, Active, Reserve and National Guard, are void of weak leaders. Certainly not. But the good news is that there are systems to weed them out in peacetime so that the terrible wartime consequences can be avoided.

Will soldiers follow weak leaders? The answer is yes. They must, for they are bound by their oath "to obey the orders of the President and the officers appointed over me ..."

But the difference between an average unit and the best unit is most often its leaders. Great leaders, men of character, inspire soldiers to do extraordinary things. Conversely, a general malaise hangs over units led by leaders who are weak. They are not held. The credibility of the system is at stake when the standards that the military cannot afford to have its standards viewed as irrelevant is not the case. Military leadership development programs, the code of ethics and the Uniform Code of Military Justice all work together in concert to insure that the standards are applied equally up and down the chain of command.

I look forward to your questions.

Mr. HYDE. Professor Dershowitz.

## STATEMENT OF ALAN M. DERSHOWITZ, FELIX FRANKFURTER PROFESSOR OF LAW, HARVARD LAW SCHOOL.

Mr. DERSHOWITZ. Thank you. For nearly a quarter of a century I have been teaching, lecturing and writing about the corrosive influences of perjury on our legal system, especially when committed by those whose job it is to enforce the law, and ignored, or even legitimatized, by those whose responsibility it is to check those who enforce the law.

I appreciate very much your asking me to share my experience and expertise here with you today. On the basis of my academic and professional experience, I believe that no felony is committed more frequently in this country than the genre of perjury and false statement crimes. Perjury during civil depositions and trials is so endemic that a respected appellate judge once observed that "experienced lawyers say that, in large cities, scarcely a trial occurs in which some witness does not lie." Police perjury in criminal cases, particularly in the context of searches and other exclusionary rule issues, is so pervasive that the former police chief in San Jose and Kansas City has estimated that "hundreds of thousands of law enforcement officials commit felony perjury every year testifying about drug arrests" alone.

But in comparison with their frequency, perjury crimes are among the most underprosecuted in this country. As prosecutor Michael McCann concluded. "Outside of income tax violation, perjury is probably the most underprosecuted crime in America." Moreover there is evidence that false statements are among the most selectively and unevenly prosecuted of all crimes and that the criteria for selectivity bears little relationship to the willfulness or frequency of the lies, the certainty of the evidence, or any other neutral criteria relating to the elements of perjury.

Historically, I think we can all agree that false statements have been committed of considerable variations in degree. The core concept of perjury grows out of the Bible, the Ten Commandments "bearing false witnesses," a term that consisted in accusing another falsely of a crime.

Clearly the most heinous brand of lying is the giving of false testimony that results in the imprisonment of somebody who is innocent. Less egregious, but still quite serious, is false testimony in the conviction of a person who may be guilty, but whose rights were violated in a manner that would preclude conviction if the police testified truthfully. There are many other points on this continuum, ranging from making false statements about income taxes to testifying falsely in civil trials. The least culpable genre of false testimony are those that deny embarrassing personal conduct of marginal relevance to the matter at issue in the legal proceeding.

I think it is clear that the false statements of which President Clinton is accused fall at the most marginal end of the least culpable genre of this continuum of offenses and would never even be considered for prosecution in the routine cases involving an ordinary defendant.

My own interest in the corrosive influences of perjury arose from two cases that I appeared in as a young lawyer. In both cases the policemen were caught committing perjury, one on tape and the other by his own admission. In both cases, the policemen were promoted, not prosecuted. Neither of those policemen were called to appear as witnesses here today.

All reports on the pervasive problems of police perjury and toler...

*page 3 of 5*

problem. The Mollen Commission in New York, for example, con-
cluded that the practice of police falsification is so common that it
has spawned its own word: "testilying." Officers also commit fal-
sifications to serve what they perceive to be legitimate law enforce-
ment ends and are committing perjury. The Commission provided
several examples of perjury cover stories that had been suggested
to young officers in order to make arrests.

Many judges who listen to or review testimony on a regular basis
agree with Judge Alex Kozinski of the ninth circuit who publicly
stated, "it is an open secret long shared by prosecutors, defense
lawyers and judges that perjury is widespread among law enforce-
ment officials," yet there is little apparent concern to remedy that
serious abuse of the oath to tell the truth, even among those who
now claim to be so concerned with the corrosive influences of per-
jury on our legal system.

This committee, for example, in pursuance of its oversight man-
date has never, to my knowledge, conducted hearings on this deep-
ly corrosive issue, which has far more dangerous impact over our
legal system than anything charged against President Clinton. If
this were truly today an objective hearing on the consequences of
perjury or on double standards, it would focus on the most serious
types of perjury: that committed by police, with the approval of
prosecutors and judges. Yet we see no such concern.

A perfect example of the selective morality regarding perjury oc-
curred when President George Bush pardoned the former Secretary
of Defense Caspar Weinberger in 1992, even though the evidence
was absolutely clear and convincing.

The real issue is not the couple of convicted perjurers who ap-
peared before this committee today or the judges who condemned
the evils of perjury, but the hundreds of thousands of perjurers
who are never prosecuted and who this committee does not seem
to care about, many for extremely serious and calculated lies de-
signed to undercut constitutional rights of unpopular defendants,
and the judges who say nothing and do nothing about this corrosive
phenomenon. You could not fit into this room or into this building
all of the people who have testified more perjuriously than President
Clinton and were not ever prosecuted.

If we really want to reduce the corrosive effect of perjury on our
legal system, the place to begin is at or near the top of the perjury
hierarchy. If, instead, we continue deliberately to blind ourselves to
pervasive police perjury and other equally dangerous forms of lying
under oath and focus on a politically charged tangential lie in the
lowest category of possible perjury, hiding embarrassing facts by
evasive answers to a dismissed civil case, we will be reaffirming the dan-
gerous and hypocritical message that perjury will continue to be se-
lectively prosecuted as a crime reserved for political or other agen-
da-driven purposes.

A Republican aide to this committee was quoted in The New
York Times as follows: "In the hearing we will be looking to wheth-
er it is tenable for a Nation to have two different standards for
lying under oath, one for the President and one for everyone else."
On the basis of my research and experience, I am convinced that
if President Clinton were an ordinary citizen, he would not be more

ecuted for his allegedly false statements. If President Clinton we...
ever to be prosecuted or impeached for perjury on the basis of t...
currently available evidence, it would, indeed, represent an in...
proper double standard, a selectively harsher one for this Preside...
and perhaps a handful of other victims of selective prosecution a...
the usual laxer one for everyone else, especially popular police pu...
jurers. Thank you.

[The prepared statement of Mr. Dershowitz follows:]

PREPARED STATEMENT OF ALAN M. DERSHOWITZ, FELIX FRANKFURTER PROFESSOR...
LAW, HARVARD LAW SCHOOL

My name is Alan M. Dershowitz and I have been teaching criminal law at H...
vard Law School for 35 years. I have also participated in the litigation—especi...
at the appellate level—of hundreds of federal and state cases, many of them invo...
ing perjury and the making of false statements. I have edited a casebook on cri...
nal law and have written books and hundreds of articles dealing with subje...
relating to the issues before this committee. It is an honor to have been asked...
share my experience and expertise with you all here today.

For nearly a quarter century, I have been teaching, lecturing and writing abo...
the corrosive influence of perjury in our legal system, especially when commit...
by those whose responsibility it is to enforce the law, and ignored—or even legitimated—
by those who have responsibility to check those who enforce the law.

On the basis of my research and professional experience, I believe that no felo...
is committed more frequently in this country than the crime of perjury and fal...
statements. Perjury occurs in nearly every... depositions and trials in so endemic that a...
spected appellate judge once observed that "experienced lawyers say that, in lar...
cities, scarcely a trial occurs in which some witness does not lie." He quoted a w...
to the effect that cases often are decided according to the preponderance of pe...
jury.[1] Filing false tax returns and other documents under pains and penalties...
perjury is so rampant that everyone enter... Making false statements to law enforcement
officers can be prosecuted. Making false... federal... provide for prosecution
only some categories of this daily crime. Perjury at criminal trials is so common th...
whenever a defendant testifies and is found guilty, he has presumptively committ...
perjury.[2] Police perjury in criminal cases—particularly in the context of search...
and other exclusionary rule issues—is so pervasive that the former police chief...
San Jose and Kansas City has estimated that "hundreds of thousands of law-e...
forcement officers commit felony perjury every year testifying about drug arrest...
alone."[3]

In comparison with their frequency, it is likely that false statement crimes a...
among the most under-prosecuted in this country. Though state and federal statut...
carry stringent penalties for perjury, few perjurers are ever actually... subjected
those penalties. As prosecutor E. Michael McCann has concluded... outside of t...
come tax evasion, perjury is... probably the most underprosecuted... in Am...
ica."[4] Moreover, there is evidence that false statements are among them most sel...
tively prosecuted of all crimes, and that the criteria for selectivity bears little rel...
tionship to the willfulness or frequency of the lies, the certainty of the evidence...
any other neutral criteria relating to the elements of perjury or other false stat...

[1] Jerome Frank, COURTS ON TRIAL, 85 (1949).
[2] Many such defendants now have perjury counts added on to their sentences under the federal guide-
lines, which add points for perjury at trial.
[3] Joseph D. McNamara, The Lies Have It, A.B.A. J., May 1996, at 71, quoted in Lisa C. Harr...
Perjury Defeats Justice... THE LIES HAVE IT, A.B.A. J., 1765-69 (1996) (footnote omitted). See al...
Hon. Sonia Sotomayer & Nicole A. Gordon, Returning Majesty to the Law and Politics: A Mode...
Approach, 30 SUFFOLK U. L. REV. 36, 61 n.52 (1996) ("Perjury on the stand are not often pursued, a...
perhaps should be given greater consideration by prosecuting attorneys and judges who impu...
the credibility of the testimony of the witnesses."); Fred Cohen, Police Perjury: An Interim... qu
Patrick Fitzgerald, & Ohm. L. BULL. 363, 367 (1972), quoted in Christopher Slobogin, Testilyin...
Police Perjury and What to Do About It, 67 U. COLO. L. Rev. 1037, 1060 n.13 (1996...
[4] E. Michael McCann, quoted as an Officer Liars' Club? Los Angel...
Times, Feb. 11, 1996, at M1.

ment crimes, Professor Richard H. Underwood, the Spears-Gilbert Professor of Law at the University of Kentucky's law school, writes that:

... more often, the [perjury] law has been invoked for revenge, or for the purpose of realizing some political end (the very base reason that lies are sometimes told), or for the purpose of nabbing a criminal who might otherwise be difficult to nab, or, dare I say it, for the purpose of gaining some tactical advantage. Proving, that perjury was committed, or that a "false statement" or a "false claim" was made, may be an easier, or a more palatable, brief for the prosecution.[6]

Historically, false statements generally have been admitted of considerable variations of degree. ¶ The core concept of perjury was that it consisted in accusing another of crime.[7] Clearly, the most heinous brand of lying is the giving of false testimony that results in the imprisonment or even execution of an innocent person. Less egregious, but still quite serious, is false testimony that results in the conviction of a person who committed the criminal conduct, but whose rights were violated in a manner that would preclude conviction if the police were to testify truthfully. There are many other points on this continuum, ranging from making false statements about marginal issues to testifying falsely in civil trials. The least culpable genre of false statements are those that deny embarrassing personal conduct of marginal relevance to the matter at issue in the legal proceeding.

Much of the public debate about President Clinton and possible perjury appears to ignore the following important lessons of history:

1. That the overwhelming majority of individuals who make false statements under oath are not prosecuted;
2. That those who are prosecuted generally fall into some special category of culpability or are victims of selective prosecution; and,
3. That the false statements of which President Clinton is accused fall at the most marginal end of the least culpable genre of this continuum of offenses and would never even be considered for prosecution in the routine case involving an ordinary defendant.

II

... interest in the corrosive effects of perjury began in the early 1970s when I represented, on a pro bono basis—a young man who was both a member of a government informer against the Jewish Defense League. He was accused of making a bomb that caused the death of a woman, but he swore that a particular policeman who had been assigned to his handler, had made him certain promises in exchange for his information. The policeman categorically denied making any promises, but my client had—unbeknownst to the policeman—surreptitiously taped many of his conversations with the policeman. The tapes proved beyond any doubt that the policeman had committed repeated perjury, and all charges were dropped against my client. But the policeman was never charged with perjury. Instead he was promoted.[8]

The following year, I represented, on appeal, a lawyer accused of corruption. The major witness against him was a policeman who acknowledged at trial that he, too, had committed three crimes while serving as a police officer. He denied that he had committed more than these three crimes. It was subsequently learned that he had, in fact, committed hundreds of additional crimes, including some he specifically denied under oath. He too was never prosecuted for perjury, because a young Assistant U.S. Attorney, named Rudolph Giuliani, led a campaign against prosecuting this admitted perjurer. Shortly afterward, the policeman explained:

Cops are almost taught how to commit perjury when they are in the Police Academy. Perjury to a policeman—and to a lawyer, by the way—is not a big deal. Whether they are giving out speeding tickets or parking tickets, they're almost always lying. But very few cops lie about the actual facts of a case. They may stretch an incident or whatever to fit it into the frame-

work of the law based on what they consider a silly law of the Supreme Court.[9]

Nor is the evidence of police perjury merely anecdotal. Numerous commission reports have found rampant abuses in police departments throughout the country. All objective reports point to a pervasive problem of police lying, and tolerance of the lying by prosecutors and judges, all in the name of convicting the factually guilty whose rights may have been violated and whose convictions might be endangered by the exclusionary rule. As the Mollen Commission reported:

The practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: "testilying." ... Officers also commit falsification to serve what they perceive to be the "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested.[10]

Even more frequently, in the Mollen Commission's view, "the evidence suggests that the ... commanding officer not only tolerated, but encouraged, this unlawful practice." The Commission provided several examples of perjured cover stories that had been suggested to a young officer by his supervisor:

Scenarios were ... were you going to say (a) that you observed what appeared to be a drug transaction; (b) you observed a bulge in the defendant's waistband; or (c) you were informed by a male black, unidentified at this time, that at the locations there were drug sales.[11]

QUESTION: So, in other words, the lieutenant was telling you is "Here's your choice of false predicates for the arrest?"

OFFICER: That's correct. Pick which one you're going to use.[12]

Nor was this practice limited to police supervisors. As the Mollen Commission reported:

Several former and current prosecutors acknowledged—"off the record"—that perjury and falsification are serious problems in law enforcement that, though not condoned, are ignored. The form that tolerance takes, however, is subtle, which makes accountability in this area especially difficult.[13]

The epidemic is conceded even among the highest ranks of law enforcement. For example, William F. Bratton, who has headed the police departments of New York City and Boston, has confirmed that "testilying is a "real problem that needs to be addressed." He also placed some of the responsibility at the feet of prosecutors:

When a prosecutor is really determined to win, the trial prep procedure may skirt along the edge of coercing or leading the police witness. In this way, some impressionable young cops learn to tailor their testimony to the requirements of the law.[13]

Many judges who listen to police testimony on a regular basis privately agree with Judge Alex Kozinski of the U.S. Court of Appeals for the Ninth Circuit, who publicly stated: "It is an open secret long shared by prosecutors, defense law-

---

[6] Richard H. Underwood, Perjury: An Anthology, 13 ARIZ. J. INT'L & COMP. L. 307, 379 (1996).

[7] See, e.g., Richard H. Underwood, Perjury! The Charges and the Defenses, 10 ARIZ. J. INT'L & COMP. L. 215, 262, and accompanying text; Peter Lushing, A Lawyer's History of the Law of Perjury.

[8] See Dershowitz, THE BEST DEFENSE, supra note 37. The chief of detectives ...

---

[11] See Dershowitz, THE BEST DEFENSE, supra note 8, at 377. This was confirmed in a book entitled The Prince of the City ... by the police of New York ...

[12] See Mark Baker, Cops: Their Lives in Their Own Words (1976). ... Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Practices of the Police Department, Milton Mollen, Chair, July 7, 1994, at 36 (hereinafter Mollen Report).

Id. at 38.

[13] Mollen Report, supra note 10, at 41.

[*] officers reported a litany of manufactured tales. For example, when officers unlawfully stop and search a vehicle because they believe it contains drugs or guns, officers will falsely claim in police reports and under oath that the car ran a red light [or] ... to conceal an unlawful search of an individual ... person's pocket or street and money changing hands. To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant.

*page 4 of 5*

yers and judges that perjury is widespread among law enforcement officers," and that the reason for it is that "the exclusionary rule . . . sets up a great incentive for . . . police to lie to avoid letting someone they think is guilty, or they know is guilty, go free."[14] Or, as Judge Irving Younger explained, "Every lawyer who practices in the criminal courts knows that police perjury is commonplace."[15]

As these judges attest, this could not happen without active complicity of many prosecutors and judges. Yet there is little apparent concern to remedy *that* serious abuse of the oath to tell the truth—even among those who now claim to be so concerned with the corrosive influences of perjury on our legal system. The sad reality appears to be that most people care about perjury only when they disapprove of the *substance* of the lie or of the *person* who is lying.

A perfect example of selective morality regarding perjury occurred when President George Bush pardoned former Secretary of Defense Caspar Weinberger in 1992, even though physical records proved that Weinberger had lied in connection with his testimony regarding knowledge of Iran arms sales. Not only was there no great outcry against pardoning an indicted perjurer, some of the same people who insist that President Clinton not be allowed to "get away" with lying were perfectly prepared to see Weinberger "get away" with perjury. Senator Bob Dole of Kansas spoke for many when he called the pardon a "Christmas Eve act of courage and compassion."[16]

The real issue is not the handful of convicted perjurers appearing before this committee, but the hundreds of thousands of perjurers who are never prosecuted, many for extremely serious and calculated acts of perjury designed to undercut constitutional rights of unpopular defendants.

If we really want to reduce the corrosive effects of perjury on our legal system, the place to begin is at or near the top of the perjury hierarchy. If instead we continue deliberately to blind ourselves to pervasive police perjury and other equally dangerous forms of lying under oath and focus on a politically charged tangential lie in the lowest category of possible perjury (hiding embarrassing facts only marginally relevant to a dismissed civil case), we would be reaffirming the dangerous message that perjury will continue to be a selectively prosecuted crime reserved for political or other agenda-driven purposes.

A Republican aide to this committee was quoted by *The New York Times* as follows:

> In the hearing, we'll be looking at perjury and its consequences, and whether it is tenable for a nation to have two different standards for lying under oath; one for the President and one for everyone else.[17]

On the basis of my research and experiences, I am convinced that if President Clinton were an ordinary citizen, he would not be prosecuted for his allegedly false statements, which were made in a civil deposition about a collateral sexual matter later found inadmissible in a case eventually dismissed and then settled. If President Clinton were ever to be prosecuted or impeached for perjury on the basis of the currently available evidence, it would indeed represent an improper double standard: a selectively harsher one for the president (and perhaps a handful of other victims of selective prosecution) and the usual laxer one for everyone else.

Mr. GEKAS [presiding]. The members of the committee will refrain from demonstrations. That is not part of the decorum of this committee.

The time of the witness has expired, and we now turn to Professor Saltzburg.

## STATEMENT OF STEPHEN A. SALTZBURG, HOWREY PROFESSOR OF TRIAL ADVOCACY, LITIGATION, AND PROFESSIONAL RESPONSIBILITY, GEORGE WASHINGTON UNIVERSITY LAW SCHOOL

Mr. SALTZBURG. Thank you, Mr. Chairman, members of the committee, the conflict among you is as understandable as it is power-

[14] Stuart Taylor, Jr., *For the Record*, AMERICAN LAWYER, Oct. 1995, at 72.

[15] Irving Younger, *The Perjury Routine*, THE NATION, May 8, 1967, at 596–97.

[16] Elaine Sciolino, *On the Question of Pardons, Dole has Taken Both Sides*, THE NEW YORK TIMES, 16 Oct. 1996, at A15.

[17] Eric Schmitt, *Panel Considers Perjury and Its Consequences*, THE NEW YORK TIMES, Nov. 28, 1998, at A13.

*Exhibit - 8*

# It's all in the NAME

At the Christian Law Fellowship and Assembly, we've been repeatedly requested to publish our accumulated research concerning the use of all or full capitalized letters for proper names; *i.e.*, **JOHN JAMES SMITH** as commonly substituted for **John James Smith** in all court documents, Driver's Licenses, bank accounts, Birth Certificates, etc.

Is this some special English grammar rule or style? Is it a contemporary American style of English? Is the use of this form of capitalization recognized by educational authorities? Is this an official judicial or U.S. government rule and/or style of grammar? Why do lawyers, court clerks, prosecutors, judges, insurance companies, banks, and credit card companies always use all capital letters when writing a proper name?

## What English grammar experts say

One of the foremost authorities on American English grammar, style, composition, and rules is *The Chicago Manual of Style*. Their latest 14th Edition, published by the University of Chicago Press, is internationally known and respected as a major contribution to maintaining and improving the standards of written or printed text. We could find no reference in their manual concerning the use of all capitalized letters with a proper name or any other usage. We wrote to the editors and asked this question:

> "Is it acceptable, or is there any rule of English grammar, to allow a proper name to be written in all capital letters? For example, if my name was John Robert Jones, can it be written as JOHN ROBERT JONES? Is there any rule covering this?"

We received the following reply from the Chicago Editorial Staff:

> "Writing names in all caps is not conventional; it is not Chicago style to put anything in all caps. For instance, even if 'GONE WITH THE WIND' appears on the title page all in caps, we would properly render it 'Gone with the Wind' in a bibliography. The only reason we can think of to do so is if you are quoting some material where it is important to the narrative to preserve the casing of the letters.
>
> We're not sure in what context you would like your proper name to appear in all caps, but it is likely to be seen as a bit odd."

Yes, it does appear "a bit odd" for governments, their judicial courts, and other legal entities incorporated within their legal jurisdiction to use this method of capitalizing every letter in a proper name.

We then contacted Mary Newton Bruder, Ph.D., also known as The Grammar Lady, who established the Grammar Hotline in the late 1980's for the Coalition of Adult Literacy. We asked her the following:

> "Why do federal and state government agencies and departments, judicial and administrative courts, insurance companies, *etc.*, spell a person's proper name in all capital letters? For example, if my name is John Joseph Smith, is it proper at any time to write it as JOHN JOSEPH SMITH?"

Dr. Bruder's reply was short and to the point:

> "It must be some kind of internal style. There is no grammar rule about it."

Another fellow researcher, whose report on this subject can be found at AllCapName.html, queried the same question from Cambridge University about capitalization. The reply from them was signed by Colin T. Clarkson:

"I have checked A comprehensive grammar of the English language, by Randolph
Quirk... [et al.] (London: Longman, 1985), The Oxford English grammar, by
Sidney Greenbaum (Oxford: Oxford University Press, 1996) and Hart's rules for
compositors and readers at the University Press, Oxford, by Horace Hart, 39th
edition (Oxford: Oxford University Press, 1983). I find no grammatical rule
which defines a situation in which all the letters of a name or, indeed, of any word
should appear as capitals. Rather the use of capitals or small capitals in this way is
simply a typographical device used for emphasis, for example of headings or
keywords."

So, in addition to there being no American English rule of grammar to spell names in all capitals, there is
neither - for those who still believe that Britain rules this country - a British English rule of grammar. The rule
which spells our names in all capital letters is outside the rules of grammar.

It seemed that these particular grammatical experts had no idea why proper names were written in all caps, so
we began to assemble an extensive collection of reference books authored by various publishers, governments,
and legal authorities in order to find the answer.

## What English grammar reference books say
## Manual on Usage & Style

One of the reference books we obtained was the *Manual on Usage & Style*, Eighth Edition, ISBN 1-878674-51-
X, published by the Texas Law Review in 1995. In **Section D, CAPITALIZATION**, paragraph D: 1:1 states:

"Always capitalize proper nouns... [Proper nouns], independent of the context in
which they are used, refer to specific persons, places, or things (*e.g.*, Dan, Austin,
Rolls Royce)."

Paragraph D: 3:2 of Section D states:

"Capitalize **People**, **State**, and any other terms used to refer to the government as
a litigant (*e.g.*, the People's case, the State's argument), but do not capitalize other
words used to refer to litigants (e.g., the plaintiff, defendant Manson)."

It appears that not a single lawyer, judge, or law clerk in Texas has ever read their own recognized law style
manual as they continue to write "Plaintiff", "Defendant", "THE STATE OF TEXAS" and proper names of
parties in all capital letters on every court document.

## The Elements of Style

Another well recognized reference book we obtained was *The Elements of Style*, Fourth Edition, ISBN 0-205-
30902-X, written by William Strunk, Jr. and E.B. White, published by Allyn & Bacon in 1999. Within this
renowned English grammar and style reference book, we found only one reference to capitalization located
within the Glossary at **proper noun**, page 94, where it states:

"The name of a particular person (*Frank Sinatra*), place (*Boston*), or thing (*Moby
Dick*). Proper nouns are capitalized."

There's an obvious and legally evident difference between capitalizing the first letter of a formal name as
compared to capitalizing the entire name.

## The American Heritage Book of English Usage

In *The American Heritage Book of English Usage, A Practical and Authoritative Guide to Contemporary
English*, published in 1996, at **Chapter 9, E-Mail, Conventions and Quirks, Informality**, they state:

"To give a message special emphasis, an E-mailer may write entirely in capital letters, a device E-mailers refer to as *screaming*. Some of these visual conventions have emerged as a way of getting around the constraints on data transmission that now limit many networks".

Here is a reference source, within contemporary - modern - English, that states it's of an <u>informal</u> manner to write <u>every</u> <u>word</u> of - specifically - an electronic message, a.k.a. E-mail, in capital letters. They say it's "*screaming*" to do so. By standard definition, we presume that's the same as shouting or yelling. Are all judges, their court clerks and lawyers shouting at us when they print our proper names in this manner? Is the insurance company screaming at us for paying the increased premium on our policy? This is doubtful as to any standard generalization, even though specific individual instances may prove this to be true. We can, however, safely conclude that it would also be informal to write a proper name in the same way.

Does this also imply that those in the legal profession are writing our Christian names *Informally* on court documents? Aren't attorneys and the courts supposed to be specific, whereas they formally write their legal documents within the "letter of the law"?

## New Oxford Dictionary of English

The *New Oxford Dictionary of English* is published by the Oxford University Press, 1998. Besides being considered the foremost authority on the British English language, this dictionary is also designed to reflect the way language is used today through example sentences and phrases. We submit the following definitions:

**Proper noun** (also **proper name**). Noun. A name used for an individual person, place, or organization, spelled with an initial capital letter, e.g. *Jane, London*, and *Oxfam*.

**Name.** <u>Noun</u> **1** A word or set of words by which a person, animal, place, or thing is known, addressed, or referred to: *my name is Parsons, John Parsons. Kalkwasser is the German name for limewater.* <u>Verb</u> **3** Identify by name; give the correct name for: *the dead man has been named as John Mackintosh.* <u>Phrases</u>. **2 In the name of.** Bearing or using the name of a specified person or organization: *a driving licence in the name of William Sanders.*

From the *Newbury House Dictionary of American English*, published by Monroe Allen Publishers, Inc., 1999:

**name** *n.* **1** [C] a word by which a person, place, or thing is known: *Her name is Diane Daniel.*

We can find absolutely no example in any recognized reference book that specifies or allows the use of all capitalized names, proper or common. Is there any doubt that a proper name is written with the first letter capitalized, followed by lower case letters?

## U.S. Government Style Manual

Is the spelling and usage of a proper name defined officially by U.S. government? Yes. The United States Government Printing Office in their *Style Manual*, March 1984 edition (the most recent edition published as of March 2000), provides comprehensive grammar, style and usage for all government publications, <u>including</u> court and legal writing.

**Chapter 3, Capitalization**, at § 3.2, prescribes rules for proper names:

"Proper names are capitalized... [Examples given are] Rome, Brussels, John Macadam, Macadam family, Italy, Anglo-Saxon."

At **Chapter 17, Courtwork**, the rules of capitalization, as mentioned in Chapter 3, are further reiterated:

"17.1. Courtwork differs in style from other work **only** as set forth in this section; otherwise the style prescribed in the preceding sections will be followed" [bold emphasis added].

After entirely reading § 17, we found no other references that would change the grammatical rules and styles specified in Chapter 3 pertaining to capitalization.

At § 17.9, this same official U.S. government manual states:

"In the titles of cases the first letter of all principal words are capitalized, but not such terms as *defendant* and *appellee*."

This wholly agrees with Texas Law Review's *Manual on Usage & Style* as referenced above. Examples shown in § 17.12 are also consistent with the aforementioned § 17.9 specification: that is, all proper names are to be spelled with capital first letters; the balance of each spelled with lower case letters.

## Grammar, Punctuation, and Capitalization

The National Aeronautics and Space Administration (NASA) has publish one of the most concise U.S. Government resources on capitalization. NASA publication SP-7084, *Grammar, Punctuation, and Capitalization, A Handbook for Technical Writers and Editors*, was compiled and written by the NASA Langley Research Center in Hampton, Virginia. At **Chapter 4. Capitalization**, they state in **4.1 Introduction**:

"First we should define terms used when discussing capitalization:

*Full caps* means that every letter in an expression is capital, LIKE THIS.

*Caps & lc* means that the principal words of an expression are capitalized, Like This.

*Caps and small caps* refers to a particular font of type containing small capital letters instead of lowercase letter.

Elements in a document such as headings, titles, and captions may be capitalized in either *sentence style* or *headline style*:

Sentence style calls for capitalization of the first letter, and proper nouns of course.

Headline style calls for capitalization of all principal words (also called caps & lc).

Modern publishers tend toward a *down* style of capitalization, that is, toward use of fewer capitals, rather than an *up* style."

Here we see that in headlines, titles, captions, and in sentences, there is no authorized usage of full caps. At **4.4.1. Capitalization With Acronyms**, we find the first authoritative use for full caps:

"Acronyms are always formed with capital letters. Acronyms are often coined for a particular program or study and therefore require definition. The letters of the acronym are not capitalized in the definition unless the acronym stands for a proper name:

*Wrong*   The best electronic publishing systems combine What You See Is What You Get (WYSIWIG) features...
*Correct* The best electronic publishing systems combine what you see is what you get (WYSIWIG) features...
*But*     Langley is involved with the National Aero-Space Plane (NASP) Program."

This cites, by example, that using *full caps* is allowable in an acronym. Acronyms are words formed from the initial letters of successive parts of a term. They never contain periods and are often not standard, so that definition is required.

Could this apply to lawful proper Christian names? If that were true, then JOHN SMITH would have to follow a definition of some sort, which it does not. For example, only if JOHN SMITH were defined as 'John Orley Holistic Nutrition of the Smith Medical Institute To Holistics (JOHN SMITH)' would this apply. The most significant section appears at **4.5.3. Administrative Names**:

> Official designations of political divisions and of other organized bodies are capitalized:

| Names of political divisions | Names of governmental units |
|---|---|
| Canada | U.S. Government |
| New York State | Executive Department |
| United States | U.S. Congress |
| Northwest Territories | |
| Virgin Islands | U.S. Army |
| Ontario Province | U.S. Navy |

According to this official U.S. Government publication, the States are *never* to be spelled in full caps such as NEW YORK STATE. The proper English grammar style is New York State. This agrees, once again, with Texas Law Review's *Manual on Usage & Style*.

## The Use of a Legal Fiction
## The Real Life Dictionary of the Law

We refer to *The Real Life Dictionary of the Law*. The authors, Gerald and Kathleen Hill, are accomplished scholars and writers. Gerald Hill is an experienced attorney, judge, and law instructor. Here is how the term *legal fiction* is described:

> **"Legal fiction**. n. A presumption of fact assumed by a court for convenience, consistency or to achieve justice. There is an old adage: 'Fictions arise from the law, and not law from fictions.' "

## Oran's Dictionary of the Law

From *Oran's Dictionary of the Law*, published by the West Group 1999, within the definition of Fiction is found:

> "A *legal fiction* is an assumption that something that is (or may be) false or nonexistent is true or real. Legal fictions are assumed or invented to help do justice. For example, bringing a lawsuit to throw a nonexistent "John Doe" off your property used to be the only way to establish a clear right to the property when legal title was uncertain."

## Merriam-Webster's Dictionary of Law

*Merriam-Webster's Dictionary of Law 1996* states:

> **"legal fiction :** something assumed in law to be fact irrespective of the truth or accuracy of that assumption. Example: the *legal fiction* that a day has no fractions -- *Fields v. Fairbanks North Star Borough*, 818 P.2d 658 (1991)."

This is the reason behind the use of *full caps* when writing a proper name. The U.S. and State Governments are deliberately using a legal fiction to "address" the Lawful Christian. We say this is deliberate because their own official publications state that proper names are not to be written in *full caps*. They are deliberately not following their own recognized authorities.

In the same respect, by identifying their own government entity in *full caps*, they are legally stating that they are also a legal fiction. As stated by Dr. Mary Newton Bruder in the beginning of this report, the use of *full caps* for writing a proper name is an "internal style" for what is apparently a pre-determined usage and, at this point, unknown jurisdiction.

The main key to a legal fiction is *assumption* as noted in each definition above.

**Conclusion: There are no official or unofficial English grammar style manuals or reference publications that recognize the use of *full caps* when writing a proper name. To do so is considered a legal fiction.**

## The Assumption of a Legal Fiction

An important issue concerning this entire matter is whether or not a legal fiction, such as a proper name written in *full caps*, can be substituted for a lawful Christian name or *any* proper name, such as the State of Florida. Is the use of a legal fiction "legal"? If so, from where does this legal fiction originate and what enforces it?

A legal fiction can be used when the name of a "person" is not known by using the fictional name "John Doe". This is understood by all and needs little explanation. If you have no way to identify someone, then the legal fiction John Doe or Jane Doe is used to describe an unknown name until the proper name can be identified. In all cases, a legal fiction is an *assumption* of purported fact without having shown the fact to be true or valid. It's an acceptance with no proof. Simply, to assume is to pretend. *Oran's Dictionary of the Law* says that the word **assume** means:

1. To take up or take responsibility for; to receive; to undertake. See assumption.

2. To pretend.

3. To accept without proof.

These same basic definitions are used by nearly all of the modern law dictionaries. It should be noted that there is a difference between the meanings of the second and third definitions with that of the first. *Pretending* and *accepting without proof* are of the same understanding and meaning. However, to take responsibility for and receive, or *assumption*, does not have the same meaning. *Oran's* defines **assumption** as:

> "Formally transforming someone else's debt into your own debt. Compare with guaranty. The assumption of a mortgage usually involves taking over the seller's 'mortgage debt' when buying a property (often a house)."

Now, what happens if all the meanings for the word *assume* are combined? In a literal and definitive sense, the meaning of *assume* would be: **The pretended acceptance, without proof, that someone has taken responsibility for, has guaranteed, or has received a debt.**

Therefore, if we apply all this in defining a *legal fiction*, the use of a legal fiction is an assumption or pretension that the legal fiction named has received and is responsible for a debt of some sort.

Use of the legal fiction JOHN SMITH in place of the proper name John Smith implies an assumed debt guarantee without any offer of proof. The danger behind this is that if such an unproven assumption is made, then unless the assumption is proven wrong, it is considered valid.

Please go no further until you understand and comprehend exactly what the above paragraphs have stated. If necessary, re-read the above until you have a full understanding of what is involved in the meaning of a legal fiction.

An assumed debt is valid unless proven otherwise. This is in accord with the Uniform Commercial Code valid in every State and made a part of the Statutes in each State. A legal fiction written with full caps - resembling a proper name but grammatically *not* a proper name - is being held as a debtor for an assumed debt.

What happens if the proper name, *i.e.* John Doe, answers for or assumes the legal fiction, *i.e.* JOHN DOE? They become one and the same. This is the crux for the use of the full caps legal fictions by the U.S. Government and the States. It is the way that they can bring someone into their fictional venue and jurisdiction that they have created. By implication of definition, this also is for the purpose of some manner of assumed debt.

Why won't they use "The State of Texas" or "John Doe" in their courts or on Driver's Licenses? What stops them from doing this? Obviously, there is a reason for using legal fictions since they are very capable of writing proper names just as their own official style manual states. The reason behind legal fictions is found within the definitions as cited above. At this point, this should be very clear to every reader.

## The Legalities Behind Legal Fictions

We could go on for hundreds of pages citing the legal basis behind the creation of legal fictions. In a nutshell, a legal fiction in and of itself, such as the STATE OF TEXAS, can create additional legal fictions. Fictions arise from the law, not the law from fictions. Take a moment to understand what that means. Legal fictions originate from any law that is used to create them, regardless of the fact that the purported foundational law is valid or not. However, a law can never originate from a fictional foundation that doesn't exist.

The generic and original U.S. Constitution is a valid foundation document of treaty law having been created between the individual state nations. Contained within it is the required due process of law for all the participating nation states of that treaty. Proper representatives of the people in each nation state agreed upon it and signed it with their lawful seals. The federal government is not only created by it, but is also bound to operate within the guidelines of Constitutional due process. Any law that originates from the Constitutional due process is valid law. Any purported law that does *not* originate from it is a fictional law without validity. Thus, the true test of any American law is its basis of due process according to the generic U.S. Constitution. Was it created according to the lawful process or outside of lawful process based on that constitutional treaty?

## Executive Orders and Directives

For years we have researched the *lawful* basis for creating full caps legal fictions and have concluded that there is no such foundation according to valid laws and due process. But what about those purported "laws" that are *not* valid and have *not* originated from constitutional due process? There's a very simple answer to the creation of such purported laws that are really not laws at all: **Executive Orders and Directives**. They are the "color of law" without being valid laws of due process. They have the appearance of law and look as if they're laws, but according to due process, they are *not* laws. Rather, they are "laws" based on fictional beginnings and are the basis for further fictional "laws" and other legal fictions. They are "regulated" and "promulgated" by Administrative Code, rules and procedures, *not* due process. Currently, Executive Orders are enforced through the legal fiction known as the federal Administrative Procedures Act. Each State has also adopted the same fictional administrative "laws".

## Lincoln Establishes E.O.'s

Eighty-five years after the Independence of the united States, seven southern nation States of America walked out of the *Second Session of the thirty-sixth Congress* on March 27, 1861. In so doing, the Constitutional due process quorum necessary for Congress to vote was lost and Congress was adjourned *sine die*, or "without day". This meant that there was no lawful quorum to set a specific day and time to reconvene which, according to *Robert's Rules of Order*, dissolved Congress. This dissolution automatically took place because there were no provisions within the Constitution allowing the passage of any Congressional vote without a quorum of the States.

Lincoln's second Executive Order of April 1861 called Congress back into session days later, but not under the lawful authority, or lawful due process, of the Constitution. Solely in his capacity as Commander-in-Chief of the U.S. Military, Lincoln called Congress into session under authority of Martial Law. Since April of 1861, "Congress" has not met based on lawful due process. Our current "Congress" is based on legal fiction no different than a proper name written in full caps is.

Legal fiction "laws", such as the Reconstruction Acts and the implementation of the Lieber Code, were soon instituted by Lincoln and thus became the basis for our current "laws". Every purported "Act" in effect today is based on legal fiction, not lawful due process. Lincoln has been called the greatest American Lawyer and his ingenious legal rule of America enforces such a title.

## The abolition of the English & American common law

Here's an interesting quote from the 1973 session of the U.S. Supreme Court:

> "The American law. In this country, the law in effect in all but a few States until mid-19th century was the pre-existing English common law... It was not until after the War Between the States that legislation began generally to replace the common law." -- *Roe v. Wade*, 410 U.S. 113.

In effect, Lincoln's second Executive Order abolished the recognized English common law in America and replaced it with "laws" based on a fictional legal foundation, *i.e.*, Executive Orders and Directives. Most States still have a reference to the common laws within their present day statutes. For example, in the *Florida Statutes (1999)*, Title I, Chapter 2, at **§ 2.01 Common law and certain statutes declared in force**, it states:

> "The common and statute laws of England which are of a general and not a local nature, with the exception hereinafter mentioned, down to the 4th day of July, 1776, are declared to be of force in this state; provided, the said statutes and common law be not inconsistent with the Constitution and laws of the United States and the acts of the Legislature of this state. **History.** --s. 1, Nov. 6, 1829; RS 59; GS 59; RGS 71; CGL 87."

Note that the basis of the common law is an approved act of the people of Florida by resolution on November 6, 1829, prior to Lincoln's Civil War. Also note that the subsequent "laws", as a result of acts of the Florida Legislature and the United States, now take priority over the common law in Florida. Since April 1861, the American and English common law was abolished and replaced with legal fiction "laws", a.k.a. Statutes, Rules and Codes, based on Executive Order, *not* the due process specified within the generic Constitution.

## Applying it all to Current "laws"

Title III, Pleadings and Motions, Rule 9(a) Capacity, *Federal Rules of Civil Procedure*, states:

> "When an issue is raised as to the **legal existence of a named party**, or the party's capacity to be sued, or the authority of a party to be sued, the party desiring to raise the issue shall do so by specific negative averment, which shall include supporting particulars." [Bold emphasis added].

At this juncture, it's clear that the existence of a name written with *full caps* is a legal fiction. This is surely an issue to be raised and the supporting particulars are outlined within this article. Use of the proper name must be insisted upon as a matter of abatement - correction - for all parties of an action of purported "law". However, the current "courts" cannot correct this since they are based on fictional law and must use fictional names. Instead, they expect the lawful Christian man or woman to accept their full caps name and become a fictional entity, just as they are.

## Oklahoma Statutes

Do the individual States within the United States follow suit? The requirement of proper names, including a mandate for correction when proper names are provided, is clearly set forth when relating to criminal prosecution in the *Oklahoma Statutes*, **Chapter 22, § 403**:

> "When a defendant is indicted or prosecuted by a **fictitious or erroneous name**, and in any stage of the proceedings his true name is discovered, it must be inserted in the subsequent proceedings, referring to the fact of his being charged by the name mentioned in the indictment or information." [Bold emphasis added].

## American Jurisprudence

In general, it's necessary to properly identify parties to court actions. If not properly identified, then judgments are void, as outlined in Volume 46, *American Jurisprudence 2d*, at **Judgments**:

> "**§ 100 Parties** - A judgment should identify the parties for and against whom it is rendered, with such certainty that it may be readily enforced, and a judgment which does not do so may be regarded as void for uncertainty. Such identification may be achieved by naming the persons for and against whom the judgment is rendered. Technical **deficiencies in the naming of the persons for and against whom judgment is rendered can be corrected if the parties are not prejudiced**. A reference in a judgment to a party plainly liable, followed by an omission of that party's name from the language of the decree, at least gives rise to an ambiguity and calling for an inquiry into the court's real intention as reflected in the entire record and surrounding circumstances." [Footnote numbers are omitted; cites have not been reproduced; bold emphasis added]

## The present situation in America
## A legal person = a legal fiction

One of the terms used predominantly by the present civil governments and courts in America is *legal person*. According to them, just what is a legal person? We offer some definitions for your review:

> **legal person :** a body of persons or an entity (as a corporation) considered as having many of the rights and responsibilities of a natural person and esp. the capacity to sue and be sued. -- *Merriam-Webster's Dictionary of Law 1996.*

> **Person.** 1. A human being (a "natural" person). 2. A **corporation** (an "artificial" person). Corporations are treated as persons in many legal situations. Also, the word *"person"* includes corporations in most definitions in this dictionary. 3. Any other "being" entitled to sue as a legal entity (a government, an association, a group of Trustees, etc.). 4. The plural of person is *persons, not* people (see that word). – *Oran's Dictionary of the Law*, West Group 1999.

> **Person.** An entity with legal rights and existence including the ability to sue and be sued, to sign contracts, to receive gifts, to appear in court either by themselves or by lawyer and, generally, other powers incidental to the full expression of the entity in law. Individuals are "persons" in law unless they are minors or under some kind of other incapacity such as a court finding of mental incapacity. Many laws give certain powers to "persons" which, in almost all instances, includes business organizations that have been formally registered such as partnerships, corporations or associations. – *Duhaime's Law Dictionary.*

**PERSON**, noun. per'sn. [Latin *persona*; said to be compounded of *per*, through or by, and *sonus*, sound; a Latin word signifying primarily a mask used by actors on the stage.] -- *Webster's 1828 Dictionary*.

A person is basically an entity - legal fiction - of some kind that has been *legally* created and has the *legal* capacity to be sued. Isn't it odd that the word *lawful* is not used within these definitions?

## Legal or Lawful?

We feel that it's quite necessary to also define what is *legal* as opposed with what is *lawful*. The generic Constitution is lawful. That fact has already been established. The present civil authorities and their courts prefer to use the word *legal*. Is there a difference in the meanings? The following is quoted from *A Dictionary of Law 1893*:

**Lawful**. In accordance with the law of the land; according to the law; permitted, sanctioned, or justified by law. "Lawful" properly implies a thing conformable to or enjoined by law; "Legal", a thing in the form or after the manner of law or binding by law. **A writ or warrant issuing from any court, under color of law, is a "legal" process however defective**. See *legal*. [Bold emphasis added]

**Legal**. Latin *legalis*. Pertaining to the understanding, the exposition, the administration, the science and the practice of law: as, the legal profession, legal advice; legal blanks, newspaper. **Implied** or imputed in law. **Opposed to *actual***. "Legal" looks more to the letter, and "Lawful" to the spirit, of the law. "Legal" is more appropriate for conformity to positive rules of law; "Lawful" for accord with ethical principle. **"Legal" imports rather that the forms of law are observed, that the proceeding is correct in method, that rules prescribed have been obeyed; "Lawful" that the right is actful in substance, that moral quality is secured. "Legal" is the antithesis of "equitable", and the equivalent of "constructive"**. *2 Abbott's Law Dict. 24*. [Bold emphasis added]

Legal matters administrate, conform to, and follow *rules*. They are equitable in nature and are implied rather than actual. A legal process can be defective in law. This falls in line with our previous discussions of *legal fictions* and the *color of law*. To be legal, a matter does not follow the law. Instead, it conforms to and follows the *rules* of law. This may help your understanding as to why the Federal and State Rules of Civil & Criminal Procedure are cited in every court petition so as to conform to *legal* requirements of the legal fictions, *i.e.*, the STATE OF GEORGIA or the U.S. FEDERAL GOVERNMENT, that rule the courts.

Lawful matters are ethically enjoined in the law of the land - the law of the people – and are actual in nature, *not* implied. This is why the lawful generic Constitution has little bearing or authority in the present day legal courts.

## Executive Orders rule the land

The current situation is now this: Legalism has taken over the law. The administration of legal rules, codes, and statutes are now being substituted for actual law. This takes place on a Federal as well as State level. Government administrates what it has created through its own purported "laws", which are *not* lawful, but purely legal. They are legal fictions based on legally - fictionally - created authority. They are authorized and enforced by legal Executive Orders. Executive Orders are not lawful and never have been. As you read the following, be aware of the words *code* and *administration*.

For example, let's take a quick look at the United States Census 2000. The legal authority for this census comes from Office of Management and Budget (OMB) Approval No. 0607-0856. The OMB is a part of the Executive Office of the President of the United States. The U.S. Census Bureau is responsible for implementing the national census, which is a division of the Economics and Statistics Administration of the U.S. Department of

Commerce (USDOC). The USDOC is a department of the Executive Branch. Obviously, Census 2000 is authorized, carried out, controlled, enforced and implemented by the President, a.k.a. the Executive Branch of the Federal Government.

In fact, the Executive Office of the President controls the entire nation through various departments and agencies effecting justice, communications, health, energy, transportation, education, defense, treasury, labor, agriculture, mails, and much more, through a myriad of Executive Orders, Proclamations, Policies, and Decisions.

All the U.S. Presidents since Lincoln have claimed their "authority" for these Executive Orders is generally based on Article II, Section 2 of the *U.S. Constitution*:

> "The President shall be commander in chief of the Army and Navy of the United
> States, and of the militia of the several states, when called into the actual service
> of the United States; ...He shall have power, by and with the advice and consent
> of the Senate, to make treaties, provided two thirds of the Senators present
> concur; and he shall nominate, and by and with the advice and consent of the
> Senate, shall appoint ambassadors, other public ministers and consuls, judges of
> the Supreme Court, and all other officers of the United States, whose
> appointments are not herein otherwise provided for, and which shall be
> established by law: but the Congress may by law vest the appointment of such
> inferior officers, as they think proper, in the President alone, in the courts of law,
> or in the heads of departments."

In reality, the Congress is completely by-passed. Since the Senate was convened in April 1861 by Presidential Executive Order No. 2, *not* by lawful constitutional due process, the current Senate is also under the direct authority of the Executive Office of the President. The President *legally* needs neither the consent nor a vote from the Senate simply because the Senate's legal authority to meet exists *only* by Executive Order. Ambassadors, public ministers, consuls, Federal judges, and *all* officers of the UNITED STATES are appointed by, and under authority of, the Executive Office of the President.

## The Federal Registry is an Executive function

For the past 65 years, every Presidential Executive Order has become purported "law" simply by its publication in the Federal Registry, which is operated by the Office of the Federal Register (OFR). In 1935, the OFR was established by the Federal Register Act. The purported authority for the OFR is found within the *United States Code*, Title 44, at Chapter 15:

> **"§ 1506. Administrative Committee of the Federal Register; establishment**
> **and composition; powers and duties**
>
> The Administrative Committee of the Federal Register shall consist of the
> Archivist of the United States or Acting Archivist, who shall be chairman, an
> officer of the Department of Justice designated by the Attorney General, and the
> Public Printer or Acting Public Printer. The Director of the Federal Register shall
> act as secretary of the committee. The committee shall prescribe, with the
> approval of the President, regulations for carrying out this chapter."

Notice that the entire Administrative Committee of the Federal Register is comprised of officers of the Federal Government. Who appoints all Federal officers? The President does. This *act* also gives the President the authority to decree all the regulations to carry out the act. This is quite a monopoly we're seeing here whereby the Executive establishes, controls, regulates and enforces the Federal Government without need for any approval from the Senate. How could anyone possibly call this lawful?

In 1917, President Woodrow Wilson couldn't persuade Congress to agree with his desire to arm United States vessels utilizing hostile German waters before the United States entered World War I. So, Wilson simply invoked the "policy" through a Presidential Executive Order. President Franklin D. Roosevelt issued Executive Order No. 9066 in December 1941. His order forced 100,000 Americans of Japanese descent to be rounded up and placed in concentration camps while all their property was confiscated.

Is it any wonder that the Congress he legally controls did not impeach President William Jefferson Clinton when the evidence for impeachment was overwhelming? On that note, why is it that the lawyer-Presidents have used Executive Orders the most? Who but a lawyer would know and understand legal rules the best. Sadly, they enforce what's legal and ignore what's lawful.

## How debt is assumed by legal fictions

We now refer back to the matter of *assumption*, as already discussed, with its relationship to legal fictions, *i.e.* THE STATE OF CALIFORNIA or JOHN SMITH. Since an assumption, by definition, implies debt, what debt does a *legal fiction* assume? Now that we've exposed the legal - executive - basis of the current Federal and State governments, it's time to put all of this together.

The government use of *full caps* in place of proper names is absolutely no mistake. It signifies an internal - legal - rule and authority. Its foundation is legal fiction and the result is further legal fiction that is created, promulgated, instituted, administrated, and enforced via legal rule, code, statute and policy. Let's just call them 'the laws that *are* but never *were*.'
*Qui sentit commodum, sentire debet et onus.* He who enjoys the benefit, ought also to bear the burden. He who enjoys the advantage of a right takes the accompanying disadvantage -- a privilege is subject to its condition or conditions. — *Bouvier's Maxims of Law 1856.*

## The Birth Certificate

Since the early 1960's, State governments - created legal fictions signified by *full caps* - have issued birth certificates to *"persons"* with legal fiction *full caps* names. This is <u>not</u> a lawful record of your physical birth, but a legal fiction as signified by the use of the full caps. It may look as if it's your proper name, but that's impossible since no proper name is ever written in full caps. The Birth Certificate is the government's created legal instrument for its legal title of ownership, or deed, to the personal legal fiction they have created just for you.

One important area to address, before going any further, is the governmental use of older data storage from the late 1950's until the early 1980's. As a "leftover" from various Teletype oriented systems, many government data storage methods used full caps for proper names. The IRS was supposedly still complaining about some of their antiquated storage systems as recent as the early 1980's. At first, this may have been a necessity of the technology at the time, not a deliberate act. Perhaps, when this technology was first being used and implemented into the mainstream of communications, some legal experts saw it as a perfect tool for their legal fictions. What better excuse could there be?

However, since local, State and Federal offices primarily used typewriters during that same time period, and Birth Certificates and other important documents, such as Driver's Licenses, were produced with typewriters, it's very doubtful that this poses much of an excuse to explain full caps usage for proper names. The only reasonable usage of the older databank full caps storage systems would have been for addressing envelopes or certain forms in bulk, including payment checks, which the governments did frequently.

Automated computer systems, with daisy wheel and pin printers used prevalently in the early 1980's, emulated the IBM electric typewriter Courier or Helvetica fonts in *both* upper and lower case letters. Shortly thereafter, the introduction of laser and ink jet printers with multiple fonts became the standard. For the past fifteen years, there is no excuse that the government computers won't allow the use of lower case letters unless the older data is still stored in its original form, *i.e.* full caps, and has not been translated due to the costs of re-entry. But this does not excuse the entry of new data, only "legacy" data. In fact, on many government forms today, proper names are in full caps while other areas of the same computer produced document are in both upper and lower

case. One can only conclude that now, more than ever, the use of full caps in substitution the writing a proper name is no mistake.

When a child is born, the hospital sends the original, not a copy, of the record of live birth to the State Bureau of Vital Statistics, sometimes called the Department of Health and Rehabilitative Services (HRS). Each STATE is required to supply the UNITED STATES with birth, death, and health statistics. The STATE agency that receives the original record of live birth keeps it and then issues a *Birth Certificate* in the name of the child's *fictional person, as signified in full caps, i.e. JAMES SMITH.*

> cer·tif·i·cate, *noun.* Middle English *certificat,* from Middle French, from Medieval Latin *certificatus,* from Late Latin, neuter of *certificatus,* past participle of *certificare,* to certify, 15th century. **3**: a document evidencing ownership or debt. -- *Merriam Webster Dictionary 1998.*

The Birth Certificate issued by the State is then *registered* with the U.S. Department of Commerce - the Executive Office - specifically through their own sub-agency, the U.S. Census Bureau, who is responsible to register vital statistics from all the States. The word *registered,* as it is used within commercial or legal based equity law, does *not* mean that the full caps name was merely noted in a book for reference purposes. When a birth certificate is *registered* with the U.S. Department of Commerce, it means that the *legal person* named on it in full caps has become a surety or guarantor.

> registered. Security, bond. -- *Merriam-Webster's Dictionary of Law 1996.* **Security.** 1a: Something (as a mortgage or collateral) that is provided to make certain the fulfillment of an obligation. Example: used his property as security for a loan. 1b: "surety". 2: Evidence of indebtedness, ownership, or the right to ownership. -- *Ibid.* **Bond.** 1a: A usually formal written agreement by which a person undertakes to a certain act (as fulfill the obligations of a contract) ...with the condition that failure to perform or abstain will obligate the person ...to pay a sum of money or will result in the forfeiture of money put up by the person or surety. 1b: One who acts as a surety. 2: An interest-bearing document giving evidence of a debt issued by a government body or corporation that is sometimes secured by a lien on property and is often designed to take care of a particular financial need. -- *Ibid.* Surety. The person who has pledged him or herself to pay back money or perform a certain action if the principal to a contract fails, as collateral, and as part of the original contract. -- *Duhaime's Law Dictionary.* 1: a formal engagement (as a pledge) given for the fulfillment of an undertaking. **2:** one who promises to answer for the debt or default of another. Under the Uniform Commercial Code, however, a surety includes a guarantor, and the two terms are generally interchangeable. -- *Merriam Webster's Dictionary of Law 1996.* Guarantor. A person who pledges collateral for the contract of another, but separately, as part of an independently contract with the obligee of the original contract. -- *Duhaime's Law Dictionary.*

It's not difficult to see that a State created birth certificate, written with full caps in the name of a *legal person,* is a document evidencing debt the moment it's issued. This is how it works: Once each State has *registered* the Birth Certificates with the U.S. Department of Commerce, the U.S. Department of the Treasury - also a part of the Executive Office - then issues Treasury Securities in the form of Treasury Bonds, Notes, and Bills using the birth certificates as sureties or guarantors for these purported Securities. This is based on the future tax revenues of the *legal person.* This means that the bankrupt corporate U.S. can guarantee to the purchasers of their securities the lifetime labor and tax revenues of all Americans as collateral for payment. They simply do this by converting the *lawful name* into a *legal person.*

Legally, you are considered a slave or indentured servant to the various Federal, State and local governments via your STATE issued and created Birth Certificate in the name of your full caps *person.* The reason this Birth

Certificate was issued is so that - exclusively - they hold the title of birth to your *legal person*. This is compounded further when one voluntarily obtains a driver's license or a Social Security Identification number. They own even your personal and private life through your STATE issued marriage certificate issued in the names of legal persons. You have no Rights in birth, marriage, or even death. They hold the sovereign right to all legal fiction titles they have created.

Our current problem is that we have voluntarily agreed to their system of legal fiction law by simply remaining silent - a legal default - and not taking claim to our own Rights. The legal rules and codes enforce themselves. There is no court hearing to determine if those rules are correct. Their "law" is self-regulating and self-supporting. Once set into motion, their "laws" automatically come into effect provided the legal process has been followed.

*Cujusque rei potissima pars principium est*– The principal part of everything is in the beginning.

## The various bankruptcies

The legally created fiction called the UNITED STATES is bankrupt and holds no lawful Constitutionally mandated silver or gold - coin and bullion - to back up or pay their debts. For example: all privately held and federally held gold coins and bullion in America was seized by Executive Order of April 5, 1933 and paid to the creditor, the private Federal Reserve Bank Corporation (FRB) under the terms of bankruptcy.

Congress - still meeting under Executive Order authority - confirmed this bankruptcy through the Joint Resolution to Suspend The Gold Standard And Abrogate The Gold Clause, June 5, 1933 in H.J. Res. 192, 73rd Congress, 1st session, Public Law 73-10. Within this 1933 Public Law, it states in part:

> "...every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy".

In 1950, the corporate U.S. declared bankruptcy a second time, whereby the Secretary of Treasury was appointed as "Receiver" of the bankruptcy in Reorganization Plan No. 26, Title 5 USC 903, Public Law 94-564, Legislative History, page 5967.

The only asset the UNITED STATES has, in order to pay their bankruptcy debt since 1933, is the people themselves. But, if the UNITED STATES openly declared this, the people would never allow their labors and future to be collateral to this bankruptcy debt. Consequently, they legally pledge the future labor and tax revenues of Americans, by and through the full caps fictional *legal persons* they have created, as collateral for credit - loans - to pay daily operational costs and the ever increasing debt.

## Full caps legal person *v.* the lawful being

Just who is the full caps person, *i.e.* JOHN JAMES SMITH? He's the legal fiction the government created to take the place of the real being, *i.e.* John James Smith. The *lawful* Christian name of birthright has been substituted by a legal fiction created by the government. If the lawful Christian name answers as the legal person, the two are recognized as being one and the same. However, if the lawful being refuses acceptance of the legal fiction, the two are separated. Therein lies the simple solution to the entire matter: refusal by the lawful Christian to accept or answer for the legal person.

How did this happen? A result of the federal government bankruptcies was their creation of a legal fiction known as THE UNITED STATES as a part of their legal reorganization. Each STATE was also converted to their respective fictional legal person, *i.e.* THE STATE OF TEXAS. Legal fictions can create further legal fictions, such as corporations or any other fictional *persons* easily identified by being written with full caps. Once this was accomplished, the entire process was set into motion.

All areas of government, including the purported courts of law, are currently authorized by, and operating as, legally created fictions. For example, the CIRCUIT COURT OF WAYNE COUNTY or the U.S. DISTRICT COURT can only recognize other *legal persons*. This is why your lawful name is never entered in their records. It has been substituted with the legal person written with full caps. Jurisdiction in such legal fiction courts is only with other legal fictions – persons. The only jurisdiction a lawful being can enter into is a *lawful* constitutional court – a common law venue. The "catch 22" is that lawful courts no longer exist. Only *legal* courts are available to Americans.

The purpose and reason for the government use of proper names written in full caps is now revealed. The only way to counter this is for lawful Americans to stop accepting the use of the substituted legal fiction the State has given them. Every document now issued by any government addresses the person written in full caps. Lawful Americans must insist that they are not that legal fiction and refuse to accept it. By joining together and doing so from the local level, each community will begin to upset the legal order. Lawful Americans must begin to demand lawful government and lawful courts. The legal fictions can only come to an end when the people refuse to use or recognize them.

**The only way to restore lawful government in America is for the people to refuse the privileges of the legal government now unlawfully in place. We've all been duped and the billboard was right before our own eyes. The use of full caps to write a proper name is absolutely no mistake.**

# I am not a Person, or an Individual, or a Human

I am not a person, or an individual, or a Hued-man. Although some hu-mans look similar to me, I am not a hued-man.

Some would say that I am a 'natural' person, but as I will show you, I am not one of those either. Who then or what then am I?

To understand who I am, you must first understand the definitions which have been placed on the words I have quoted above, words that are commonly used, but do not describe me. For example, the word 'person'.

**Person -** *The Revised Code of Washington, RCW 1.16.080,* (I live in The State of Washington) defines a person as follows: "The term 'person' may be construed to include the United States, this state, or any state or territory, or any public or private corporation, as well as an individual."

**Person -** *Black's Law Dictionary 6th Edition, pg. 791,* defines 'person' as follows: "In general usage, a human being (i.e. natural person), though by statute term may include labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers."

**Person -** *Oran's Dictionary of the Law, West Group 1999,* defines Person as: 1. A human being (a "natural" person). 2. A corporation (an "artificial" person). Corporations are treated as persons in many legal situations. Also, the word "person" includes corporations in most definitions in this dictionary. 3. Any other "being" entitled to sue as a legal entity (a government, an association, a group of Trustees, etc.). 4. The plural of person is persons, not people (see that word). -

**Person -** *Duhaime's Law Dictionary.* An entity with legal rights and existence including the ability to sue and be sued, to sign contracts, to receive gifts, to appear in court either by themselves or by lawyer and, generally, other powers incidental to the full expression of the entity in law. Individuals are "persons" in law unless they are minors or under some kind of other incapacity such as a court finding of mental incapacity. Many laws give certain powers to "persons" which, in almost all instances, includes business organizations that have been formally registered such as partnerships, corporations or associations. -

**Person, noun. per'sn. -** *Webster's 1828 Dictionary.* Defines person as: [Latin persona; said to be compounded of per, through or by, and sonus, sound; a Latin word signifying primarily a mask used by actors on the stage.]

**legal person -** *Merriam-Webster's Dictionary of Law 1996,* defines a legal person as: a body of persons or an entity (as a corporation) considered as having many of the rights and responsibilities of a natural person and esp. the capacity to sue and be sued.

A person according to these definitions, is basically an entity - legal fiction - of some kind that has been legally created and has the legal capacity to be sued. Isn't it odd that the word lawful is not used within these definitions?

I am not "the United States, this state, or any territory, or any public or private corporation". I am not "labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers." So, I cannot be a 'person' under this part of the definition.

The RCW quoted above also states that a person could also be an "individual." Black's Law Dictionary also defines a person as a "human being," which they define by stating "(i.e. natural person)". So let's first check to see if I am an "individual".

**Individual** - *Black's Law Dictionary 6th Edition, pg. 533*, defines "individual" as follows: "As a noun, this term denotes a single person as distinguished from a group or class, and also, very commonly, a private or natural person as distinguished from a partnership, corporation, or association; but it is said that this restrictive signification is not necessarily inherent in the word, and that it may, in proper cases, include artificial persons."

Well now, I have already been shown that I am not a 'person', and since 'individual' denotes a single 'person' as distinguished from a group or class, I can't be an 'individual' under this definition either. But I see the term 'natural person' used in the definition of the RCW, and also in the definition of some of the Law Dictionaries. Maybe I am a 'natural' person, since I know I am not an 'artificial' one.

I could not find the term 'Natural person' defined anywhere, so I had to look up the word 'natural' for a definition to see if that word would fit with the word person...

**Natural** - *Black's Law Dictionary 6th Edition, pg. 712*, defines 'Natural' as follows: "Untouched by man or by influences of civilization; wild; untutored, and is the opposite of the word "artificial". The juristic meaning of this term does not differ from the vernacular, except in the cases where it is used in opposition to the term "legal"; and then it means proceeding from or determined by physical causes or conditions, as distinguished from positive enactment's of law, or attributable to the nature of man rather than the commands of law, or based upon moral rather than legal considerations or sanctions."

What the hell do they mean by this definition? Am I untouched by man (depends on what the word 'man' means I guess), or by influences of civilization? I don't think so. Am I 'wild', or 'untutored'? Nope, not me. Even though the definition states that this word is the opposite of the word 'artificial', it still does not describe who I am. So I must conclude that I am not a 'natural' person, under this definition of the word 'natural' either. So the term 'natural person' does not appear to apply to me.

Black's Law Dictionary also used the term 'human being', and although Black's defined it as a 'natural person', maybe they made a mistake, and maybe I am a 'human being.' 'Human' or 'human being' does not appear to have a 'legal' definition, so I will have to rely on my old standby 1888 Noah Webster's Dictionary for a vernacular definition of this word. Maybe Noah would know who I am.

**Human** - *Webster's 1888 Dictionary defines 'human' as follows*: n. A human being; one of the race of man. [Rare and inelegant.] "Sprung of humans that inhabit earth."

I know that I did not 'Sprung' up! Scripture says that my ancestor Adam was shaped from the dust of the soil by Yahweh Elohim ...So my descendants were 'shaped or formed' not 'Sprung up.' The etymology of the word Human, suggests that it is a word formed of two separate words 'Hued' (defined as the property of color), and man. But this cannot be correct, at least not politically, so I can't really go there, because the word 'human' would then mean colored man.

Am I of the race of man? Rare and inelegant? Sprung of humans that inhabit earth? (I'm not colored, and I did not spring up). Well, it looks like I have to define the word 'man' using Webster's because there appears to be no 'legal' definition for 'man' (At least I could not find one). I am not a Person....                              Page 2                                    03/05/03

Oh! Oh! Well, it looks like we are back to the beginning of our study of definitions, yep, back to the start, completed the circle. I am not an 'individual', so I cannot be considered 'of the human race'; and since I'm not of the human race, so I can't be 'a human being,' and I've also been shown (by definitions) that I'm not 'a person' either.

When I was younger, I remember filling out forms, which had the word 'Caucasian', listed for race (they don't seem to use that definition any more for some reason). I was always told that this was the word for me to use since I had white skin. (It is actually pinkish, and some is tanned, with mostly white next to the tanned). I was still told I was a 'Caucasian'). So back to the definitions of 'Caucasian".

**Caucasian** - *Black's Law Dictionary 6th Edition, defines 'Caucasian' as follows:* Of or pertaining to the white race.

Well, I guess that makes more sense since I have always held myself to be 'white' but this is really not a very descriptive definition. Let's see what an 'older' Black's Law Dictionary has to say if anything (they have a tendency to change the meaning of words in the new dictionaries for some reason).

**Caucasian** - *Black's Law Dictionary 4th Edition* defines "Caucasian" As follows: Pertaining to the white race, to which belong the greater part of European nations and those of western Asia. *The term is inapplicable to denote families or stocks inhabiting Europe and speaking either the so-called Aryan or Semitic languages.*

That's interesting, it appears that 'white racist Aryan' groups, like 'Aryan Nations' types, or those speaking Aryan, are not even 'Caucasians' under this definition, so they can't be from the 'White' Race (I wonder if they know that). Neither are the people who call themselves Jews, and speak a form of Hebrew (which appears to be derived from the older 'Semitic' language referred to in Black's Law Dictionary).

Back to Noah's Dictionary to see if he has a vernacular definition of the word 'Caucasian'.

**Caucasian** - *Webster's 1888 Dictionary defines 'Caucasian' as follows:* Anyone belonging to the Indo-European race, and the white races originating near Mount Caucasus.

**Well anyway, here then is my Conclusion:** There may be some beings that are 'persons' and some of them are 'individuals', and some 'Natural persons' do exist, of this I have no doubt, I've met some of them. There are also many that I believe are 'Humans', or 'Hued-man beings' these human beings seem to exist all over this globe. However...

My kinfolk came from Western Europe, so I must have come from one of the European Nations. I am also white (I use the term loosely) so by definition I guess I am a 'Caucasian'. Since I am a Caucasian, I must have come from, or be a member of one of the white races originating near Mount Caucasus. I am a male of my race, so I must conclude that I am a 'Caucasian male'. I am also a follower of the Scriptural Messiah whose name is Yahshua (some call him Jesus). Some would call me a Christian, since I am a follower of the Messiah. I am a living breathing being, formed from the soil. Therefore I must conclude that I am a Living Breathing Christian Caucasian Male of the soil. That's it, I am a 'Living Breathing Caucasian Christian Male' (of the soil) or for short, how about **'L.B.C.C.M'** - Cool - Ok, now where are the Caucasus Mountains, and why would my Caucasian Race be originating from the area near that mountain called Mount Caucasus .........Hummm?

RCW 42.17.251
Construction.

*Exhibit - 10*

The people of this state do not yield their sovereignty
to the agencies that serve them. The people, in
delegating authority, do not give their public servants
the right to decide what is good for the people to know
and what is not good for them to know. The people insist
on remaining informed so that they may maintain control
over the instruments that they have created. The public
records subdivision of this chapter shall be liberally
construed and its exemptions narrowly construed to
promote this public policy.

[1992 c 139 § 2.]

Further take notice that we the People
of the State also do not yield our
Rights nor our Soverevgnty to the agencies
that rule over we the Sovereign Electors.

6 U.S. 444 (1990)
ery car, or every third car,
are per se reasonable under
that states have a compell
8, while the intrusion on
eck point stops is slight.

no suspicion whatsoever as
e follows guidelines that
e not random.

*E-Z Review for Criminal Procedure*

# V.  Exclusionary Rule

Central to constitutional criminal procedure is the Exclusionary Rule.
The Rule requires suppression of illegally obtained evidence.  This
Rule has been applied to violations of the Fourth, Fifth, Sixth and
Fourteenth Amendments.  This Rule is unique to American
Jurisprudence. In this section, we will explore the rationale, definition,
operation of and cases involving the Exclusionary Rule.

A.  Generally

1.  Evidence obtained by the government in violation of a
    Constitutional right is not admissible in a court of law to
    prove guilt.

2.  Purpose.  The purpose of exclusion of inadmissible evidence
    is to:

    a.  Maintain judicial integrity;
    b.  Deter bad conduct on the part of law enforcement
        officers; and
    c.  Protect a person's constitutional right to privacy.

3.  Limitations.  Exclusionary rules are made only:

    a.  By judges, not by Congress or the Constitution; and
    b.  In criminal proceedings only.

4.  Exclusionary rules apply to state as well as federal courts.

*Mapp v. Ohio*, 367 U.S. 643 (1961)
**Held:**  The Exclusionary Rule not only applies to the federal courts
but also to the state courts.  Thus, any evidence obtained in violation
of a person's Fourth and Fourteenth Amendment rights must be
excluded.

5.  Procedure.   The following procedures apply for the
    invocation of the exclusionary rule:

    a.  It is raised in a pre-trial motion; and
    b.  The burden is on the prosecution to prove that the
        evidence is admissible.

27

B. What is not Admissible?

The following are not admissible.

1. Illegally seized evidence

2. "Fruits of the Poisonous Tree"

   *Definition.* Any evidence that is the direct or indirect result of the initial illegal search or seizure. (Example: a confession may be the fruit of an unlawful arrest).

   a. All evidence from the resulting illegal act is inadmissible in court, unless it has been obtained by means sufficiently distinguishable to be purged of the primary taint.

   b. For example, officers unlawfully arrest Mary Juana and unlawfully search Mary Juana's home without a warrant. Surprisingly, they find drugs. The drugs would be inadmissible in court because the warrantless search of Mary Juana's home, absent exigent circumstances, violates her Fourth Amendment right to be free from unreasonable searches and seizures. The officers also find a day planner which says "pick up 1000 kilos of cocaine at 101 High Street." The police go to 101 High Street and seize 1000 kilos of cocaine. That cocaine would be excluded as fruit of a poisonous tree, unless the prosecution could successfully argue that there would have been:

      i. Inevitable discovery of the evidence;

      ii. There was an independent source for the information; or

      iii. There was sufficient attenuation.

C. Exceptions to the Exclusionary Rule (Burden of proof on Prosecution.)

1. Inevitable Discovery

   *Definition.* Fruit of a poisonous tree is admissible if the court finds that the evidence would have been discovered anyway by lawful means.

   a. Limitation. Inevitable discovery is usually limited to physical evidence or weapons.

---

*Nix v. Williams,* 467 U.S. 431 (1984)

**Facts:** The police obtained statements from the defendant in violation of his right to counsel. Those statements lead the police to the body of a 14-year-old girl. The defendant was convicted of murdering the girl, but the Supreme Court overturned the conviction. During a second trial, the prosecution sought to use evidence of the body, location, and other crime scene evidence to show defendant guilt. The defendant contended that such physical evidence should be excluded as a fruit of the illegally obtained statement.

**Held:** The body and evidence were admissible under the doctrine of inevitable discovery since they would even all have been found even absent the illegal police actions. The Court noted that the reason for the exclusionary rule is that the government should receive no advantage from illegal police actions. Here, however, police could have found the evidence anyway so there is no real benefit that would come from excluding the evidence.

On the **Burden of Proof.** The prosecution must prove, by a preponderance of the evidence, that the evidence would have been discovered by other means.

2. To determine whether there is sufficient attenuation to cleanse an illegal taint, look at:

   a. The flagrancy of the illegal conduct;

   b. The temporal proximity between the arrest and confession; and

   c. The presence of intervening circumstances.

3. Purged Taint. Under the following circumstances, the taint on any evidence may be removed.

   a. Intervening actions, including defendant's own acts, remove the taint of an illegal act.

   b. However, defendant's act must be:

      i. Made voluntarily;

      ii. Made after the stress of the criminal taint has dissipated.

*Wong Sun v. United States,* 371 U.S. 471 (1963)

**Facts:** The police illegally searched Toy's apartment. As a result of the search, Toy made an incriminating statement against Yee. The police obtained heroin from Yee, who said that it came from Toy and

**Wong Sun:** Wong Sun was charged and taken into custody, and released. Several days later, Wong Sun confessed. The question presented to the Court was whether, after granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint.
**Held:** The Court held that Wong Sun's confession may be used after the illegal search of Toy's apartment was so attenuated as to dissipate the taint.

**Brown v. Illinois, 422 U.S. 590 (1975).**
**Held:** Statements made within two hours after illegal arrest were inadmissible fruits of a poisonous tree, despite the interception of Miranda warnings.

---

**Rule:** Once a defendant makes a confession he makes is unrelated to the illegal entry.

---

4. The relationship between confession and illegal entry into a home is as follows.

5. There is a legal distinction between physical evidence and a live witness.

---

**United States v. Ceccolini, 435 U.S. 268 (1978).**
**Facts:** An officer stopped in to talk to a friend who was an employee at a local flower shop. While there the officer unlawfully opened an envelope containing money and gambling slips. The officer's friend told him that, if helpful to the defendant. The officer played this information to the FBI...who questioned the friend, who was willing to testify against the defendant.
**Held:** For attenuation purposes, there is a distinction between physical evidence and live witnesses.

**Note:** The Court's treatment of live witnesses, unlike physical evidence, can be explained by its theory that live witnesses, unlike physical evidence, possess free will. Even in the absence of the illegal search, it is possible that a live witness could come forward and testify, whereas physical evidence never volunteers to be found.

---

6. Independent Source.

**Rule:** Evidence is admissible if the prosecution can prove that it could have been obtained by an independent and lawful source, wholly unconnected to the illegal search and seizure.

---

**U.S. v. Crews, 445 U.S. 463 (1980).**
**Facts:** Defendant was identified as a possible suspect in a pair of bathroom robberies at the Washington Monument. Unable to photograph the defendant at the scene, police took him into custody, questioned him, and took his photograph. A victim later identified the defendant from the illegally obtained photograph.
**Held:** A defendant is not himself a suppressible "fruit," and the illegality of his detention does not deprive the government of the opportunity to prove his guilt through the use of untainted evidence. In this case, the police had an independent basis to suspect defendant's involvement in the crimes with which he was charged - eyewitness identifications.

7. The independent source rule also applies where police have probable cause to search the premises, but without a warrant.

**Murray v. United States, 487 U.S. 533 (1988).**
**Facts:** Police entered premises unlawfully, with no warrant but upon probable cause, found drugs, and then left. The police then applied for a warrant to search the premises, but did not mention that they had previously searched them. The police went back and seized the drugs.
**Held:** Police had an independent source upon which to get a warrant, so the evidence is admissible.

8. Good Faith exception to the Exclusionary Rule.
   a. Requirements for the good faith exception are that:
      i. The police reasonably relied on warrant issued by detached and neutral magistrate.
      ii. The warrant is later found to be defective.
   b. Consequence. Physical evidence that meets the requirements of the exception is admissible in the prosecutor's case-in-chief.

**United States v. Leon**, 468 U.S. 897 (1984)

**Facts:** The police obtained a search warrant based upon an informant's tip and police investigation. The police executed the warrant finding drugs and other evidence used to convict the defendant. Later, the search warrant was found to be deficient of probable cause. At a trial, the defendant argued that the evidence obtained using the deficient warrant should have been excluded. The government argued that the warrant should have been excluded.

**Held:** Evidence obtained from a reasonable reliance on a subsequently invalidated search warrant is admissible. The Court noted that one reason for the Exclusionary Rule is to curb violative police conduct. When officers act in good faith, there is no danger of illegal police conduct. Most important, the Court found that the exclusion of evidence in this situation would have no significant deterrent effect on the issuing magistrate. Remember that if an affidavit was falsely used to gain a warrant then the Good Faith Exception is not available.

   c. Applies to:
     i. Overturned cases;
     ii. Overturned rulings;
     iii. Subsequent changes in the law, and
     iv. Finding of new Constitutional rights.

D. Inapplicability of the Exclusionary Rule.

The exclusionary rule is inapplicable in the following proceedings:

1. Private searches where the evidence is turned over to the government by a non-government searcher;

2. Civil Proceedings;

3. Post-conviction sentencing;

4. Grand Jury investigations;

5. Impeachment proceedings.

6. Parole Revocation Hearings

---

**Pennsylvania Board of Probation and Parole v. Scott**, No. 97-581 (1998)

**Facts:** A condition of the defendant's parole was that he was to refrain from owning or possessing weapons. Parole officers believed he was violating this rule. The officers searched his home without a warrant and found firearms and bows and arrows. The State sought to revoke the defendant's parole. The defendant sought to suppress the evidence. The Hearing Examiner denied the motion. The Commonwealth Court reversed, which was affirmed by the State Supreme Court. The court held that, although normally the Fourth Amendment does not play a role in parole revocation hearings, it does in the instant case because the officers in control of the search was aware of the defendant's status as a parolee. The court reasoned that to hold otherwise would not deter officers from randomly searching parolled criminals at will.

**Held:** The Court concluded that the Exclusionary Rule does not bar the introduction of evidence seized in opposite of the Fourth Amendment at a parole revocation hearing. The Court noted that the Rule is judicial created and not applicable in every situation. The Court opined the social aspects of allowing a parole-end-out under restrictions outweighs any alternative. The Court also noted that there is a high percentage of repeat offenders among parolees. An officer in this situation need not be deterred.

E. Rationales for the Exclusionary Rule

The exclusionary rule:

1. Prevents violations of constitutional rights from their misconduct.

2. Deters misconduct by government personnel

3. Preserves the integrity of the judicial system.

4. Protects right to privacy.

5. Leads to greater training and professionalism in enforcement.

6. Protects Fourth Amendment Rights to be free from unreasonable searches and seizures to law and order.

F. Reasons Militating for the Elimination of the Rule

1. Guilty persons may be set free because of excess police enforcement.

2. The rule encourages police to commit perjury.

*E-Z Review for Criminal Procedure*

3. It diminishes overall respect for the justice system.
4. It does not punish the violator of the constitutional right. Rather, it punishes society by freeing guilty parties.
5. The United States is the only country which has this type of rule ("Fruits of the Poisonous Tree").
6. The Exclusionary Rule is not explicitly required by the Constitution.

G.  Alternatives

The following alternatives are offered instead of the exclusionary rule:

1. Allow evidence to come in but allow person to sue government in tort for violations.
2. Hold the individual officer who violates Constitutional rights accountable in tort or provide for disciplinary action.
3. Expand the Good Faith Doctrine, see supra.

Alternatives to the exclusionary rule, such as those listed above, have failed in the past to provide adequate safeguards for Fourth Amendment rights.